340 F.3d 497
 THE PEOPLE, Plaintiff and Respondent,
v.
CARL FRANKLIN HARRISON, Defendant and Appellant.
 IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
 
 FIFTH APPELLATE DISTRICT
 Filed 10/1/01
 (Super. Ct. No. 513578-5 & 410784-3)
 APPEAL from a judgment of the Superior Court of Fresno County. Lawrence J. O'Neill, Gene Gomes, Ralph Nunez, Harry N. Papadakis and Stephen J. Kane, Judges.
 
 
 1
 Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.
 
 
 2
 Bill Lockyer, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, Michael J. Weinberger, Thomas Y. Shigemoto and Tony L. Nunley, Deputy Attorney Generals, for Plaintiff and Respondent.
 
 
 3
 CERTIFIED FOR PARTIAL PUBLICATION*
 
 OPINION
 
 4
 On December 13, 1989, the first of several informations was filed in Fresno County Superior Court against appellant Carl Franklin Harrison. On November 2, 1994, a jury convicted him as follows:
 
 
 5
 * Count one: Penal Code[1] section 286, subdivision (c) (forcible sodomy with child under age 14 and more than 10 years younger than Harrison; victim Tony R.);
 
 
 6
 * Counts two through six: Section 288a, subdivision (c) (forcible oral copulation with child under age 14 and more than 10 years younger than Harrison; victim Tony R.);
 
 
 7
 * Counts seven and eight: Section 288a, subdivision (c) (victim Victor R.);
 
 
 8
 * Count nine: Section 286, subdivision (c) (victim Victor R.);
 
 
 9
 * Count ten: Section 288a, subdivision (c) (victim Jeffrey R.);
 
 
 10
 * Counts eleven and twelve: Section 288a, subdivision (c) (victim Andrea G.);
 
 
 11
 * Count thirteen: Section 288, subdivision (a) (lewd and lascivious act on child under age 14; victim Andrea G.);
 
 
 12
 * Count fourteen: Section 261, subdivision (2) [sic; subd. (a)(2)] (forcible rape; victim Janiva P.);
 
 
 13
 * Count sixteen: Section 242 (battery, a lesser included offense of 273.5 (infliction of corporal injury on cohabitant); victim Cynthia E.);
 
 
 14
 * Count seventeen: Section 207, subdivision (b) (kidnapping a child under age 14 for the purpose of committing a violation of 288; victim Sylvia G.);
 
 
 15
 * Counts eighteen through twenty-one and twenty-three: Section 288, subdivision (a) (victim Sylvia G.);
 
 
 16
 * Count twenty-two: Section 243.4 (sexual battery, a lesser included offense of 288, subd. (a); victim Sylvia G.).
 
 
 17
 With respect to counts one through fourteen, eighteen through twenty-one, and twenty-three, the jury also found true the special allegation that in committing the offenses, Harrison engaged in substantial sexual conduct with a child under age 14 ( 1203.066, subd. (a)(8)). The jury acquitted Harrison of count fifteen, which charged a violation of section 288, subdivision (b) (forcible lewd and lascivious act on child under age 14; victim Janiva P.) as an alternative to count fourteen.
 
 
 18
 Harrison was sentenced to a total unstayed term of 121 years in prison and ordered to pay a $4,000 fine. He filed a timely notice of appeal. He now raises numerous issues, all of which fall into one of three general categories: motions for substitution of appointed counsel, competency proceedings, and trial. For the reasons which follow, we will affirm the judgment in its entirety, with the exception that we will order vacated the vexatious litigant finding and order issued July 17, 1992.
 
 
 19
 FACTS*
 
 
 20
 The statement of facts is confined to the evidence adduced at trial concerning the criminal charges against Harrison. Other proceedings will be discussed where pertinent to the issues raised on appeal.
 
 
 21
 * Prosecution Evidence
 
 
 22
 Prior to April 1989, Harrison resided with Cynthia (Cindy) E. and her sons, Tony, Victor, and Jeffrey. All three boys were under the age of five. At first, the relationship was not abusive. In the summer of 1987, Harrison, Cindy, and the children moved to a house on the corner of Temperance and Ashlan. During this time, Harrison had Tony orally copulate him. In approximately March of 1988, the group moved to a residence on South Armstrong in Fresno. There, Harrison forced Tony, Victor, and Jeffrey to orally copulate him on numerous occasions. He also sodomized Tony and Victor. One time, he forced Tony to orally copulate him, then forcibly sodomized the child and made Tony suck the feces off his penis. Cindy was present during many of these events, but initially did not take the children and leave or report the abuse because she was afraid of Harrison, as he had previously beaten her and the children and threatened to kill them all. Finally, near the end of April 1989, Cindy and her sons managed to get away from the house on Armstrong with the help of Cindy's sister and two men.
 
 
 23
 During this same general time period, Harrison also sexually abused Andrea G., who was four or five years old. The abuse, which occurred on many occasions, took the form of fondling, digital penetration, oral copulation, sodomy, and intercourse. Andrea did not tell her mother because Harrison threatened to hit or do something bad to the mother. In addition, in July of 1989, Harrison raped Janiva P. after threatening to break her legs. At the time, Janiva was eight or nine years old. Shortly thereafter, Janiva reported the incident to Teresa Lopiccolo, Harrison's sister.
 
 
 24
 On August 4, 1989, Harrison asked Richard N. if he could take Richard's daughter, nine-year-old Rosie, and stepdaughter, ten-year-old Sylvia G., to a drive-in, along with several other girls. Permission was granted after Harrison gave Richard N. his driver's license. Harrison was to bring the girls back by midnight. When they had not returned by 1:30 a.m., the police were summoned. Harrison arrived with the girls while Jenny N., the girls' mother, was still talking to Officer Farmer. Sylvia seemed nervous, so Farmer said to see if anything happened. Jenny went inside to talk to Sylvia, who began crying and said that Harrison had touched her and made her do things to him, and that he had given her a $50 bill so she would not say anything. Sylvia also said Harrison had had a gun. Sylvia then went outside and reported the abuse to Farmer. Sylvia related that the acts consisted of oral copulation, intercourse, and digital penetration of her anus and vagina.
 
 
 25
 Harrison was arrested on the morning of August 5, 1989. A loaded handgun was seized from the cab of his pickup, and children's clothing was found in the bed of the truck. Possible seminal fluid and saliva were found on the undergarments Harrison was wearing. However, no semen was detected on components of Sylvia G.'s sexual assault evidence kit.
 
 II
 Defense Evidence
 
 26
 Harrison presented evidence that Janiva P. had told Alice Perez, a friend of Harrison's, that Harrison had not done anything to her. A medical examination of Andrea G., performed on April 17, 1990, revealed normal physical findings or, at most, findings that were nonspecific and, hence, not clearly indicative of sexual abuse. Similar results were obtained from the examinations of Janiva P., Tony R., Victor R., and Jeffrey R., which were also conducted a number of months after the incidents reportedly occurred. In addition, X-rays taken of Jeffrey did not confirm reported physical abuse. Sylvia G. was examined a few hours after reportedly being abused. Everything was either within normal limits or was nonspecific for sexual abuse. The results did not confirm the reported intercourse, nor was semen found on her body.
 
 
 27
 Harrison testified that Cindy E. physically and sexually abused her children, and that she told him someone named Carlos had sodomized Tony. Harrison admitted physically abusing the boys, but denied all sexual conduct. He also admitted engaging in mutual combat with Cindy. He testified that he saw Andrea G. and Janiva P. engage in sexually related activity with Cindy's boys on numerous occasions, and that the girls would sneak into the bedroom and watch while he and Cindy had sex. Harrison denied having any sexual contact with Sylvia, but had engaged in oral copulation with an adult the night before the reported molestation of Sylvia.
 
 
 28
 DISCUSSION*
 
 
 29
 * Marsden Issues
 
 A.Denial of 1991 and 1994 Marsden Motions
 
 30
 During the course of proceedings in superior court, Harrison had at least four different attorneys and submitted, orally or in writing, a minimum of 19 motions to substitute appointed counsel pursuant to People v. Marsden (1970) 2 Cal.3d 118 (Marsden). He now contends that two of these motions - one heard on May 22, 1991, by Judge Gomes, and the other heard on October 5, 1994, by Judge O'Neill - were erroneously denied because the court failed to read the written motions and to inquire of defense counsel.[2]
 
 
 31
 As the California Supreme Court has summarized,
 
 
 32
 "Marsden motions are subject to the following well-established rules. '"'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' [Citations.]"' (People v. Memro (1995) 11 Cal.4th 786, 857.) Denials of Marsden motions are reviewed under an abuse of discretion standard. (People v. Berryman (1993) 6 Cal.4th 1048, 1070.)[3] Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' (People v. Webster (1991) 54 Cal.3d 411, 435.)" (People v. Barnett (1998) 17 Cal.4th 1044, 1085, parallel citations omitted.)
 
 
 33
 With these principles in mind, we turn to the motions at issue.
 
 1.The motion heard by Judge Gomes
 
 34
 By the time of the motion with which we are concerned, Judge Gomes had presided over a number of hearings involving Harrison, and had twice found Harrison to be incompetent, once on July 23, 1990, and again on March 11, 1991. As to the latter occasion, criminal proceedings were reinstated, following a finding of restored competence, on April 15, 1991.
 
 
 35
 On May 7, 1991, Thomas J. Richardson, Harrison's defense attorney during all times pertinent to this appeal, requested an order shortening time in which to file various pretrial motions, including one to set aside the informations in case Nos. 410784-3 and 433352-2. Richardson averred that the motions had not been filed because he was involved in two other lengthy cases, and because he had had numerous personal problems, including the illnesses of his mother and grandmother. Judge Gomes granted the order shortening time that same day. Richardson filed, inter alia, a motion to set aside or dismiss the information in case No. 433352-2 on the grounds that Harrison was induced to waive his right to a preliminary hearing based on counsel's erroneous advice, which in turn was based on an erroneous interpretation of the state of the law.[4]
 
 
 36
 Also on May 7, Harrison filed a written motion to relieve Richardson as attorney of record and to appoint new counsel, on the grounds that Richardson had failed to provide effective assistance of counsel. Harrison asserted that Richardson had only been to see him once since he (Harrison) was transferred to the Acute Psychiatric Unit (APU); had a conflict of interest because Harrison currently was suing him for malpractice; had told Harrison his case was impossible to win; had so many personal problems and other clients that he had insufficient time adequately to prepare Harrison's case; had been reported by Harrison to the State Bar for appropriate action; had been overheard by Harrison having friendly conversations with the prosecutor and that Richardson's continuing personal friendship with the prosecutor was affecting his representation of Harrison; had repeatedly obtained continuances in order to be prepared and yet was still unprepared to proceed in this matter; and had incorrectly interpreted case law, causing Harrison to waive his preliminary hearing. Harrison also incorporated the grounds set forth in his malpractice action.
 
 
 37
 Judge Gomes heard the Marsden motion on May 22, 1991. He began by asking Harrison if there had been a previous Marsden motion with regard to Richardson. When Harrison replied affirmatively, Judge Gomes asked him to relate any new grounds that had arisen since the previous hearing. Harrison complained that his handcuffs were preventing him from getting into his legal work, and that he had been denied his legal work at APU. He claimed to have "two boxes sitting over there with stuff in it that has all the evidence against" Richardson, but that he had not been permitted to bring it. Judge Gomes responded that he was not asking Harrison to "present evidence that may be in a box somewhere," but to state the grounds for the motion to relieve counsel. When Harrison replied that the grounds were in the records at APU, Judge Gomes reiterated that he was not asking Harrison to present documents or evidence, but simply to state his grounds. Harrison said he could not get into detail, but could tell the court "a little bit about it."
 
 
 38
 Harrison proceeded to relate that Richardson had not investigated the case prior to the preliminary hearing, and that he (Harrison) was not being kept abreast of what was being done in the case. Harrison recounted that he had waived his right to a preliminary hearing based on Richardson's last-minute advice, and he felt he had been "quick-talk[ed]" into the waiver and "cheated" out of his preliminary hearing because Richardson was unprepared. This caused Harrison to lose confidence in Richardson, and "at that point everything just started going downhill." Harrison complained that he was being given the unfavorable reports of the prosecutor's evidence, but none of the favorable interviews with his witnesses. He contended that Rosie, a key defense witness, had not been investigated, even though she was present during certain of the alleged offenses and said that nothing happened. He also related that Richardson played golf or baseball with Duce Rice, the prosecutor in this case, and this made him leery of Richardson.
 
 
 39
 Judge Gomes then inquired of defense counsel, who explained that he had not been prepared to proceed with the preliminary hearing because he had spent an enormous amount of time attempting to have Harrison transferred from the jail to APU due to his mental condition. When the magistrate was reluctant to grant a continuance, the prosecutor proposed a waiver. The prosecutor informed Richardson that he would be conducting the preliminary hearing under the provisions of Proposition 115, and offered, in consideration of Harrison waiving the preliminary hearing, to add no new charges once the case reached superior court and to make no attempt to join Harrison's two cases. Richardson explained this to Harrison, who said he wanted to waive the hearing based on those factors. Richardson related that he had since filed a section 995 motion so that Harrison could have his preliminary hearing, and that the prosecutor would not oppose the motion and would seek an expedited calendar setting for the preliminary hearing. Richardson conveyed his belief that it was not in Harrison's best interests to proceed by way of section 995, because additional counts could be added and the prosecutor would almost certainly move to join the two cases, which would make a defense more difficult. Nevertheless, he was proceeding in that manner at Harrison's request. Richardson also related that he had explained to Harrison that he was friendly with a lot of judges and prosecutors, but that he was Harrison's advocate. Richardson denied that he played golf with Duce Rice, and confirmed that he did not let personal or professional relationships impact his handling of cases.
 
 
 40
 Judge Gomes then asked about Rosie. Richardson explained that the defense had been trying to talk to her "since day one. She refuses to talk to us. Her parents refuse to let us talk with her." Richardson related that he was attempting to obtain any confidential information that might exist through juvenile court, and that he was trying to get any information he could by whatever means were available. He further recounted that he had explained to Harrison that the defense could not force the child to be interviewed or compel the parents to allow it, but that he would have her subpoenaed and she would have to testify at trial. This followed:
 
 
 41
 "THE COURT: All right. Mr. Harrison, any other areas?
 
 
 42
 "THE DEFENDANT: Umm, well, I wasn't able to take notes or anything right now to go over what he had said right now. I can't even remember what the first thing he said was, because my hands - these new cuffs you got, you can't really move your hands.
 
 
 43
 "THE COURT: Uh-huh. Well, the cuffs are not a decision made by the Court, they're a decision made by the Sheriff.
 
 
 44
 "THE DEFENDANT: Well, I really can't work on my paperwork with them on.
 
 
 45
 "THE COURT: I'm not asking you for any paperwork.
 
 
 46
 "THE DEFENDANT: That's how I can defend my case properly.
 
 
 47
 "THE COURT: If there's a necessity for paperwork, I'll allow you plenty of opportunity and time to get your paperwork. I simply want to know whether there are any other areas you want to raise at this point. Areas, not evidence. Areas.
 
 
 48
 "Hearing none, I'll conclude the Marsden hearing.
 
 
 49
 "THE DEFENDANT: I didn't stop yet.
 
 
 50
 "THE COURT: No conflict of interest between the defendant and Mr. Richardson.
 
 
 51
 "THE DEFENDANT: I'm not done.
 
 
 52
 "THE COURT: The Court finds Mr. Harrison is - is continuing his harassment and dilatorious delay tactics -
 
 
 53
 "THE DEFENDANT: That's not true.
 
 
 54
 "THE COURT: - in opposing everything counsel says.
 
 
 55
 "THE DEFENDANT: I can prove that's not true.
 
 
 56
 "THE COURT: An example is he is blaming Mr. Richardson and the District Attorney and alleging collusion between them for withholding evidence because there is no investigation report regarding the statements of the witness Rosie, who apparently is a minor witness, and Mr. Richardson has satisfied the Court he is going through all available legal means to obtain an interview with the child witness prior to her subpoenaed testimony that's anticipated at trial.
 
 
 57
 "And there's certainly no collusion going on, no denial of rights being done by Mr. Richardson. Quite the contrary, he is expending extraordinary efforts to attempt to put your case together and defend you adequately and in a well and proper manner as an attorney.
 
 
 58
 "He has explained to you the legal reasoning. You insist on refusing to acknowledge or listen to him, just as the record will show you are refusing to acknowledge or listen to anything I'm saying at this time.
 
 
 59
 "The Court finds no conflict of interest. Marsden motion is denied. And the - I encourage you once again, as I have in the past, to cooperate fully with your attorney. He is doing a good and adequate job in preparing your case, but his preparation and ultimate success in the defense of your case will in a large part depend on your cooperation with him.
 
 
 60
 "You're the one that knows the facts that he needs to ferret out to prepare the defense. I encourage you to cooperate with him...."
 
 
 61
 The record amply supports Judge Gomes's ruling; denial of the Marsden motion was not an abuse of discretion. "Once the defendant is afforded an opportunity to state the reasons for discharging an appointed attorney, the decision to allow a substitution of attorney is within the discretion of the trial judge unless defendant has made a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation. [Citations.]" (People v. Crandell (1988) 46 Cal.3d 833, 859.) Here, Harrison made no such showing. Lack of communication does not necessarily establish inadequate representation, nor is a disagreement regarding tactics sufficient to compel discharge of appointed counsel unless it signals a complete breakdown in the attorney-client relationship. (Id. at pp. 859-860.) A trial court does not abuse its discretion by denying a request for substitution of attorneys where the only substantial conflict between the defendant and counsel is the defendant's refusal to cooperate in the preparation of a defense. (People v. Floyd (1970) 1 Cal.3d 694, 705, disapproved on other grounds in People v. Wheeler (1978) 22 Cal.3d 258, 287, fn. 36.) Likewise, where the record supports the conclusion that whatever breakdown occurred between the defendant and counsel was caused by the defendant's intransigence, the motion for substitution is properly denied. (People v. Lindsey (1978) 84 Cal.App.3d 851, 860.)
 
 
 62
 Harrison complains that Judge Gomes forced him to proceed without his "legal work," which was at APU. The record amply demonstrates he was able to relate the grounds for his dissatisfaction without whatever documents he had at APU, and that, had documentary evidence been necessary, Judge Gomes would have afforded him the opportunity to produce it.
 
 
 63
 Harrison also complains that his written motion contained separate allegations which triggered the court's duty to inquire into defense counsel's state of mind. In what can only be described as a leap of logic, Harrison concludes that no such inquiry was made because Judge Gomes had failed to read the written motion and refused to allow Harrison to obtain his legal materials.
 
 
 64
 We have already dealt with Harrison's purported lack of legal materials. As to the asserted duty to inquire, we can find no case in which the California Supreme Court has expressly held that such an obligation exists. For instance, in People v. Silva (1988) 45 Cal.3d 604, 621-622, the defendant claimed his attorney was incompetent and did not have his best interests at heart, failed to make certain motions, and had only seen him once. The trial court, apparently without inquiring of defense counsel, responded to each point the defendant made. In upholding denial of the motion for substitution of counsel, the Supreme Court said nothing about inquiring of the attorney.
 
 
 65
 This court has held that "inquiry into the attorney's state of mind is required only in those situations in which a satisfactory explanation for counsel's conduct or attitude toward his client is necessary in order to determine whether counsel can provide adequate representation." (People v. Penrod (1980) 112 Cal.App.3d 738, 747, italics added, fn. omitted.) On the record before us, we find no duty on the part of Judge Gomes to inquire further than he did. The May 7 motion was a self-contained document. It did not merely state vague general dissatisfaction, but instead contained specific allegations. Under such circumstances, a full-blown, formal Marsden hearing was not required. (People v. Horton (1995) 11 Cal.4th 1068, 1103; People v. Freeman (1994) 8 Cal.4th 450, 481; People v. Wharton (1991) 53 Cal.3d 522, 580; People v. Terrill (1979) 98 Cal.App.3d 291, 299.)
 
 
 66
 Moreover, we are not prepared to conclude Judge Gomes had failed to read the written motion. We will not presume error; instead, it must be affirmatively shown. (People v. Carpenter (1999) 21 Cal.4th 1016, 1046; People v. Wiley (1995) 9 Cal.4th 580, 592, fn. 7; Denham v. Superior Court (1970) 2 Cal.3d 557, 564; Boquilon v. Beckwith (1996) 49 Cal.App.4th 1697, 1719, fn. 23; People v. Connolly (1951) 103 Cal.App.2d 245, 248.) Any uncertainty in the record is resolved against the party asserting error. (People v. Green (1979) 95 Cal.App.3d 991, 1001.) We presume official duty has been regularly performed (Evid. Code, 664); where, as here, a trial court has a duty to perform a particular act, we will not assume, based on silence, that it did not do so (see, e.g., People v. Cruz (1960) 178 Cal.App.2d 83, 87 [trial court's failure specifically to mention particular ground for new trial motion]; People v. Heath (1955) 131 Cal.App.2d 172, 173-174 [trial court's failure to state it had read preliminary hearing transcript where case submitted thereon]). Here, if anything, the record shows Judge Gomes had read the May 7 motion, which claimed there was a conflict of interest by virtue of the fact Harrison had sued Richardson for malpractice. Judge Gomes expressly referenced the lawsuit in his remarks to Harrison and subsequently found no conflict of interest. As the California Supreme Court has explained,
 
 
 67
 "[T]he trial court properly determined, in the exercise of its discretion, that the filing of the complaint did not create any actual conflict of interest necessitating the withdrawal of appointed counsel. Although being named as a defendant in a collateral lawsuit by one's client may place an attorney in a situation in which his or her loyalties are divided [citation], a criminal defendant's decision to file such an action against appointed counsel does not require disqualification unless the circumstances demonstrate an actual conflict of interest. [Citation.] A contrary holding would enable an indigent criminal defendant to challenge each successive appointment of counsel, delaying indefinitely the criminal prosecution. [Citation.] The trial court's finding that the filing of the complaint represented yet another attempt by defendant to delay his trial and otherwise interfere with the criminal prosecution against him is supported amply by the record." (People v. Horton, supra, 11 Cal.4th at p. 1106; see Smith v. Lockhart (8th Cir. 1991) 923 F.2d 1314, 1321, fn. 11 ["We recognize the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys. [Citation.] A patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel"].)
 
 
 68
 We are unable to discern whether Harrison is also claiming error with respect to another written Marsden motion, which was dated March 2, 1991, but which is file-stamped March 15, 1995. That motion consisted of a form document with all boxes checked and no further declaration or specification of reasons. Across the top was written, "To judge jones." (Sic.) Harrison concludes Judge Gomes never saw this motion, given the date it was filed; however, this is sheer speculation and also requires the assumption that Harrison submitted the document to the court on or about the date he placed on it. In any event, Harrison was free to raise his March 2 allegations at the May 22 hearing, as there had been no intervening Marsden hearing and Judge Gomes invited him to relate what had arisen since the last hearing which concerned Richardson. "Marsden ... requires that the court afford a defendant an opportunity to state the reasons why he believes a court-appointed attorney should be discharged. [Citation.] The court extended that opportunity to defendant .... No more is required." (People v. Bean (1988) 46 Cal.3d 919, 947-948.) Assuming (which we do not) that Judge Gomes was unaware of the March 2 written motion, any error in failing to hold a separate hearing thereon was cured when Harrison was given the opportunity to state the grounds for the motion at the May 22 hearing. (See People v. Lloyd (1992) 4 Cal.App.4th 724, 731-732.)
 
 2.The motion heard by Judge O'Neill
 
 69
 Years passed. Harrison filed a number of Marsden motions against Richardson and, in 1992, was found to be incompetent. On April 6, 1994, criminal proceedings were reinstated following a finding of restored competence. Additional Marsden motions were forthcoming. Finally, on October 4, 1994, trial began before Judge O'Neill, who had previously presided over a competency hearing and been challenged for cause, unsuccessfully, by Harrison.
 
 
 70
 On October 4, after various pretrial issues had been discussed by the court and both counsel, Richardson informed the court that Harrison wished to file "yet another" Marsden motion against him. The court proceeded to clear the courtroom, then invited Harrison to state his grounds, "limited to anything that has happened or not happened since the last Marsden hearing." Harrison submitted a lengthy motion, which consisted of a Marsden form with all boxes checked, followed by an extensive chronicle of counsel's purported shortcomings, many of which consisted of alleged lack of investigation and instances of ineffective assistance of counsel. Attached were supporting exhibits.[5] Judge O'Neill continued the hearing until the following morning so he could read the documents.
 
 
 71
 At the outset of the continued hearing on October 5, Judge O'Neill stated he had now had a chance to review the materials. He agreed with defense counsel that some of the information was potentially inculpatory and should not be accessible to the prosecution; hence, he ordered the documents sealed. When he explained this to Harrison, Harrison proceeded to complain about defense counsel's in limine motions, including his purported failure to file a motion concerning Harrison's prior conviction. When Judge O'Neill pointed out that Richardson had indeed filed a motion to bifurcate, Harrison asserted that Richardson had not seen him in jail in six months, and that they had never discussed what they were going to do in the case. Harrison noted that they had differing concepts of how to proceed, as pointed out in the Marsden motion. Judge O'Neill reiterated that he had read the motion. Harrison asserted that Richardson did not want to raise the issue of police pressure on the mother of one of the victims, but Judge O'Neill observed that in fact, Richardson had argued that very issue the preceding day.
 
 
 72
 Judge O'Neill then asked Richardson to respond to the allegations. Richardson related that he had gone to the jail twice within the last few days to give Harrison copies of motions and discuss strategy with him. Prior to that, he delegated the duty of visiting Harrison to Sandy Glickman, his investigator. This was done in part due to Richardson's busy calendar, but also because Glickman got along better with Harrison than Richardson did. Richardson explained that Harrison was "totally uncooperative" with him, but seemed to be more receptive to information conveyed by Glickman. Richardson termed "nonsense" the allegation that he was not aggressively trying to advocate in Harrison's interest.
 
 
 73
 Richardson then raised two issues concerning which he thought his performance might be deemed deficient: his failure to file a timely affidavit to disqualify Judge O'Neill pursuant to Code of Civil Procedure section 170.1, and his failure to give timely notice pursuant to Evidence Code section 782. As to the first, Judge O'Neill explained that that was a risk Harrison took by filing his own motions; as to the second, that the issue needed to be handled in the prosecutor's presence. Harrison then brought up appellate proceedings concerning the finding of restored competence, and alleged that Richardson's incompetence in that regard had caused him wrongfully to be sent to the state hospital at Atascadero for over a year. Judge O'Neill eventually asked him to stay on the issue, assuring him, "I really honestly have read all of the documents," including Harrison's malpractice action. The judge stated, "I have read it all, because I took it home last night and I read it."
 
 
 74
 Harrison then stated he had filed a motion asking to be permitted to act as cocounsel in the case. He acknowledged that he was not seeking to represent himself, but claimed he was allowed both to have an attorney and freedom of speech. Richardson responded that he had researched the issue, including his ethical responsibilities, and that Harrison wanted him to do and say things that were unethical, not based in fact, inadmissible, or otherwise improper. Richardson refused to do that or to work as Harrison's assistant. Richardson affirmed that he would continue to try to work with Harrison and to do his best to represent him, but he refused to take a subservient position unless the court ordered him to do so. In Richardson's view, he, as the attorney, had "the right to run the ship." This ensued:
 
 
 75
 "THE COURT: All right. I think I have been generous in the amount of time allotted.
 
 
 76
 "THE DEFENDANT: Your Honor, I still have a number of issues to go over here. I haven't even started with the issues.
 
 
 77
 "THE COURT: Yes, you have, and you submitted all of this documentation which I read. And this isn't - this isn't a two week Marsden motion. This is -
 
 
 78
 "THE DEFENDANT: I know, Your Honor, but there's evidence that has to be brought into a Marsden that's necessary.
 
 
 79
 "THE COURT: You are not getting to the point, you are rambling. You are rambling factually[,] you're rambling on legal issues, you're not staying within the confines of Marsden. You're either going to have to get to the point or it's over.
 
 
 80
 "THE DEFENDANT: Okay. Well, let's get to the point to the motions then ....
 
 
 81
 "The attorney filed this motion to present testimony out of order of Dr. Underwager.... This doctor in every case that he's ever done in his life he is constantly in the courtroom to watch the accusers, to what the ... the way they react in the courtroom, to checkout their past, he's filed a motion to have this guy come in at a time when - when - well, on October - it says October 17th out of order. It's a motion in limine to present testimony.
 
 
 82
 "THE COURT: You are talking about motions in limine?
 
 
 83
 "THE DEFENDANT: Yeah.
 
 
 84
 "THE COURT: We haven't even got to some of those motions in limine. I'm not going to allow you to go motion by motion and tell me how you disagree with his analysis and tactics.
 
 
 85
 "THE DEFENDANT: It is not tactics. This - the doctor is supposed - there's another lady that even contacted him with Underwager.
 
 
 86
 "THE COURT: You are arguing the merits of the motion, a motion that we have not even gotten to yet. Now, that's -
 
 
 87
 "THE DEFENDANT: It is in my hands, Your Honor, that's good enough for me. He is going to argue it. And if he tells me that's what he's going to do then that's grounds to me to argue.
 
 
 88
 "THE COURT: Based on what I'm hearing, and based on what I have read, and based on what is before me, Mr. Harrison, you're arguing the facts of the case, you're arguing evidence, you are arguing strategy, you are arguing trial tactics, you are arguing which witnesses to call and when and when they should be in the courtroom.
 
 
 89
 "THE DEFENDANT: Not the witnesses, the experts -
 
 
 90
 "THE COURT: Just a minute.
 
 
 91
 "THE DEFENDANT: - that are supposed to be called.
 
 
 92
 "THE COURT: You are talking about settlements of the plea bargain in your motion that's before me, you are arguing the law which - most of which is inaccurate as you argue it. You are arguing findings at the preliminary examination, and you're arguing a lot of things that are not new arguments since the last Marsden motion. You are arguing matters that are not within the Marsden hearing and have never been considered by any court of appeal to be proper matters within Marsden. All of which I have before me, all of which I've heard, and as a result of that, disagreements over trial tactics and strategy, including which witnesses to call, that is not sufficient for a granting of a Marsden motion....
 
 
 93
 "You have indicated you have a lack of confidence in your attorney, you have not given legitimate reasons, factual or legal....
 
 
 94
 "You're indicating that you're not relating well to your attorney. It appears to me it is as though it's a lack of cooperation from you. You have certain ideas how things should be run, and Mr. Richardson, who is a very experienced lawyer and is fighting very hard for you, disagrees, and it's his responsibility ultimately to do what he needs to do factually, legally and ethically....
 
 
 95
 "You're indicating minimal contacts between you and your attorney, particularly at the jail. It sounds to me as though if you would meet with him and confer with him instead of arguing with him all the time on matters such as the ones that you've raised in these documents ..., and relate with him concerning how to proceed with the trial and ultimately rely on his expertise and knowledge you would be well served. You have met with his investigator, and that is at the direction of your attorney to try to help you to try to defend you. But the minimal contacts you're describing they are not sufficient ....
 
 
 96
 "You are indicating you have no trust in Mr. Richardson. You don't get along. That's not enough based on what I'm hearing....
 
 
 97
 "You are indicating that, or at least Mr. Richardson is indicating, that you're really not cooperative. And you can't not be cooperative and then - you can't be uncooperative and then come in and say that things aren't working out....
 
 
 98
 "And for all of these reasons the Marsden motion is denied."
 
 
 99
 Harrison insists "it is clear either that the trial court had not read Mr. Harrison's Marsden motions, including the one received on October 4, 1994, or that - if it had read the motion - it had elected not to pursue its allegations." (Italics omitted.) Harrison refers to motions, yet his claim of error is limited (aside from the hearing by Judge Gomes which is discussed ante) to the trial court's denial of his October 4, 1994, motion. Accordingly, our discussion is also so limited.
 
 
 100
 We categorically reject, as being wholly unsupported by even the most cursory reading of the reporter's transcript, any attempt to suggest Judge O'Neill had not read the October 4 motion. On October 4, he continued the Marsden hearing specifically so that he could read the written motion and documentation submitted by Harrison. At the very outset of the continued hearing on October 5, he announced twice that he had now had a chance to review all of the material. By our count, during the course of the hearing, Judge O'Neill expressly stated on six separate occasions that he had read the materials Harrison submitted. Moreover, some of the references in his ruling, such as to Harrison's arguing findings made at the preliminary hearing, clearly imply awareness of the written motion's contents. To now assert it is "clear" the court had not read the motion is simply not supported by the record.
 
 
 101
 We have set out the applicable law, ante, and find no abuse of discretion or breach of duty on Judge O'Neill's part. The right of a defendant to state his or her reasons for requesting a change of attorneys (Marsden, supra, 2 Cal.3d at p. 123) is not a license to take over the courtroom. Judge O'Neill's conduct here "did not amount to denying defendant an opportunity to enumerate specific examples of inadequate representation" (People v. Avalos (1984) 37 Cal.3d 216, 231), nor did the judge fail to conduct an adequate inquiry (cf. People v. Penrod, supra, 112 Cal.App.3d at p. 747). Judge O'Neill was not required to ask about each and every allegation put forth by Harrison. With respect to allegations about Richardson's purported failure to locate witnesses and conduct investigation, it was apparent from the written motion that much of the "evidence" Harrison claimed should be investigated or presented was irrelevant or inadmissible. Under the circumstances, Harrison was sufficiently permitted to present his allegations, and Judge O'Neill conducted an adequate inquiry. In fact, he showed admirable patience with Harrison during the hearing. There was no error.
 
 B.Vexatious Litigant Finding
 
 102
 On June 19, 1992, Harrison was found to be incompetent in case Nos. 410784-3 and 433352-2, and conservatorship proceedings were instituted. Harrison subsequently submitted a petition for writ of habeas corpus in case No. 410784-3, as well as a "DEMAND FOR HEARING on issues of Wel. Inst. Code 5008 and 5350." (Sic.) On July 17, 1992, Judge Nunez issued the following order in case No. 410784-3, entitled "ORDER PROHIBITING FURTHER FILINGS IN PROPRIA PERSONA":
 
 
 103
 "Having read and considered the numerous motions, petitions, and other documents submitted in propria persona by Carl Harrison plus relevant court documents on file in this and related matters, the Court finds that the defendant is represented by an attorney of record, defendant's actions have become vexatious within the meaning of section 391 of the Code of Civil Procedure, and defendant currently is not qualified to represent himself.
 
 
 104
 "IT IS THEREFORE ORDERED that the County Clerk shall not accept any further documents for filing submitted in propria persona by Carl Harrison unless leave has first been obtained from the Presiding Judge of this Court."
 
 
 105
 The order was filed on July 20, 1992. Insofar as the record shows, it was issued on the court's own motion, without prior notice to the parties or hearing. Thereafter, Harrison continued to submit various documents and motions (including pursuant to People v. Marsden (1970) 2 Cal.3d 118 [Marsden]), some of which took the form of letters written to specific judges, and others which were stamped "received" instead of "filed." Some appear in the clerk's transcript on appeal without any stamp, while others appear in the correct chronological order for the date placed on the motion by Harrison, but are file-stamped March 15, 1995, after he was sentenced. Harrison withdrew two Marsden motions, dated February 11 and March 6, 1994, on March 10, 1994, during his hearing on restored competence.
 
 
 106
 Harrison now contends Judge Nunez exceeded his statutory authority by issuing a "vexatious litigant" order in a criminal case, and that the error requires reversal because it had the effect of precluding consideration of any of Harrison's Marsden motions that were submitted between the date of the order and the motion of October 4, 1994. We agree there was error, but conclude reversal of the judgment is not required.[6]
 
 
 107
 The vexatious litigant statutes (Code Civ. Proc., 391 et seq.) were first codified in 1963. (Camerado Ins. Agency, Inc. v. Superior Court (1993) 12 Cal.App.4th 838, 841; Stats. 1963, ch. 1471, 1, p. 3038.) These statutes, which are constitutional (In re Whitaker (1992) 6 Cal.App.4th 54, 56), "were enacted to require a person found to be a vexatious litigant to put up security for the reasonable expenses of a defendant who becomes the target of an obsessive and persistent litigant whose conduct can cause serious financial results to the unfortunate object of his or her attack. The purpose of the statutory scheme is to deal with the problem created by the persistent and obsessive litigant who has constantly pending a number of groundless actions, often against the judges and other court officers who decide or were concerned in the decision of previous actions adversely to him. [Citation.]" (Childs v. PaineWebber Incorporated (1994) 29 Cal.App.4th 982, 992.)
 
 
 108
 The vexatious litigant scheme recently was synopsized in McColm v. Westwood Park Assn. (1998) 62 Cal.App.4th 1211, 1215-1216:
 
 
 109
 "The vexatious litigant statute authorizes a 'defendant' to bring a motion to require a 'plaintiff' to furnish security. Defendant must prove that the plaintiff is a 'vexatious litigant' and that there is no reasonable probability that plaintiff will prevail in the litigation. ([Code Civ. Proc.,] 391.1.) The statute contemplates a hearing to determine whether the plaintiff qualifies as 'vexatious' ([Code Civ. Proc.,] 391.2) and instructs the court to require security if it finds plaintiff has no reasonable probability of prevailing. Security is 'for the benefit of the moving defendant' and in 'such amount and within such time as the court shall fix.' ([Code Civ. Proc.,] 391.3.) If security is not furnished as ordered, the 'litigation' shall be dismissed as to the 'defendant for whose benefit it was ordered furnished.' ([Code Civ. Proc.,] 391.4.) .... [] ... []
 
 
 110
 "Section 391.7, added in 1990 (Stats. 1990, ch. 621, 3, pp. 3072-3073), furnished the courts an additional resource for addressing vexatious litigant problems. This newer section operates beyond the pending case and affects the litigant's future filings. It authorizes a court to 'enter a prefiling order which prohibits a vexatious litigant from filing any new litigation in the courts of this state in propria persona without first obtaining leave of the presiding judge of the court where the litigation is proposed to be filed.' ([Code Civ. Proc.,] 391.7, subd. (a).)
 
 
 111
 "When a prefiling order is in force, '[t]he presiding judge shall permit the filing of such litigation only if it appears that the litigation has merit and has not been filed for the purposes of harassment or delay. The presiding judge may condition the filing of the litigation upon the furnishing of security for the benefit of the defendants ....' ([Code Civ. Proc.,] 391.7, subd. (b).) If the clerk mistakenly files any litigation presented by a litigant who is subject to a prefiling order, the litigant may be required to seek the presiding judge's permission to proceed. ([Code Civ. Proc.,] 391.7, subd. (c).) The clerk of any court issuing a prefiling order is to provide a copy of such order to the Judicial Council, which maintains and disseminates annually a list of persons subject to such orders. ([Code Civ. Proc.,] 391.7, subd. (d).)" (Fns. omitted.)
 
 
 112
 In the case at bench, it appears Judge Nunez was attempting to issue a prefiling order, as contemplated by Code of Civil Procedure section 391.7. Before there can be a prefiling order, however, there must be a "vexatious litigant" within the contemplation of the code.[7] While a court may enter a prefiling order on its own motion, the statutes do not appear to envision that a court may, on its own motion, find a plaintiff to be a vexatious litigant in the first instance. Insofar as the record shows, and assuming Harrison could qualify as a "plaintiff" within the meaning of the statutes,[8] no "defendant" made an appropriate motion,[9] and no hearing was held. Accordingly, the order was procedurally defective.
 
 
 113
 There is an even more basic flaw. The vexatious litigant statutes apply to "litigation," which is expressly defined as "any civil action or proceeding, commenced, maintained or pending in any state or federal court." (Code Civ. Proc., 391, subd. (a), italics added.) The Legislature long ago drew a distinction between civil and criminal actions (Code Civ. Proc., 24), and it gave them mutually exclusive statutory definitions ( 683; Code Civ. Proc., 30-31; In re Bittaker (1997) 55 Cal.App.4th 1004, 1009). By expressly limiting the definition of "litigation," for purposes of the vexatious litigant statutes, to "any civil action or proceeding," the Legislature excluded criminal cases from the ambit of Code of Civil Procedure section 391 et seq. Thus, the vexatious litigant statutes may properly be employed only in civil cases. (See McColm v. Westwood Park Assn., supra, 62 Cal.App.4th at pp. 1216, 1219; In re Bittaker, supra, 55 Cal.App.4th at p. 1009; Childs v. PaineWebber Incorporated, supra, 29 Cal.App.4th at p. 992; Camerado Ins. Agency, Inc. v. Superior Court, supra, 12 Cal.App.4th at pp. 843-844.) They may not be used in criminal cases. (See In re Bittaker, supra, 55 Cal.App.4th at pp. 1009-1012 [Code Civ. Proc., 391 et seq. inapplicable to petitions for writ of habeas corpus].)
 
 
 114
 The People contend the vexatious litigant statutes are made applicable by section 9, of the Penal Code, and ask how else Harrison can attempt to enforce the provisions of Code of Civil Procedure section 170 et seq. Section 9 provides: "The omission to specify or affirm in this Code any liability to damages, penalty, forfeiture, or other remedy imposed by law and allowed to be recovered or enforced in any civil action or proceeding, for any act or omission declared punishable herein, does not affect any right to recover or enforce the same." This section simply means that "the failure to specify civil remedies in the Penal Code does not affect the availability of such remedies." (Heritage Cablevision of Cal., Inc. v. Pusateri (1995) 38 Cal.App.4th 517, 522.) In other words, an act may be both a crime and a tort; the wrongdoer may be both convicted of the crime and held liable civilly for the tort; and the failure to specify a penalty for the crime does not affect the right to recover civilly for the tort. (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, 4, p. 15.) Section 9 does not make the vexatious litigant statutes applicable to criminal proceedings. As for Code of Civil Procedure section 170 et seq., nothing in the language of those statutes expressly limits them to a particular type of action. In fact, Code of Civil Procedure section 170.5, subdivision (f) broadly defines "proceeding" as "the action, case, cause, motion, or special proceeding to be tried or heard by the judge," while Code of Civil Procedure section 170.6, subdivision (1) refers to a disqualified judge trying "any civil or criminal action or special proceeding of any kind or character ...." (Italics added.) Clearly, the disqualification statutes are not analogous to the vexatious litigant provisions.
 
 
 115
 We do not mean to suggest a court is required to accept each and every motion presented by a defendant in a criminal case who is represented by counsel. To the contrary, "a party who is represented by counsel has no right to be heard personally [citation]...." (In re Cathey (1961) 55 Cal.2d 679, 684; see also People v. Merkouris (1956) 46 Cal.2d 540, 554-555.) A trial court may, in its discretion and upon a showing of good cause, permit a party who is represented by counsel to participate in conducting the case, but it should not do so unless it determines "that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (People v. Mattson (1959) 51 Cal.2d 777, 797.) Where the party is not permitted personally to participate in conducting the case, pro se filings by that party may be returned unfiled (People v. Clark (1992) 3 Cal.4th 41, 173) or, if filed, stricken (People v. Mattson, supra, 51 Cal.2d at p. 798).
 
 
 116
 There is, however, one exception to the rule that motions of parties represented by counsel must be filed by such counsel: courts must "accept and consider pro se motions regarding representation, including requests for new counsel. (Cf. People v. Marsden, supra, 2 Cal.3d 118.) Such motions must be clearly labeled as such, and must be limited to matters concerning representation. [Courts] will not consider extraneous matters even in such documents unless submitted by counsel." (People v. Clark, supra, 3 Cal.4th at p. 173.)
 
 
 117
 In the present case, then, the court had the authority to refuse to file or consider pro se motions and other documents presented by Harrison which related to the conduct of the case (for example, motions to dismiss), albeit not by way of Code of Civil Procedure section 391 et seq. The court did not, however, have the power to prohibit Harrison from submitting Marsden motions, nor was it free to ignore those motions once they were presented. Any order to the parties and/or clerk's office should have made clear the exception.
 
 
 118
 Citing People v. Hale (1988) 44 Cal.3d 531, 541 ("once a doubt has arisen as to the competence of the defendant to stand trial, the trial court has no jurisdiction to proceed with the case against the defendant without first determining his competence"), the People question whether the court had jurisdiction to resolve any issue other than competency, since, at the time the order in question was issued, Harrison had been declared incompetent and had not yet been restored to competence. It is unclear whether the People are suggesting the court lacked jurisdiction to issue a vexatious litigant finding, or that it lacked jurisdiction to proceed on Harrison's requests to substitute counsel. If the former, any lack of jurisdiction is immaterial since the order was erroneous in any event. If the latter, we disagree: the California Supreme Court has made it clear that "while the trial court may not 'proceed with the case against the defendant' before it determines his competence in a section 1368 hearing [citation], it may and indeed must promptly consider a motion for substitution of counsel when the right to effective assistance 'would be substantially impaired' if his request were ignored. [Citation.]" (People v. Stankewitz (1990) 51 Cal.3d 72, 88.) Thus, the fact Harrison had been declared incompetent did mean the court was entitled to ignore Harrison's Marsden motions. (Ibid.)
 
 
 119
 As Harrison points out, the record on appeal contains Marsden motions which appear to have been submitted prior to October 4, 1994, and yet were not acted upon. Moreover, Harrison mentioned to the court on at least two occasions (to Judge Kane on March 10, 1994, and to Judge O'Neill on July 18, 1994) that his papers were not being accepted for filing. From this, Harrison concludes he is entitled to a reversal because the trial court failed to comply with the requirements of Marsden, supra, 2 Cal.3d 118.
 
 
 120
 To the extent any Marsden motions were not filed because of Judge Nunez's prefiling order, Harrison was not precluded from presenting those motions to the court. There is nothing in the record to indicate Harrison attempted to comply with the order's requirement that he obtain the presiding judge's permission to have the documents filed. More importantly, and regardless of whether the motions were not heard because they were not filed or because Harrison had been declared incompetent, we find no cause for reversal because of what took place in a hearing conducted by Judge O'Neill on July 18, 1994:
 
 
 121
 "THE COURT: Listen to me, Mr. Harrison. If there is that issue, which you still wish to raise, just prepare your Marsden motion, send it to me, I will make sure it is in the file at the time of the hearing on these motions and it will be heard at the same time. [] ... []
 
 
 122
 "THE COURT: All I am telling you, if you want a Marsden hearing you send it to me, I'll make sure it is in the file. And on August 17th at the same time that all of your other motions are heard we will hear that one." (Italics added.)
 
 
 123
 Harrison has not shown that any of his concerns with counsel were so pressing that he was prejudiced because they were not heard immediately, that he could not have resubmitted his motions prior to the August 17 hearing,[10] or that he was unable to submit further complaints about counsel to Judge O'Neill. Some of his complaints, being exceedingly repetitious, were in fact ruled upon in later hearings. To the extent any earlier complaints were not heard, any error was cured by Harrison's failure to raise them at the hearings on his subsequent motions. (See People v. Lloyd (1992) 4 Cal.App.4th 724, 731-732.)
 
 
 124
 II*
 
 Competence Issues
 
 125
 A.Failure to Make a Timely Motion to Dismiss Charges
 
 
 126
 Harrison was found incompetent several times during the course of proceedings. On June 19, 1992, following a trial on the issue, Judge Quaschnick issued written factual findings in which he found that Harrison suffered from Dissociative Disorder (Multiple Personality Disorder); had several separate and distinct personalities, one of whom was afflicted with paranoid schizophrenia and was unwilling and unable to assist counsel in preparation for trial; had no control over the personalities; and quickly switched from one to another, making him unable to assist counsel since one of the personalities was actively working against Richardson. Judge Quaschnick found, by a preponderance of the evidence, that Harrison was incompetent; that there was no substantial likelihood competence would be restored within the foreseeable future; and that the evidence established competency would not be regained for at least 10 years and probably never. Judge Quaschnick further found, beyond a reasonable doubt, that Harrison was gravely disabled, had a dangerous mental condition, and represented a substantial danger. Based on the foregoing, Judge Quaschnick ordered Harrison deemed incompetent pursuant to sections 1368-1370, found him gravely disabled within the meaning of Welfare and Institutions Code section 5008, subdivision (h)(1)(B), and ordered initiation of conservatorship proceedings pursuant to Welfare and Institutions Code section 5350 et seq.
 
 
 127
 Judge Quaschnick subsequently referred the matter to the public guardian's office for investigation and report pursuant to Welfare and Institutions Code section 5008, subdivision (h)(1)(B), and continued the matter for hearing on a "Murphy" conservatorship. On July 30, Judge Quaschnick committed Harrison to a secure, long-term, locked mental health facility operated by the State of California and ordered the public guardian to institute a "Murphy" conservatorship.
 
 
 128
 Harrison apparently was sent to Atascadero State Hospital, where he remained until August 1993. On August 13, 1993, Harrison was back in court, the conservatorship proceedings evidently having been withdrawn. While the authorities at Atascadero claimed Harrison was competent, Richardson continued to assert he was not and never would be. During the August 13 hearing before Judge Gomes, Harrison argued that under Jackson v. Indiana (1972) 406 U.S. 715, he could no longer be prosecuted.[11] Harrison reiterated this claim at the continued hearing on August 20, 1993.
 
 
 129
 During the August 20 hearing, Richardson responded to Harrison's assertion that prosecution was barred by the so-called "three-year rule" by requesting that a motions date be set. The court assigned a date of September 22, 1993. Various continuances were had, and Richardson did not actually move to dismiss charges until December 8, 1993.
 
 
 130
 Harrison now contends Richardson's performance was deficient, since it is reasonably probable a motion to dismiss would have been granted had it been brought shortly after Judge Quaschnick issued his findings. Had the motion been successful, Harrison claims, he would have continued as a conservatee solely pursuant to Welfare and Institutions Code section 5008. He seeks reversal of the judgment so that conservatorship proceedings can be reinitiated.[12]
 
 
 131
 The burden of proving ineffective assistance of counsel is on the defendant. (People v. Pope (1979) 23 Cal.3d 412, 425.)
 
 
 132
 "Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. (Strickland v. Washington (1984) 466 U.S. 668, 687, 694; In re Wilson (1992) 3 Cal.4th 945, 950.) A 'reasonable probability' is one that is enough to undermine confidence in the outcome. (Strickland v. Washington, supra, 466 U.S. at p. 694; In re Jones (1996) 13 Cal.4th 552, 561.)" (People v. Dennis (1998) 17 Cal.4th 468, 540-541, parallel citations omitted.)
 
 
 133
 "If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (People v. Kipp (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on direct appeal, competency is presumed unless the record affirmatively excludes a rational basis for the trial attorney's choice. [Citations.]" (People v. Musselwhite (1998) 17 Cal.4th 1216, 1260.)
 
 
 134
 In order for a defendant to prevail where counsel's alleged shortcoming consists of the failure to make a particular motion (or, as here, a request), the defendant must show that reasonably competent counsel would have made the motion; that such motion would have been successful; and that had the motion been granted, an outcome more favorable to the defendant was reasonably probable. (People v. Grant (1988) 45 Cal.3d 829, 864-865; People v. Gonzalez (1998) 64 Cal.App.4th 432, 437-438; cf. Kimmelman v. Morrison (1986) 477 U.S. 365, 375; People v. Davenport (1995) 11 Cal.4th 1171, 1236; People v. Mattson (1990) 50 Cal.3d 826, 876; Mu'Min v. Pruett (4th Cir. 1997) 125 F.3d 192, 199; James v. Borg (9th Cir. 1994) 24 F.3d 20, 27.)
 
 
 135
 Section 1370 originally provided that a defendant who was found not competent to stand trial could be committed to a state mental facility until "becoming sane." (See Historical and Statutory Notes, 51A West's Ann. Pen. Code (2000) foll. 1370, p. 69.) In 1972, however, the United States Supreme Court struck down, on due process and equal protection grounds, Indiana's similarly open-ended law.
 
 
 136
 Jackson v. Indiana, supra, 406 U.S. 715 presented a situation in which Jackson, a defendant in a criminal case, was found incompetent to stand trial. His prognosis for regaining competence was "'dim.'" Pursuant to the Indiana statute, which required confinement in a psychiatric institution until restoration of "sanity," the trial court committed Jackson to the Department of Mental Health until he was certified sane. (Id. at pp. 717-719 & fn. 1.)
 
 
 137
 The Supreme Court compared the terms of the competency commitment with commitment of an individual as feeble-minded or mentally ill and determined that, under the latter two statutes, Jackson might be eligible for release within a short time, even if he did not improve. By the terms of Jackson's commitment for incompetence, on the other hand, he would not be entitled to release at all, absent an unlikely substantial improvement in his condition. (Jackson v. Indiana, supra, 406 U.S. at pp. 728-729.) Accordingly, the high court held "that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by [the statutes addressing commitment as feeble-minded or as mentally ill], Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment." (Id. at p. 730, fn. omitted.)
 
 
 138
 The court then turned to the question of due process. In this regard, it concluded:
 
 
 139
 "We hold ... that a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely like any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal." (Jackson v. Indiana, supra, 406 U.S. at p. 738, fn. omitted.)
 
 
 140
 The California Supreme Court's pronouncement on the subject came the following year. In In re Davis (1973) 8 Cal.3d 798, 801, the court "adopt[ed] the rule of the Jackson case that no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future. Unless such a showing of probable recovery is made within this period, defendant must either be released or recommitted under alternative commitment procedures." The court "accept[ed] Jackson's premise that due process demands that the duration of commitments to state hospitals must bear some reasonable relation to the purpose which originally justified the commitment." (In re Davis, supra, 8 Cal.3d at p. 805.) It concluded:
 
 
 141
 "[W]e think that in order to comply with Jackson's demands the trial courts should henceforth direct the appropriate state hospital authorities to commence an immediate examination of the person committed and, within a reasonable time, report to the court the result of that examination and estimate the additional time probably necessary to restore the person to competence....
 
 
 142
 "If the report discloses that there exists no reasonable likelihood that the person will recover his competence to stand trial in the foreseeable future, then the court should either order him released from confinement or initiate appropriate alternative commitment proceedings under the Lanterman-Petris-Short Act (Welf. & Inst. Code, 5000 et seq.). On the other hand, if the report is optimistic regarding the person's probable recovery, the court should continue his commitment and require the hospital authorities to furnish, within a reasonable time, additional periodic reports regarding the person's progress. The trial court necessarily must exercise sound discretion in deciding whether, in a particular case, sufficient progress is being made to justify continued commitment pending trial. To guide its discretion, the trial court should consider, among other things, the nature of the offense charged, the likely penalty or range of punishment for the offense, and the length of time the person has already been confined." (Id. at pp. 806-807, fns. omitted.)
 
 
 143
 In response, the Legislature added a three-year limit to section 1370 in 1974, when it passed Assembly Bill No. 1529. The purpose of this legislation, which was authored by Assemblyperson Frank Murphy, was to bring the procedure for the commitment of mentally incompetent defendants into accord with the Davis decision. (In re Polk (1999) 71 Cal.App.4th 1230, 1235.) As explained in Polk,
 
 
 144
 "At the time In re Davis was decided, the Lanterman-Petris-Short (LPS) Act did not contain any specific provisions for commitment of a criminal defendant who was found incompetent to stand trial. It provided short-term commitment for a person dangerous to himself or others or long-term commitment for a gravely disabled person who was unable to feed, clothe or house himself. [Citation.] 'To resolve this problem, and to otherwise bring California's incompetency commitment procedure into conformity with the Jackson-Davis guidelines, the Legislature passed Assembly Bill No. 1529.' [Citation.]
 
 
 145
 "Assembly Bill No. 1529 amended both the procedure for the commitment of mentally incompetent criminal defendants in the Penal Code and the scope of long-term commitments under the LPS Act in the Welfare and Institutions Code. The procedure the superior court is to follow after a criminal defendant has been found incompetent to stand trial is set forth in section 1370. [Citation.] The court is to suspend the criminal proceedings until the defendant becomes mentally competent and, in the meantime, is to commit the defendant to a state hospital or other facility for treatment for restoration to mental competence. [Citation.] Within 90 days of the commitment, the director of the treatment facility must make a written report to the court concerning the defendant's progress. [Citation.] If the defendant has not regained his mental competence, but there is a substantial likelihood he will do so in the foreseeable future, he is to remain at the facility. Thereafter, at six-month intervals or until the defendant becomes mentally competent, the director of the treatment facility must continue to make written reports to the court concerning the defendant's progress. If a report indicates there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future, he must be returned from the treatment facility. [Citation.] If the defendant remains in a treatment facility for 18 months, the court must order him returned for a second hearing on his mental competence. [Citation.] At the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment for the most serious charge, whichever is shorter, the defendant must be returned from the treatment facility. [Citation.] When the defendant is returned following a report that there is no substantial likelihood of recovery of mental competence or following the maximum term of commitment, the court is to order conservatorship proceedings under the LPS Act. [Citation.]
 
 
 146
 "Assembly Bill No. 1529 created the 'Murphy' conservatorship (named after the bill's author) by amending the definition of 'gravely disabled' in the LPS Act to include persons who have been found mentally incompetent and are charged with a violent felony. [Citations.] Under another provision of the bill, the conservator must notify the trial court, the district attorney, and defense counsel when the defendant recovers his mental competence; and the court in turn must order the sheriff to return the defendant immediately to the court in which the criminal charges are pending. [Citation.]" (In re Polk, supra, 71 Cal.App.4th at pp. 1236-1238; see also Conservatorship of Hofferber (1980) 28 Cal.3d 161, 167-170; Hale v. Superior Court (1975) 15 Cal.3d 221, 223-227.)[13]
 
 
 147
 Given the charges facing Harrison, the maximum potential confinement time in the present case was three years ( 1370, subd. (c)(1)), which limit, insofar as the record shows, had not yet been reached. (See In re Polk, supra, 71 Cal.App.4th at p. 1238 [interpreting 1370, subd. (c)(1) as referring to aggregate of all commitments for incompetency regarding same criminal charges].) Although "[t]he criminal action remain[ed] subject to dismissal pursuant to Section 1385" ( 1370, subd. (d)), we know of no authority which would have required that such a motion be granted in 1992. "The current California scheme ... provid[es] that confinement under the Penal Code shall cease once there is no substantial likelihood of restoration to competence, with a maximum confinement of three years. [Citation.] The assumption is that three years is a reasonable time to reach a prognosis; persons not restored to competence by that time are, in effect, treated as permanently incompetent." (Conservatorship of Hofferber, supra, 28 Cal.3d at p. 174, fn. 11.)
 
 
 148
 Harrison points to Judge Quaschnick's finding that he would not be restored to competence for 10 years, if ever. However, it is questionable whether this finding was properly made when it was, as the question before Judge Quaschnick was Harrison's mental competence as of that time. (See 1368-1370.) Instead of confining himself to that question, Judge Quaschnick appears to have merged the competency proceedings with those of the "Murphy" conservatorship. In any event, even assuming the finding was properly made, there is no assurance a motion to dismiss would have been heard by Judge Quaschnick or that a different judge would have interpreted the finding as requiring dismissal.[14]
 
 
 149
 The record on appeal sheds no light on why defense counsel failed to request dismissal in 1992. We know that he was well aware of the three-year period. He was confronted with a defendant who seemingly cycled in and out of competence, experts who (as Harrison recognizes) were not in unanimous agreement concerning whether he was incompetent, and the Legislature's designation of three years as a reasonable period of time in which to formulate a prognosis. Under these circumstances, counsel might reasonably have believed that a request to exercise discretion to dismiss brought in 1992 would not have stood much chance of success because it would have been well within the trial court's discretion to determine that dismissal would not have been "in furtherance of justice," as required by section 1385, subdivision (a). We cannot say there could be no satisfactory reason for defense counsel's omission (People v. Bell (1989) 49 Cal.3d 502, 546); while it is conceivable a request for dismissal might have been granted, "the issue was so close that it cannot be said that a reasonably competent attorney could not have failed to make such a [request]." (Satchell v. Cardwell (9th Cir. 1981) 653 F.2d 408, 410). Accordingly, Harrison has failed to establish counsel's performance was deficient. (People v. Bell, supra, 49 Cal.3d at p. 546; People v. Pope, supra, 23 Cal.3d at p. 426.)
 
 
 150
 Moreover, Harrison has failed to establish prejudice. Given his history of being found competent, then incompetent, then competent again, as well as the possibility he was malingering, it appears a longer period of observation and treatment were appropriate. Certainly we cannot say, given the history of this case as of late 1992, it is likely the request to dismiss would have succeeded had it been made. (See People v. Mayfield (1993) 5 Cal.4th 142, 175-176; People v. Grant, supra, 45 Cal.3d at p. 864.) The Legislature itself has recognized that "mental incompetence may be intermittently episodic, and mental competence intermittently recurrent, in the context of a criminal prosecution." (Bayramoglu v. Superior Court (1981) 124 Cal.App.3d 718, 728.)
 
 
 151
 Additionally, we failed to see a reasonable likelihood events would have played out differently than they did, even if a request had been made and dismissal ordered. Harrison was found restored to competence, tried on the criminal charges, and convicted. He has not convinced us that ultimate outcome might have changed. He speculates that, had he been subject solely to a "Murphy" conservatorship, Atascadero would not have returned him to court but instead he would have continued as a conservatee, with only periodic reviews. However, a defendant bears the burden of establishing counsel's ineffectiveness. "'The proof of this inadequacy or ineffectiveness must be a demonstrable reality and not a speculative matter.' [Citations.]" (People v. Jenkins (1975) 13 Cal.3d 749, 753.) Harrison's speculation does not furnish grounds for reversal.
 
 
 152
 B.Denial of December 1993 Motion to Dismiss Charges
 
 
 153
 As previously noted, Harrison challenged Atascadero's conclusion that he had been restored to competence. On December 8, 1993, after trial on the issue had been continued several times, Harrison moved, through counsel, to dismiss charges. In the written motion, he contended that dismissal was required pursuant to Jackson v. Indiana, supra, 406 U.S. 715, In re Davis, supra, 8 Cal.3d 798, and Conservatorship of Hofferber, supra, 28 Cal.3d 161. He claimed this was so because Judge Quaschnick determined, on June 19, 1992, that there was no substantial likelihood Harrison's competence would be restored within the foreseeable future; California's statutory scheme provided that commitment under the Penal Code was to cease once there was no substantial likelihood competence would be restored, with a maximum confinement time of three years; and Harrison had been incarcerated for more than three years and had not regained competence. In addition to this due process argument, Harrison contended his equal protection rights were violated because, unlike a person committed under California's civil commitment statutes, a criminal defendant can be committed without a finding of dangerousness and without a requirement that he or she be treated for his or her underlying mental condition. Harrison also contended that an incompetent person could be institutionalized for life, while an imminently dangerous person could only be committed until he or she was no longer dangerous. Harrison pointed out that, contrary to the situation in Conservatorship of Hofferber, supra, there had been no judicial determination of probable cause in case No. 433352-2, because a doubt concerning his competence was raised during the preliminary hearing.
 
 
 154
 The People opposed the motion to dismiss, asserting the three-year limit contained in section 1370, subdivision (c)(1) started to run from the date of the most recent commitment; hence, Harrison was well within that time frame. The People further asserted that subdivision (c)(1) of section 1370 did not apply in any event since Harrison had been restored to competence, and that section 1372 did not permit dismissal of criminal charges against a defendant who was certified as restored to competence.
 
 
 155
 Judge Papadakis denied the motion on December 29, 1993, following a hearing at which the parties stipulated the court could take judicial notice of the contents of its file, and could consider everything contained therein with particular attention paid to documents specified by the parties. Judge Papadakis first determined that Judge Gomes had made a finding of competence, albeit not in specific language, following Harrison's return from Atascadero. This finding was then followed by defense counsel's statement of continued incompetence, upon which another hearing was set.
 
 
 156
 Judge Papadakis saw the three-year period as being the major issue. In that regard, he found the law was followed as Harrison was afforded a timely review each time he was found incompetent and sent to a state hospital. Judge Papadakis also found there was no equal protection violation, as Harrison was afforded the rights and protections to which he was entitled. When Richardson protested that the central issue was not the time periods specified by statute but instead Judge Quaschnick's 1992 determination that Harrison was incompetent and would not regain competence in the foreseeable future, Judge Papadakis decided that those findings did not mean the court should now ignore the statutory three-year period. He then determined that, because Harrison had been afforded his rights, regularly reviewed, and returned to court, "when he had the last hearing is when that three-year period of time begins to run." This exchange then took place:
 
 
 157
 "MR. RICHARDSON: For point of clarification, Your Honor, is the Court saying that in spite of the constitutional requirements of Jackson versus Indiana, that there must be at least a three-year period pursuant to the statute? Because my understanding of reading Jackson is that there is a time period that is set up and then ... any time period under the constitution is removed if there is a finding that the individual is not likely to regain competency.
 
 
 158
 "THE COURT: Okay, let me give you my understanding.... [I]t appears what had been occurring is people were, I believe, in the words of the Court, in effect giving [sic] life sentences without a trial. And so the protection was set up to make sure that the courts would review the issue of competency.
 
 
 159
 "I don't think in any way that Jackson versus Indiana was going to open the door where a person could be found unlikely to regain competency and then miraculously regain competency within a short period of time that the people couldn't proceed to the criminal proceedings. I understand what the Court was saying was, 'We're protecting against people being placed in state hospitals, mental institutions and left there without appropriate court review and in a reasonable time.' They were trying to avoid the life sentence without a trial is the way I read it.
 
 
 160
 "And in this case, ... the regular reviews were had, it was brought back to court, it wasn't done just by the hospital, the Court reviewed it, hearings were had, trials have been had, there has been, according to the experts, the psychiatrists on the record, appears that Mr. Harrison, according to the psychiatrists, either they are totally disagreeing with each other or he is - has gone back and forth between being competent at the stage of trial and incompetent at the stage of trial. The treatment, according to the doctor at Atascadero and Patton, says his treatment was working. And Jackson says, 'We want to make sure these people are being treated. We want to make sure that the courts are reviewing it.'
 
 
 161
 "So it's the opinion of this Court that that has been accomplished, Mr. Harrison has been protected. And so the motion to dismiss will be denied."
 
 
 162
 Harrison subsequently sought writ review from this court (F020892). His petition was denied on January 13, 1994. He now contends that, based upon his history and Judge Quaschnick's findings, the motion to dismiss should have been granted. He argues that the "reasonable period of time" permitted by Jackson had passed, Judge Quaschnick's finding of no substantial likelihood of restoration of competence was controlling, and he was beyond the maximum statutory confinement time of three years. The People dispute Harrison's computation of the three-year period, and argue that Jackson v. Indiana, supra, 406 U.S. 715 and In re Davis, supra, 8 Cal.3d 798, are inapplicable because Harrison was committed subsequent to the relevant amendments to section 1368 et seq.
 
 
 163
 The broad language of Jackson and Davis must be read in light of the statutory scheme then in existence. Accordingly, we view those cases and their progeny as standing for the proposition that indefinite commitments without trial are prohibited. (See Conservatorship of Hofferber, supra, 28 Cal.3d at p. 168.) In light of the limitations and restrictions which were added to the relevant statutes in 1974 specifically to bring California's scheme for confinement of incompetent criminal defendants "within constitutional bounds" (id. at p. 169), we do not interpret Jackson and Davis as automatically mandating immediate dismissal of criminal charges any time a court makes a finding such as the one made by Judge Quaschnick. The Legislature has determined that three years is a reasonable time in which to assess the likelihood of restoration of competence. On the record before us, we cannot say this period of time is unreasonable when applied to Harrison's circumstances.[15]
 
 
 164
 Assuming dismissal of criminal charges is required at the end of three years if competence is not restored (discussed post), dismissal prior to that time is subject to the requirements of section 1385 (i.e., that it be in furtherance of justice) and is reviewable for abuse of discretion (see People v. Memro, supra, 11 Cal.4th at pp. 835-836). Dismissal almost certainly would have constituted an abuse of discretion here, inasmuch as Harrison had been certified restored to competence. (See People v. Orin (1975) 13 Cal.3d 937, 946-947.)
 
 
 165
 The question arises whether Harrison had been held beyond the three-year statutory period. Under the express language of section 1370, subdivision (c)(1), the three years begins running at the date of "commitment," not the date of "arrest." This language clearly denotes commitments for incompetence. (See In re Polk, supra, 71 Cal.App.4th at p. 1238.) If the statute refers to the most recent commitment after a finding of incompetence, Harrison was clearly within the three-year period. In Polk, however, the Court of Appeal interpreted the three-year limit as referring "to the aggregate of all commitments on the same charges." (Ibid., fn. omitted.) Assuming Polk is correct, it appears Harrison may have been beyond the three-year limitation by the time the motion to dismiss was heard, although the record on appeal may not be complete in this regard and both the hearing on the motion and trial on the restoration issue had been continued at his attorney's request.
 
 
 166
 Assuming the three-year limitation was exceeded, however, we do not believe reversal of Harrison's criminal conviction is required.[16] First, we do not interpret Jackson, Davis, or the statutory scheme as necessarily entitling a defendant to dismissal of criminal charges once the three-year limit is reached. As described in In re Polk, supra, 71 Cal.App.4th at page 1237, "At the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment for the most serious charge, whichever is shorter, the defendant must be returned from the treatment facility. ( 1370, subd. (c)(1).) When the defendant is returned following a report that there is no substantial likelihood of recovery of mental competence or following the maximum term of commitment, the court is to order conservatorship proceedings under the LPS Act. ( 1370, subd. (c)(2).)"
 
 
 167
 Thus, while the criminal action remains subject to dismissal pursuant to section 1385 apparently during the entire process ( 1370, subd. (d)), reaching the three-year limitation does not entitle a criminal defendant to dismissal. Indeed, as the California Supreme Court has observed,
 
 
 168
 "When a defendant is returned to court as unlikely to recover competence, or as still incompetent after maximum confinement, the court may dismiss the charges in the interest of justice. (Pen. Code, 1370, subd. (d), 1385.) If it does so, defendant must be released from confinement without prejudice to institution of any short-term LPS Act civil commitment proceedings for dangerousness. (Id., 1370, subd. (e).) But the dismissal would preclude a long-term, renewable LPS Act conservatorship based on dangerous criminal incompetence, since nondismissal of the criminal charges is a prerequisite to that form of commitment. (Welf. & Inst. Code, 5008, subd. (h)(2).) The only other long-term civil commitment possibility would be the standard LPS Act conservatorship for persons who, because of chronic alcoholism or mental disorder, are unable to provide for their food, clothing, and shelter. (Id., subd. (h); ...." (People v. Waterman (1986) 42 Cal.3d 565, 568, fn. 1, italics added.)[17]
 
 
 169
 Thus, a dismissal in the present case would not have been automatic, and Harrison fails to persuade us that he was entitled to one, either in 1992 or at the time he moved to dismiss. Moreover, he has failed to establish prejudice, even assuming the charges should have been dismissed or conservatorship proceedings instituted under the LPS Act.
 
 
 170
 We do not view this case as one in which Harrison is entitled to reversal without a showing of prejudice. For instance, it is not a situation in which the trial court failed to hold a competency hearing after a doubt was declared (see, e.g., People v. Marks (1988) 45 Cal.3d 1335, 1340-1344) or revoked probation after the probationary period had expired (see, e.g., In re Griffin (1967) 67 Cal.2d 343, 346).[18] Instead, the circumstances are akin to those presented in cases in which a defendant asserts that his or her right to a speedy trial has been violated. When such a violation is urged as a basis for reversal following trial, prejudice must be shown (or, under the federal Constitution, is a highly relevant factor) - even if, as here, the defendant raised the issue in a pretrial writ. (People v. Wilson (1963) 60 Cal.2d 139, 148-154; see Moore v. Arizona (1973) 414 U.S. 25, 26-27; Barker v. Wingo (1972) 407 U.S. 514, 533; People v. Martinez (2000) 22 Cal.4th 750, 755, 765-767; People v. Roybal (1998) 19 Cal.4th 481, 512-513; People v. Hill (1984) 37 Cal.3d 491, 496; People v. Johnson (1980) 26 Cal.3d 557, 574-575.)[19]
 
 
 171
 Harrison was found competent to stand trial, and he then underwent a jury trial in which he was convicted of criminal charges. We do not see how this outcome would have changed. If conservatorship proceedings had been instituted, Harrison still would have been found restored to competence and subsequently would have been tried and convicted. (See 1372, subd. (b).) Had criminal charges been dismissed, the dismissal would not have acted as a bar to further prosecution. (See 1387.) The record does not suggest any occurrence that even remotely might have changed the course of the proceedings, either with regard to the judicial determination that Harrison was competent to stand trial, or with respect to that trial itself.
 
 
 172
 C.Burden of Proof at Restored Competence Hearing
 
 
 173
 As previously noted, Harrison challenged the conclusion that he had been restored to competence. A hearing on the restoration issue ( 1372) began on March 7, 1994, before Judge Kane, and concluded on March 14.[20] By written ruling, Judge Kane found Harrison competent to stand trial. In so doing, Judge Kane applied the presumption contained in section 1369, subdivision (f) ["It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent"]. Factually, Judge Kane found that Harrison understood the nature of the criminal proceedings, and that he was able to assist in his defense, although whether he would choose to cooperate with defense counsel was uncertain. Judge Kane found:
 
 
 174
 "The fact that he [Harrison] has at ... times been uncooperative establishes not that he has multiple personalities over which he has no control, but that he picks and chooses the times when he wishes to be cooperative.... The court agrees with Dr. Davis'[s] conclusion that the defendant's intent has been to stall, cause confusion, and to put a 'monkey wrench into the workings of the court proceedings.' ...
 
 
 175
 "This court finds that defendant does not suffer from a Multiple Personality Disorder, but if he did, it is not such as to preclude him from understanding the nature of the criminal proceedings, nor does it preclude him from having the ability to assist counsel.
 
 
 176
 "The court finds that Mr. Harrison is not amnesic. The court finds that the defendant is a malingerer and a pathological liar. The defendant does not want to go to trial and is doing everything within his power, deliberately and with premeditation, to prevent the trial from ever occurring.
 
 
 177
 "The evidence presented at the hearing does not rebut the presumption that Mr. Harrison is competent. Contrariwise, the convincing force of the evidence establishes that Mr. Harrison is competent to stand trial."
 
 
 178
 Harrison now contends it is a violation of the Fourteenth Amendment's due process clause to require a criminal defendant to bear the burden of proving incompetence at a "restored competence" hearing. He says the error requires reversal.
 
 
 179
 We reject this argument for two reasons. First, the last sentence of the ruling, quoted above, demonstrates that Judge Kane found the evidence itself established that Harrison was competent, irrespective of any presumption or allocation of burden of proof. (See People v. Sakarias (2000) 22 Cal.4th 596, 617-618.) Second and more importantly, after briefing was completed in this case, the California Supreme Court held:
 
 
 180
 "For a trial of a defendant's mental competence, Penal Code section 1369 establishes a presumption that the defendant is mentally competent unless he is proved by a preponderance of the evidence to be otherwise. In so doing, it operates to impose the burden of proof on the party, if any, who claims that the defendant is mentally incompetent, and fixes the weight thereof at preponderance of the evidence.
 
 
 181
 "The question that we shall address is whether Penal Code section 1372 does the same for a hearing on a defendant's recovery of mental competence. The answer that we shall give is affirmative." (People v. Rells (2000) 22 Cal.4th 860, 862.)
 
 
 182
 In reaching this conclusion, the court reviewed and relied on both state and federal authorities, including the primary cases Harrison now cites to us - Cooper v. Oklahoma (1996), 517 U.S. 348, Medina v. California (1992), 505 U.S. 437, and People v. Mixon (1990) 225 Cal.App.3d 1471.[21] Based on its review of those opinions, the California Supreme Court determined that application of the presumption does not offend the Fourteenth Amendment. (People v. Rells, supra, 22 Cal.4th at p. 869.) The court explained:
 
 
 183
 "The reason is this: The Fourteenth Amendment's due process clause in fact permits the presumption that the defendant is mentally competent unless he is proved by a preponderance of the evidence to be otherwise. (Cooper v. Oklahoma[, supra,] 517 U.S. [at p.] 355; Medina v.
 
 
 184
 California[, supra,] 505 U.S. [at pp.] 442-453.) That is certainly true of a trial of a defendant's mental competence, at which the presumption unobjectionably 'affect[s] [mental] competency determinations only in a narrow class of cases where the evidence is in equipoise ....' (Medina v. California, supra, 505 U.S. at p. 449; see id. at pp. 452-453; see also Cooper v. Oklahoma, supra, 517 U.S. at p. 363.) That is also true, to our mind, of a hearing on a defendant's recovery of mental competence, at which the presumption has the same effect. The fact that a hearing presupposes an earlier finding by the court or a jury of mental incompetence is balanced by the fact that the hearing itself is triggered by the later filing by a specified mental health official of a certificate of restoration to mental competence. (Cf. Cooper v. Oklahoma, supra, 517 U.S. at p. 365 [presuming that 'it is unusual for even the most artful malingerer to feign [mental] incompetence successfully for a period of time while under professional care'].) Although we recognize that a presumption that fixes the weight of the burden of proof, at a trial, at clear and convincing evidence is violative of the Fourteenth Amendment's due process clause (Cooper v. Oklahoma, supra, 517 U.S. at pp. 354-369), we do not believe that a presumption that fixes the burden's weight, at a hearing, at preponderance of the evidence is similar. A different presumption may prove 'more favorable' to a defendant. (Medina v. California, supra, 505 U.S. at p. 451.) But it is not required by the Fourteenth Amendment's due process clause for that reason. (Medina v. California, supra, 505 U.S. at p. 451.)" (People v. Rells, supra, 22 Cal.4th at pp. 869-870, parallel citations omitted.)
 
 
 185
 The United States Supreme Court denied certiorari in Rells. (Lopez Rells v. California (2000) 531 U.S. 902.)
 
 
 186
 In the present case, Harrison was the party claiming the defendant was mentally incompetent. Rells is dispositive of his claim that Judge Kane erred.
 
 
 187
 D.Ineffective Assistance of Counsel at Restored Competence Hearing
 
 
 188
 Harrison next contends Richardson rendered ineffective assistance of counsel during the restored competence hearing by conceding he had no right to a jury trial on the issue and by failing to ask Judge Kane to take judicial notice of Judge Quaschnick's 1992 findings. The People say Harrison had no right to a jury trial and defense counsel moved for judicial notice of the court's file. We find no deficient performance or, in any event, no prejudice.
 
 
 189
 At the November 22, 1993, trial confirmation hearing before Judge Gomes, Richardson stated: "What we would like to do today is withdraw our request for a jury trial on the issue of competency, submit the matter to the Court, and then proceed with criminal charges depending upon the Court's ruling. [] I still firmly believe that my client is incompetent.... Judge Quaschnick determined my client was incompetent and not likely to ever regain his competency. Nothing has changed. The documents submitted by Atascadero show that he received no treatment of any kind for his multiple personality disorder.... [] I would simply request this Court send him back to the state hospital system with instructions for them to do their job." When Judge Gomes asked whether Richardson was "willing to give up the right to - a statutory right to a jury trial on the 1372 issue," Richardson replied that he was.
 
 
 190
 On November 29, the case was back before Judge Gomes. At that time, Richardson revealed that, after extensive discussions, the parties were "going to need to do a full-blown court trial on this." Trial was placed on calendar and subsequently continued.
 
 
 191
 Trial eventually began before Judge Kane on March 7, 1994. At the outset, Judge Kane inquired whether there had been a jury trial waiver previously entered. This ensued:
 
 
 192
 "MR. RICHARDSON: No. It's not necessary to have - my client is not entitled to a jury trial on the issue of continuing competence. If we advance to the point of him being found incompetent, then he is absolutely entitled to a jury trial on the issue of dangerousness, but at this stage, he's just - there's no issue of jury trial because he's not entitled to one.
 
 
 193
 "MR. RICE: Your Honor, I think I've done a brief on this .... Because this is a - he's been found restored to competence by Atascadero, and this is a hearing on whether or not his competence has been restored, he's not entitled to a jury trial....
 
 
 194
 "THE COURT: Okay. Then under what statute are we proceeding?
 
 
 195
 "MR. RICE: This would be under 1372.
 
 
 196
 "THE COURT: Well, that statute doesn't talk about one way or the other. But if both sides are in agreement that's the law, then we'll proceed and try the case in front of the court.
 
 
 197
 "MR. RICE: Your Honor, if I may approach, I do have a copy of that brief. It does cite a couple of cases that discuss -
 
 
 198
 "MR. RICHARDSON: That is the law.
 
 
 199
 "THE COURT: All right...."
 
 
 200
 The matter was then heard by the court. On March 16, 1994, Judge Kane issued his written finding that Harrison was competent. The ruling noted the parties' agreement that Harrison was not entitled to a jury trial on whether his competence had been restored, and cited People v. Murrell (1987) 196 Cal.App.3d 822 and People v. Mixon, supra, 225 Cal.App.3d 1471, for that proposition.
 
 
 201
 Harrison now complains about Richardson's concession that he had no right to have a jury determine whether he was restored to competence. The law regarding claims of ineffective assistance of counsel is set out, ante. Briefly reiterated, the burden of proving ineffective assistance is on the defendant. (People v. Pope, supra, 23 Cal.3d at p. 425.) In order to establish such a claim, "a defendant must show that counsel (1) performed at a level below an objective standard of reasonableness under prevailing professional norms; and thereby (2) subjected the defense to prejudice, i.e., in the absence of counsel's failings a more favorable outcome was reasonably probable." (People v. Hamilton (1988) 45 Cal.3d 351, 377.)
 
 
 202
 As an initial matter, it appears that, despite Richardson's representation to Judge Kane, a jury trial waiver was, in fact, entered before Judge Gomes. Where the right to a jury trial exists in competence proceedings, it is a statutory, not constitutional, right; hence, defense counsel may waive a trial by jury, even over the defendant's objection. (People v. Masterson (1994) 8 Cal.4th 965, 969, 972-973; see People v. McPeters (1992) 2 Cal.4th 1148, 1169.)
 
 
 203
 Here, the record sheds no light on why Richardson decided to waive a jury trial, and we cannot conclude there could be no satisfactory explanation. Accordingly, a successful claim of ineffective assistance of counsel cannot be predicated on that waiver. (See People v. Cudjo (1993) 6 Cal.4th 585, 623.) Later, however, Richardson affirmatively informed Judge Kane that Harrison had no right to a jury trial on the issue of restored competence. Because in this respect the record contains an explanation for the challenged aspect of counsel's representation - namely, his belief that Harrison was not entitled to a jury trial - we "must determine 'whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate.' [Citation.]" (Ibid.)
 
 
 204
 We are not convinced Richardson's performance was deficient. People v. Murrell, supra, 196 Cal.App.3d 822, was the only authority extant at the time of Harrison's restored competence hearing which had directly before it the question of the right to a jury trial at a restored competence hearing. Murrell squarely held that a defendant has no such right. (Id. at p. 826.) The Court of Appeal reasoned:
 
 
 205
 "Although section 1372 does not directly provide for a hearing where the defendant may challenge the medical director's certification of competence, the numerous references in that statute to a hearing indicate a legislative intention that such a hearing be afforded.
 
 
 206
 "We believe, however, that the Legislature intended that the hearing on certification of competence be held before the court and not before a jury. The competence hearing provided for by section 1368 is a 'special proceeding' and, as such, the sole right to a jury at the hearing is that provided by statute. [Citations.] The hearing on the certification of competence provided for in section 1372 is also a special proceeding. Unlike section 1368, however, section 1372 does not provide for a jury. To the contrary, the reference in section 1372, subdivision (c), to the finding 'by the court' whether defendant has recovered competence and the direction in section 1372, subdivision (d) that '... the committing court [approve] the certificate of restoration to competence' indicate the Legislature intended that the court, not a jury, hear this phase of the competence proceedings." (People v. Murrell, supra, 196 Cal.App.3d at pp. 826-827.)[22].
 
 
 207
 In People v. Mixon, supra, 225 Cal.App.3d 1471, the issue on appeal was whether the presumption of competence, contained in section 1369, subdivision (f), applied in a hearing under section 1372. The court stated:
 
 
 208
 "As we earlier observed, the Legislature did not prescribe an automatic hearing for defendants certified competent. Instead, the trial court was authorized to merely 'approve[] the certificate of restoration to competence ....' ( 1372, subd. (d).) But, as we have also observed, the Legislature did provide a 'hearing' for those returned defendants who requested one. ( 1372, subd. (c).) That 'hearing,' except for the right to a jury trial (People v. Murrell, supra, 196 Cal.App.3d 822, 826), is the only hearing provided by the statutory scheme, a section 1369 hearing.
 
 
 209
 "A defendant about whose competency a doubt arises receives a section 1369 hearing ( 1368, subd. (b)). A defendant found incompetent, and after 18 months still not certified as competent, also receives a section 1369 hearing. ( 1370, subd. (b)(2).) A defendant found incompetent, certified competent, and whose competency is again doubted receives a section 1369 hearing. ( 1368.) To suggest, as defendant does, that as to another and populous class of defendants, those certified as having regained competence, the Legislature granted a hearing but simply failed to prescribe what kind, flaunts common sense and fundamental principles of statutory construction. We hold that the reference to 'any hearing' in section 1372, subdivision (c) means a section 1369 hearing,[23] including its prescription that: 'It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." (People v. Mixon, supra, 225 Cal.App.3d at p. 1482, fn. & italics omitted.)
 
 
 210
 Even if we were to disagree with these cases and hold today that a defendant has a statutory right to a jury trial on the issue of restored competence - a question we do not reach - this would not change the fact that Richardson acted in accordance with the law as it stood at the time of the hearing before Judge Kane.[24] We require a defense attorney to be reasonably competent under prevailing professional norms, not all-prescient. (See, e.g., People v. Davis (1995) 10 Cal.4th 463, 503 [no deficient performance where, prior to Supreme Court opinion on subject, defense counsel reasonably could have believed certain evidence was inadmissible]; People v. Turner (1990) 50 Cal.3d 668, 704 [defense counsel not incompetent for failing to anticipate Supreme Court's interpretation of provision of Cal. Const. which rejected "overwhelming weight of appellate authority and consciously declined to accept the apparent plain meaning of the constitutional language"]; People v. Archer (1989) 215 Cal.App.3d 197, 205-206 [defense counsel not incompetent for failing to anticipate subsequent appellate opinion where legal issue was "not a solidly entrenched legal precept" but instead involved "evolving area," so that subsequent holding "was not necessarily predictable"].)
 
 
 211
 The cases cited by Harrison do not alter our conclusion. In People v. McPeters, supra, 2 Cal.4th at page 1169, the California Supreme Court listed the right to a jury trial as one of the "available incidents of the hearing procedure" under section 1368. However, contrary to Harrison's representation, McPeters appears to have involved an initial competency determination, not a hearing pursuant to section 1372.[25] In People v. Harris (1993) 14 Cal.App.4th 984, it appears the defendant was afforded a jury trial on the issue of restored competence, although the appellate court's description of the procedural history could be clearer.[26] However, at issue in Harris was the nature of the defendant's right to a jury trial at the initial competency proceedings. In no way can the holding of the case be construed as entitling a defendant to a jury trial on the issue of restored competence. Moreover, as the opinion does not refer to section 1372 or Mixon and only cites Murrell as one of several appellate opinions holding there is no constitutional right to a jury trial in section 1368 proceedings (see People v. Harris, supra, 14 Cal.App.4th at p. 991), it can hardly be said to have placed Richardson on notice that a difference of appellate opinion existed concerning whether a defendant was entitled to a jury trial in a restored competence proceeding. Indeed, Harris does not evidence a difference of opinion because the issue of the right to a jury trial at a restored competence hearing was not before the court. The same is true of McPeters, even assuming it involved the issue of restoration of competence.
 
 
 212
 The fact that the trial court in Harris - apparently without, insofar as we can tell, discussion or dissent - allowed a defendant to have a jury trial on the issue of restored competence does not mean Richardson's performance was deficient because he failed to request such a trial for Harrison. To the contrary, reasonably competent counsel could have concluded no such right existed and so such a request would be futile. (See People v. Davis, supra, 10 Cal.4th at p. 503.)[27]
 
 
 213
 We now turn to the question of judicial notice. In this regard, Richardson discussed the 1992 findings in his argument before Judge Kane. Judge Kane recited Judge Quaschnick's 1992 findings in his written ruling, thus clearly demonstrating his awareness of the fact those earlier findings were made and the contents thereof. A request for judicial notice would not have accomplished more, since Judge Kane could not properly have judicially noticed the truth of the findings. (People v. Moore (1997) 59 Cal.App.4th 168, 178; Sosinsky v. Grant (1992) 6 Cal.App.4th 1548, 1564-1565.) Richardson's performance was adequate under the circumstances.[28]
 
 
 214
 E.Failure to Refer Harrison for Further Competency Proceedings
 
 
 215
 Next, Harrison complains that Judge O'Neill erroneously failed to suspend criminal proceedings and refer him for a further section 1368 evaluation in August 1994. As noted, Judge Kane found Harrison restored to competence on March 16, 1994, and criminal proceedings were reinstated on April 6. On July 25, Harrison submitted a Marsden motion in which he alleged, inter alia, that defense counsel was a spy from the KGB and might be a Republican from another planet. On August 4, Harrison submitted a Marsden letter to Judge O'Neill in which he claimed defense counsel was a liar. Judge O'Neill heard the Marsden motion on August 17; during that proceeding, Harrison stated he was starting to hear voices. When Judge O'Neill asked what he wanted, Harrison replied,
 
 
 216
 "What I would like, if you could have a [B]ible, if you could make him [Richardson] swear on the [B]ible that he is not Satan or he has nothing to do with the revelations or nothing, if you would do something like that, just make him swear on it or something, maybe some holy water, anything. At that point I think I will probably at least have a little bit of trust in him. But right now they're giving me pills, they put pills in my food, and at night all I know is that him and three other judges came into my cell numerous times already, they have come in there and I've had things happen I don't even want to discuss."
 
 
 217
 The Marsden motion was denied.
 
 
 218
 On August 18, 1994, at a case status hearing before Judge Gomes, Richardson advised the court that he had a doubt concerning Harrison's competence, and that at the conclusion of the Marsden hearing, Judge O'Neill had suggested this as the appropriate course of action. Richardson represented that Harrison's condition had grown significantly worse since the section 1372 hearing. This ensued:
 
 
 219
 "THE COURT: All right, well, based on the pending issue of the defendant's competency which has been raised by declaration of doubt by Defense Counsel on, I don't know, six or eight indications, I see no reason for this Court to suspend proceedings under 1368 based on your declaration, no offense. Or to trail the case under the Code to allow you to talk to the defendant to render your opinion as to his competency. I know what your opinion would be.
 
 
 220
 "The only new wrinkle here seems to be the expression by Judge O'Neill, so we'll transfer this matter back to Department of the Presiding Judge [Judge O'Neill], and if he wants to declare a doubt or recess the matter so that you can talk to Mr. Harrison and give a more specific opinion to Judge O'Neill, he has the power under the Code to do that.
 
 
 221
 "MR. RICHARDSON: Your Honor, perhaps I didn't express this correctly, but I have spoke with my client and I have a doubt right now that my client is competent to stand trial.
 
 
 222
 "THE COURT: But you always have. So what's new?"
 
 
 223
 On August 19, the matter was heard by Judge O'Neill. At the hearing, Defense Investigator Glickman testified concerning Harrison's behavior and purported decompensation. In addition, Richardson offered recent letters from Harrison which contained delusional material, and the prosecutor moved into evidence Judge Kane's written findings in the section 1372 hearing. The prosecutor pointed out that the issue of Harrison's competence had been litigated numerous times, and that Judge Kane had found him to be a malingerer.
 
 
 224
 Citing People v. Kelly (1992) 1 Cal.4th 495, Judge O'Neill determined that, because a competence hearing already had been held, the focus now was on whether the court had been presented with a substantial change of circumstances or with new evidence which cast serious doubt on the validity of Judge Kane's findings. Judge O'Neill continued:
 
 
 225
 "I found Mr. Glickman to be a very credible witness. I don't in any way dispute what you are saying based on your view of it, Mr. Richardson, but neither one of those is the real issue.
 
 
 226
 "The real issue is whether or not the testimony is or is not consistent with Judge Kane's findings. If you look at the findings, specifically at page six of the opinion, Judge Kane after hearing the evidence, both factual and hearing argument of Counsel from a legal standpoint, indicates 'that the Defendant,' as Judge Kane puts it, 'picks and chooses the times which he wishes to be cooperative,' end of quote. And then Judge Kane finds that, quote, 'the Defendant is a malingerer and a pathological lier [sic],' end of quote. That to me the only inference I can draw from that is that Judge Kane found that this Defendant is a smart, manipulative lier [sic] who cooperates when it is to his advantage to cooperate.
 
 
 227
 "Therefore, the real issue here is whether or not he is a good actor. Whether or not he is putting on a good act for you. Whether or not he is putting on a good act for Mr. Glickman. Mr. Glickman was obviously quite truthful in his statement [that Harrison] could be putting on an act. He also said he didn't think so. But the fact of the matter is, Judge Kane thinks that's exactly what he was doing based on a full hearing, and there's nothing inconsistent from what I have heard with that finding. It sounds like based on what Judge Kane is saying he is still putting on a pretty good act.
 
 
 228
 "And in looking at the law and People vs. Kelly nothing I've heard addresses the reasons Judge Kane found how he found based on his opinion. Therefore, the Court does not find there's reason to allow another competency hearing. I have not heard any evidence before me that casts a serious doubt on the validity of Judge Kane's finding."
 
 
 229
 Harrison now contends that, because the findings of Judge Quaschnick and Judge Kane were so diametrically opposed, meaningful application of the "changed circumstances" test employed by Judge O'Neill was impossible because Harrison's circumstances would never be deemed to have changed from those found by Judge Kane. As Harrison puts it, "no degree of 'decompensation' could ever constitute 'changed circumstances,' if the trial court's fundamental premise was that Mr. Harrison was feigning mental illness." Because of this, the argument runs, Judge O'Neill was required to form his own subjective opinion on the question of doubt as to competence. Under the "unique circumstances" of this case, Harrison concludes, Judge O'Neill failed to recognize his full duty to reach an individualized, subjective opinion, despite strong evidence of decompensation.
 
 The law is settled:
 
 230
 "A defendant who, as a result of mental disorder or developmental disability, is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner,' is incompetent to stand trial. [Citation.] When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial. [Citation.] The court's duty to conduct a competency hearing arises when such evidence is presented at any time 'prior to judgment.' [Citations.]
 
 
 231
 "When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" (People v. Jones (1991) 53 Cal.3d 1115, 1152-1153, italics added; accord, People v. Kelly, supra, 1 Cal.4th at p. 542; People v. Murrell, supra, 196 Cal.App.3d at p. 827; People v. Melissakis (1976) 56 Cal.App.3d 52, 62.)
 
 
 232
 The California Supreme Court has determined that "more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] ...." (People v. Laudermilk (1967) 67 Cal.2d 272, 285.) Here, Glickman's testimony showed that Harrison was engaging in the same kind of conduct that had been occurring for years, including the other times he returned from a state mental hospital. In other words, Harrison was now exhibiting the same behavior that Judge Kane had found to be malingering. In fact, although Glickman did not believe Harrison was putting on an act, he conceded it was possible.[29] In short, Judge O'Neill was not "'presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of" Judge Kane's finding of competence. (People v. Jones, supra, 53 Cal.3d at p. 1153.)
 
 
 233
 Harrison urges us not to apply the "changed circumstances" test based on the purportedly unique particulars of this case. Otherwise, he says, circumstances never could be deemed to have changed from those found by Judge Kane. We see no reason to depart from the rule. Had something new been presented, changed circumstances would have existed, and nothing suggests Judge O'Neill would not have so found. Were this not the case, there would have been no reason for him to take testimony on the issue. He simply found nothing to indicate Harrison was not still "putting on a good act"; therefore, he found no substantial change of circumstances or new evidence which cast a serious doubt on the validity of Judge Kane's findings and, hence, no reason to conduct another competence hearing.[30] There was no error.
 
 
 234
 III*
 
 Trial Issues
 
 235
 A.Rejection of October 1994 Challenge for Cause
 
 
 236
 At some point prior to September 21, 1994, Harrison personally filed a motion to disqualify Judge O'Neill for cause (Code Civ. Proc., 170.1).[31] Apparently by checking boxes on a form, Harrison alleged that Judge O'Neill had personal knowledge of disputed evidentiary facts, was related to a material witness in the case, served as a lawyer in the case, gave legal advice to a party in the case, associated with the prosecutor on a social basis, was biased as to the outcome of the proceedings, was a party to the proceedings, could not be impartial, was involved in a political controversy with counsel or a party to the proceedings, and participated in a conspiracy against a party or counsel. Harrison added that Judge O'Neill was "'under investigation for raping Carl F. Harrison at the County Jail involved in a conspiracy to rape and drug inmates.'" (Sic.) Judge O'Neill filed a sworn declaration in which he denied every allegation. Judge Schultz of the Kings County Superior Court, who was assigned to hear the matter, concluded that Harrison's "indiscriminate allegations of prejudice" were "wholly unsupported by any indicia of credibility." Accordingly, on September 30, he denied the motion for disqualification.
 
 
 237
 On October 4, Judge O'Neill, who was then the presiding judge, assigned the case to himself for trial. That same day, Richardson moved to disqualify him pursuant to Code of Civil Procedure section 170.1. Richardson declared that on August 17, 1994, at the conclusion of a Marsden hearing, he observed a look on Judge O'Neill's face which counsel interpreted as asking why he had not asked for a competency hearing. At Richardson's request, a discussion was held in chambers (in the presence of the prosecutor) in which Richardson explained the procedural history of the case, as well as what he viewed as Harrison's worsening mental problems. Richardson also told Judge O'Neill that the case appeared to him to be "factually indefensible," yet Harrison would not permit an insanity plea or argument concerning his mental ailments. Richardson conveyed his belief that he could not disprove Harrison's guilt, but Harrison refused to consider the reasonable settlement offer that had been made. Richardson sought to assure himself that Judge O'Neill would not interpret the filing of another section 1368 request as being disrespectful or disregarding Judge Kane's earlier ruling.
 
 
 238
 In his disqualification declaration, Richardson asserted that at the time he spoke to Judge O'Neill, he had no idea the case would be assigned to Judge O'Neill for trial, as he understood the presiding judge heard only short matters. Had he realized otherwise, he would not have made the statements he did. Richardson further asserted that on August 19, Judge O'Neill made an express finding that Harrison was a pathological liar and was malingering and acting crazy to avoid going to trial. Richardson claimed he first learned of these facts on October 3.
 
 
 239
 Judge O'Neill asked Richardson to address Code of Civil Procedure section 170.4, subdivision (c)(3), which provided then, as now:
 
 
 240
 "A party may file no more than one statement of disqualification against a judge unless facts suggesting new grounds for disqualification are first learned of or arise after the first statement of disqualification was filed. Repetitive statements of disqualification not alleging facts suggesting new grounds for disqualification shall be stricken by the judge against whom they are filed."
 
 
 241
 Judge O'Neill pointed out that Harrison had already attempted to disqualify him under Code of Civil Procedure section 170.1 and that such disqualifications could not be done "in seriatim." Richardson responded that Harrison had tried to disqualify almost every judge in front of whom he appeared, and Richardson had seen no reason to disqualify Judge O'Neill if Judge O'Neill was simply hearing the matter for purposes of assignment. Richardson reiterated that he had believed the presiding judge heard only short matters, and had only learned the day before that Judge O'Neill might assign the trial to himself. Judge O'Neill observed that counsel's explanation did not respond to the issue, in that all grounds for disqualification had to be stated at the time Harrison made his motion, and Code of Civil Procedure section 170.4, subdivision (c)(3) rendered the new filing untimely unless new grounds had arisen. Judge O'Neill found they had not. Richardson replied, "Well, my explanation is, as I've stated before, that my client routinely files motions to disqualify every judge. I saw no need to file any kind of a disqualification motion against this court when it was sitting as Presiding and simply going to assign the case to another judge. Uhm - I had no idea or no knowledge at that time that this Court was going to be keeping the case for itself. So I saw no need to further complicate matters by filing additional pleadings."
 
 
 242
 Judge O'Neill accepted Richardson's declaration for filing, and stated that he had reviewed and considered it. He then found it untimely under Code of Civil Procedure section 170.4, subdivision (c)(3) and ordered it stricken. The defense did not seek writ review from this court.[32]
 
 
 243
 Harrison now contends Judge O'Neill erred in rejecting Richardson's challenge for cause. The People say the ruling is not appealable. Harrison disputes this assertion, but says if we agree, then Richardson's performance was deficient because he failed to seek writ review.
 
 
 244
 Code of Civil Procedure section 170.3 sets out the procedures to be followed when a judge determines him- or herself to be disqualified or fails or refuses to recuse him- or herself. Subdivision (d) of the statute provides:
 
 
 245
 "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding."
 
 
 246
 Harrison recognizes that no writ review was sought of Judge O'Neill's ruling. He says this requirement does not apply in the case at bench, however, because there was no "determination of the question" of disqualification. Instead, Judge O'Neill struck Richardson's declaration pursuant to Code of Civil Procedure, section 170.4, subdivision (c)(3). Hence, Harrison concludes, the ruling may be challenged on appeal.
 
 
 247
 We agree with the People that the ruling is not appealable. Section 170.3, subdivision (d) of the Code of Civil Procedure applies "to any motion to disqualify a judge, whether the challenge is peremptory or 'for cause.'" (Guedalia v. Superior Court (1989) 211 Cal.App.3d 1156, 1160; accord, People v. Hull (1991) 1 Cal.4th 266, 268.) As this court has previously observed, the purpose of the rule expressed in the statute "is twofold. It seeks to eliminate the waste of time and money which would flow from continuing the proceeding subject to its being voided by an appellate ruling that the disqualification decision was erroneous. It also promotes fundamental fairness by denying the party seeking disqualification a second 'bite at the apple' if he loses on the merits but succeeds on appeal from the disqualification order. [Citation.]" (Gai v. City of Selma (1998) 68 Cal.App.4th 213, 230.) Thus, "the language of the statute, and public policy concerns, require that the procedure set forth in subdivision (d) be applied in all cases involving statutory grounds for disqualification where the basis of disqualification is known." (People v. Barrera (1999) 70 Cal.App.4th 541, 552.)
 
 
 248
 The language of the statutory scheme and the policy concerns which prompted the enactment of subdivision (d) of Code of Civil Procedure section 170.3, cause us to conclude the provision also applies where, as here, a statement of disqualification is stricken pursuant to Code of Civil Procedure section 170.4, subdivision (c)(3). We reject Harrison's claim that such a striking does not constitute a "determination" within the meaning of Code of Civil Procedure section 170.3, subdivision (d). "[T]his argument elevates semantics over substance." (People v. Hull, supra, 1 Cal.4th at p. 274.) The word "determination" is to be given its "'usual and ordinary meaning,'" and includes a finding that a disqualification motion was not timely filed. (Id. at pp. 274-275.)[33]
 
 
 249
 Moreover, Code of Civil Procedure section 170.3, subdivision (d) was enacted to provide a speedy appellate determination of the disqualification issue. (People v. Jenkins (1987) 196 Cal.App.3d 394, 403-404, disapproved on other grounds in People v. Brown (1993) 6 Cal.4th 322, 336, fn. 12.) To adopt Harrison's reading of the code would lead to the absurd result that, if a judge followed the statutory mandate of striking a statement of disqualification that fell within Code of Civil Procedure section 170.4, subdivision (c)(3), the party seeking disqualification could wait until the case was decided and, if dissatisfied with the results, obtain the "'intolerable windfall'" of reversal. (Guedalia v. Superior Court, supra, 211 Cal.App.3d at pp. 1162-1163; see People v. Hull, supra, 1 Cal.4th at p. 273.) "The Legislature determined in enacting [Code of Civil Procedure] section 170.3, subdivision (d), that an appellate court should have an opportunity to redress an incorrectly decided section 170.1 or 170.6 motion before the issue in the case is decided on the merits." (In re Sheila B. (1993) 19 Cal.App.4th 187, 195.) This purpose is no less evident - or paramount - where Code of Civil Procedure section 170.4, subdivision (c)(3) is concerned.
 
 
 250
 In light of the foregoing, we conclude Judge O'Neill's ruling could only be reviewed by writ of mandate, in accord with Code of Civil Procedure section 170.3, subdivision (d).[34] We now turn to the question whether Richardson rendered ineffective assistance of counsel by failing to seek such review. The answer is no. First, the record on appeal contains no explanation for counsel's omission. As the California Supreme Court has acknowledged, a party may choose not to contest a disqualification order for a number of reasons. (Curle v. Superior Court (2001) 24 Cal.4th 1057, 1071.) We cannot say, under the circumstances of this case, that Richardson could not have had a satisfactory reason. Accordingly, we must reject the claim of ineffective assistance of counsel. (People v. Kipp, supra, 18 Cal.4th at p. 367.)
 
 
 251
 Moreover, writ relief would not have been granted had it been sought. Code of Civil Procedure section 170.4, subdivision (c)(3) is clear and unequivocal: "A party may file no more than one statement of disqualification ... unless facts suggesting new grounds for disqualification are first learned of or arise after the first statement of disqualification was filed...." Absent new grounds for disqualification, this statute permits the filing of one statement of disqualification, not one by the litigant and one by his or her attorney. We reject Harrison's suggestion that the Legislature did not intend the limitation to apply to "'loose cannon'" defendants, especially where, as here, counsel was or should have been aware the initial statement of disqualification was filed,[35] and in fact a full determination of the issue was made by a neutral judge. In short, this is not a situation in which the initial statement of disqualification was rejected or ignored because the party submitting it was represented by counsel.
 
 
 252
 Code of Civil Procedure section 170.1 sets out the grounds for disqualification:
 
 
 253
 "(a) A judge shall be disqualified if ... :
 
 
 254
 "(1) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding. [] ... []
 
 
 255
 "(2) The judge served as a lawyer in the proceeding, or in any other proceeding involving the same issues he or she served as a lawyer for any party in the present proceeding .... [] ... []
 
 
 256
 "(3) The judge has a financial interest in the subject matter in a proceeding or in a party to the proceeding. [] ... []
 
 
 257
 "(4) The judge, or the spouse of the judge, or a person within the third degree of relationship to either of them, or the spouse of such a person is a party to the proceeding .... [] ... []
 
 
 258
 "(5) A lawyer or a spouse of a lawyer in the proceeding is the spouse, former spouse, child, sibling, or parent of the judge or the judge's spouse or if such a person is associated in the private practice of law with a lawyer in the proceeding.
 
 
 259
 "(6) For any reason (A) the judge believes his or her recusal would further the interests of justice, (B) the judge believes there is a substantial doubt as to his or her capacity to be impartial, or (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial....
 
 
 260
 "(7) By reason of permanent or temporary physical impairment, the judge is unable to properly perceive the evidence or is unable to properly conduct the proceeding."
 
 
 261
 Aside from the fact Judge O'Neill would preside at trial, all of the facts presented in Richardson's statement of disqualification arose and were known at the time the initial statement of disqualification was filed. The assignment of the trial to Judge O'Neill is not, in our view, a "fact[] suggesting new grounds for disqualification" within the meaning of Code of Civil Procedure section 170.4, subdivision (c)(3). While it may or may not be a new circumstance, it does not suggest a new basis for disqualification. The asserted bases for disqualification existed, if at all, at the time Harrison filed the initial statement of disqualification. In order to be timely, they had to be presented then, or at least sufficiently contemporaneously so as to be considered by Judge Schultz. (See Urias v. Harris Farms, Inc. (1991) 234 Cal.App.3d 415, 425.) As Judge O'Neill explained during a subsequent Marsden motion, "this is one of the risks that a Defendant takes when he without knowledge of his Counsel and without conferring with his Counsel files a document such as the one he did under 170.1"
 
 
 262
 Since Judge O'Neill properly struck Richardson's statement of disqualification pursuant to Code of Civil Procedure section 170.4, subdivision (c)(3), we need not determine whether that statement of disqualification made an adequate showing of apparent bias under subdivision (a)(6)(C) of section 170.1 of the Code of Civil Procedure. We note, however, that the standard for disqualification under that section is an objective one; disqualification is mandated "[i]f a reasonable member of the public at large, aware of all the facts, would entertain doubts" as to the judge's impartiality. (Flier v. Superior Court (1994) 23 Cal.App.4th 165, 170, italics added.) In this regard, "'the litigants' necessarily partisan views'" do not provide the "'applicable frame of reference'" for reviewing the claim of bias. (Roitz v. Coldwell Banker Residential Brokerage Co. (1998) 62 Cal.App.4th 716, 724.) Moreover, "the mere fact a judge obtains information during litigation does not automatically disqualify that judge from further proceedings." (People v. Scott (1997) 15 Cal.4th 1188, 1206.)
 
 
 263
 Regardless of whether the showing made would have been adequate to disqualify Judge O'Neill, Judge O'Neill properly struck Richardson's statement of disqualification; that ruling cannot be challenged on this appeal; no writ relief was sought; and Richardson was not ineffective for failing to seek such relief because it would not have been granted in any event.
 
 
 264
 B.Denial of Additional Peremptory Challenges
 
 
 265
 At the outset of trial, Harrison moved, in limine, for additional peremptory challenges so that he and the People would each have 20.[36] He asserted that, due to the nature of the case, it would be difficult to find 12 people who could be fair, and a defendant faced with a life sentence is entitled to 20 peremptory challenges. Judge O'Neill denied the motion, finding that the matter was governed by Code of Civil Procedure section 231 and noting that the parties were afforded unlimited challenges for cause. After the jury and alternates were sworn, Richardson was allowed to place on the record his objection to the court's refusal to give him additional challenges. He stated:
 
 
 266
 "As I argued before, this is a case where - uhm - because of the nature of the charges and the multitude of the charges that it is very, very difficult to find a jury that can be fair and unbiased. I don't believe the jury that we have here is fair and unbiased. I am not satisfied with the jury. I would hereby be requesting that I be given an additional six peremptory challenges. This is a life case for all practical purposes. My client is looking at a hundred and forty years. I would also point out that one of the jurors that's still left on the jury is an acquaintance of the chief investigating officer and has extensive history in law enforcement. I don't believe that individual can be fair, while I was unable to show cause to get him dismissed in that manner, I certainly think that a peremptory challenge should have been used as far as he's concerned. And that's my request."
 
 
 267
 Harrison now contends that Judge O'Neill's failure to grant him additional peremptory challenges violated the equal protection clause and also constituted an abuse of discretion. We disagree.
 
 
 268
 Code of Civil Procedure section 231, subdivision (a) provides in part:
 
 
 269
 "In criminal cases, if the offense charged is punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to 20 and the people to 20 peremptory challenges. Except as [not pertinent here], in a trial for any other offense, the defendant is entitled to 10 and the state to 10 peremptory challenges."
 
 
 270
 Division 2 of the Fourth District Court of Appeal has observed, "As far as our research has determined, courts have never interpreted Code of Civil Procedure section 231, subdivision (a) or its predecessor statute (Pen. Code, former 1070) to require granting a defendant additional peremptory challenges when the defendant faced an aggregate sentence equivalent to life imprisonment." (People v. Brown (1996) 42 Cal.App.4th 461, 476.) Our research has produced the same results. Harrison says, however, that such an interpretation violates equal protection guarantees. (See U.S. Const., 14th Amend.; Cal. Const., art. I, 7 & art. IV, 16.)
 
 
 271
 We question whether Harrison can establish the basis for an equal protection challenge. "'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citation.] As Judge Frankfurter explained in Tigner v. Texas (1940) 310 U.S. 141, 147 []: 'The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' [Citation.] [] ... [] 'Persons convicted of different crimes are not similarly situated for equal protection purposes.' [Citations.] '[I]t is one thing to hold ... that persons convicted of the same crime cannot be treated differently. It is quite another to hold that persons convicted of different crimes must be treated equally.' [Citation.]" (People v. Jacobs (1984) 157 Cal.App.3d 797, 801-803.)
 
 
 272
 Harrison compares his potential sentence to that of persons convicted of first and second degree murder. However, a defendant sentenced to a determinate term is not similarly situated with murderers who receive indeterminate life sentences. (See People v. Sipe (1995) 36 Cal.App.4th 468, 484.) This being the case, in our view Harrison fails to state a claim under equal protection principles.[37]
 
 
 273
 Assuming an equal protection claim is available to Harrison, application of the "rational basis" test is appropriate because "the 'peremptory challenge is not a constitutional necessity but a statutory privilege.'" (People v. Brown, supra, 42 Cal.App.4th at p. 475, quoting People v. Wheeler, supra, 22 Cal.3d at p. 282, fn. 28; see also People v. Leung (1992) 5 Cal.App.4th 482, 491, 494 [applying rational basis test to restrictions on voir dire contained in Code Civ. Proc., 223 & applicable only to criminal cases].) Under this test, "'the classification need only be rationally related to a legitimate state purpose'" in order to withstand an equal protection challenge. (People v. Brown, supra, 42 Cal.App.4th at p. 475.) We believe the United States Supreme Court has hinted that the "rational basis" test is the appropriate one (see Ross v. Oklahoma (1988) 487 U.S. 81, 90 [finding nothing "arbitrary or irrational" about limitation state placed on use of peremptory challenges]) and, in any event, we concur with Brown's reasoning.[38]
 
 
 274
 In People v. Brown, supra,42 Cal.App.4th 461, a defendant facing a de facto life sentence argued that his right to equal protection of the laws was violated when he sought, and was denied, one additional peremptory challenge beyond the 10 afforded him by Code of Civil Procedure section 231, subdivision (a). After an extensive review of authorities on the subject, the Court of Appeal reasoned:
 
 
 275
 "Brown was charged with 20 counts of violating section 288, subdivision (b). He was subject to full consecutive sentences .... Thus, he faced a sentence of 60, 120, or 160 years if convicted of all counts; his actual sentence was 120 years. Even with applicable credits ..., Brown faced a term of 60 years before eligibility for parole. However, ..., a defendant convicted of second degree murder may face a sentence of as little as 10 years, even if he is sentenced to 15 years to life [citation] and a defendant convicted of first degree murder may serve only 16 years and 8 months [citations]. Thus, Brown argues, equal protection principles dictate that he receive as many peremptory challenges as a defendant charged with murder.
 
 
 276
 "Brown's logic applies to virtually any combination of crimes which, with enhancements, lead to a potential sentence greater than that for an express life term (i.e., parole eligibility after seven years) or that for second degree murder (i.e., parole eligibility after ten years). Thus, Brown's position proves too much. The history of the peremptory challenge law teaches us to look not only at the sentence but also at the seriousness of the underlying crime. The Legislature has established the punishment for a single count of second degree murder at fifteen years to life, but the punishment for a single count of forcible lewd conduct with a minor at three, six or eight years. ( 288, subd. (b).) Thus, the Legislature considers second degree murder to be a more serious crime than forcible lewd conduct with a minor. The fact that a defendant is charged with multiple counts of the same crime does not alter this fundamental fact.
 
 
 277
 "Consistent with the long history of Code of Civil Procedure section 231, subdivision (a) and its predecessor statute, we conclude a defendant is entitled to additional peremptory challenges only when he is subject to a life term for a single crime. When the defendant faces an aggregate punishment for multiple crimes, he is not entitled to additional peremptory challenges. Such a policy does not violate equal protection principles; the state may rationally allocate greater resources to a person charged with a single serious crime than to a defendant charged with multiple crimes for which the aggregate punishment is just as great. Thus, we conclude the trial court did not err in failing to grant an additional peremptory challenge." (People v. Brown, supra, 42 Cal.App.4th at pp. 478-479.)
 
 
 278
 The same result obtains here, and Harrison's argument is not helped by casting it in terms of his right to trial by an impartial jury. "'[T]o establish the constitutional entitlement to additional peremptory challenges argued for here, a criminal defendant must show at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury.' [Citation.] Logic dictates that no more lenient standard applies to nonconstitutional claims of error in denying additional peremptory challenges." (People v. Pride (1992) 3 Cal.4th 195, 231.)
 
 
 279
 Harrison points to jurors with whom he was dissatisfied, specifically a woman who, as a nurse, had dealt years earlier with a sexual assault victim; a woman whose father was a Madera County detective; a woman whose sister was raped years earlier; a man whose father was a juvenile hall counselor; and an ex-police officer who knew the prosecutor's investigator and had heard "horrendous" stories of child abuse. However, we have examined the record of voir dire with particular attention to those jurors, and conclude that Harrison has established no more than the barest possibility of an unfair trial. This is not enough. (People v. Bonin (1988) 46 Cal.3d 659, 678-679, overruled on other grounds in People v. Hill, supra, 17 Cal.4th at p. 823, fn. 1.) Harrison was not entitled to additional peremptory challenges and, as Judge O'Neill's decision to deny such challenges did not exceed the bounds of reason under the circumstances, Harrison has likewise failed to establish an abuse of discretion. (People v. Giminez (1975) 14 Cal.3d 68, 72.)
 
 
 280
 C.Preclusion of Expert Testimony Concerning Investigative Techniques
 
 
 281
 In his trial brief, Harrison related that his defense was centered around showing the children made their claims because they received needed love and attention as a result, and he sought to offer expert testimony that children suffering deprivations often make false claims. Harrison also asserted that suggestive investigative methods were used on the children, and he sought to show the allegations were the result of continued brainwashing of the children and statements of the interviewers and parents, and that the allegations were not based on the children's actual memories but rather on what was suggested to them by the interviewers. The prosecutor moved to exclude expert testimony on the credibility of child sexual assault victims. He argued that whether the children were telling the truth was not a proper subject of expert testimony under Evidence Code section 801; since the expert did not observe the interviews of the children, his opinion would be speculative and not based on a sufficient foundation; such testimony would be contrary to the judicially established policy against allowing expert testimony on the credibility of witnesses; and such testimony would probably result in the calling of rebuttal experts and so should be excluded pursuant to Evidence Code section 352 because the combined expert testimony would confuse the issues and be unduly time-consuming.
 
 
 282
 At the hearing on the prosecutor's motion, Richardson explained, "[I]t's my intention to offer expert testimony from this individual not as to specifically whether these particular witnesses are being truthful or nontruthful, I intend to offer evidence from this witness about the problems associated with leading and improper interview techniques in dealing with children, the way children - they're unusually susceptible to this kind of questioning. And also we need to explain the mechanisms involved in how a child remembers things, how a child relates things, and how exterior forces have a relationship upon how they recall and what they recall." Richardson stated that he would first lay the foundation as to whether there was improper interrogation, and that this would be done during cross-examination in the prosecution's case-in-chief. The prosecutor responded that there was no "science of interrogation," that this was not a proper subject for expert testimony, that the only relevance went to credibility, and that it would necessitate calling numerous witnesses in rebuttal.
 
 
 283
 Richardson requested a foundational hearing to allow him to show this was a science, and to have his expert present his background and tell why his information would assist the trier of fact in this case. Richardson stated the expert would testify about how leading questions affect children and the fallacies of those questions, as well as the problems of improper investigation techniques. He assured Judge O'Neill that he was not going to have the expert testify that any one of the children was lying. The prosecutor responded that the crux of the proposed testimony still went to credibility, otherwise it was irrelevant. He stated that he had no problem with the qualifications of the proposed witnesses, but that there was no agreement on the subject - no science of interviewing. The prosecutor did not oppose a foundational hearing, but warned it would be extensive.
 
 
 284
 Upon inquiry by Judge O'Neill, Richardson stated his belief that he was entitled to an evidentiary hearing on the foundational matter without an offer of proof as to what he believed his expert would say. Richardson opined that he might not be able to give an adequate offer of proof, as he was not an expert in this field. He reiterated that he wanted his expert to explain to the jury some of the factors to be considered in determining whether an interview technique was impermissibly leading and suggestive. He was not intending to have his expert brand anyone a liar, but to present factors to be looked at in judging the credibility of a particular witness. Jurors could then consider the factors and make their own determination whether the child witnesses were, in effect, brainwashed. When Judge O'Neill asked why these were not questions of fact for the jury and why an expert was needed, Richardson explained that the areas were not ones of common knowledge, so he was trying to present evidence to jurors without a background in psychology in order to enable them to understand how "the kinds ... of children that we are dealing with here, children that have lived in abject poverty, whose parents were drug addicts and prostitutes, who were continually physically and sexually abused by their parents" would respond under the circumstances.
 
 
 285
 The prosecutor continued to contend that expert testimony on the credibility of witnesses should not be allowed, and that this type of testimony was directed at credibility, which was a matter for the jury. After extensive argument, Judge O'Neill asked defense counsel, "But it would either be psychiatric or psychological testimony, [the defense experts] are going to come in, and you can't give me the specifics as to what they will say or the basis as far as their studies are concerned, but your position is that they would come in and they would be discussing the issue of credibility of the children with regard to what they might be influenced to say?" Richardson responded that he intended to have an expert testify concerning the fallacies of the type of interviews done in this case, just as the expert in People v. McDonald (1984) 37 Cal.3d 351 (overruled on other grounds in People v. Mendoza (2000) 23 Cal.4th 896, 914) sought to testify concerning the fallacies of eyewitness identification. Richardson wanted to have his expert testify about different factors which jurors could use to evaluate the children's testimony, and he reiterated that he would not ask questions about the expert's opinion as to any child's truthfulness. Nevertheless, the prosecutor warned that if the defense attacked the credibility of the children with expert psychiatric testimony, the prosecution would "put on doctor after doctor" and present evidence of Child Sexual Abuse Accommodation Syndrome.
 
 
 286
 After further argument, in which Richardson insisted that he was not bringing in someone to testify that these children were liars or mistaken, Judge O'Neill determined that a foundational hearing was not mandatory. He continued:
 
 
 287
 "In this particular case ... there's been an offer of proof indicating what you believe the subject matter of the psychiatrist or psychologist or combination of both are going to be testifying to. And ... when I view that in light of the reading of [People v. Alcala (1992) 4 Cal.4th 742, 781 ...], the Alcala case is where the Supreme Court has last spoken and directly spoken to the issue of disfavoring attempts to impeach witnesses by means of psychiatric testimony.
 
 
 288
 "Here that's exactly what the issue is, is impeachment. And I understand that initially we were talking about whether or not impeachment means just simply lying, and we know that it is much more broad than that. It just means discrediting. And the law does and there is a judicial policy against attempting to impeach witnesses by means of psychiatric testimony. In addition to that, disfavoring, as I indicated, this does not prevent Defendant from suggesting to the jury that the testimony is suspect or unreliable based on the same factors that you're arguing the experts would testify to.
 
 
 289
 "In addition to that, in weighing the, which of course the Court must do, the probative value with regard to the probability of undue consumption of time, confusing the issues and misleading the jury under 352 the Court finds on both issues, on both factual and legal grounds that the law favors, and the Court does thereby rule that the motion to exclude is granted."
 
 
 290
 Richardson subsequently was permitted to ask prospective jurors whether they believed children always told the truth and whether, depending on how a child was questioned, he or she could be led to say virtually whatever the questioner wanted. He was also permitted to broach the subject in his opening statement. He was allowed to examine the district attorney's investigator, Weldon Griffith, at length about investigative techniques and Griffith's questioning of the children in this case, and to read extensive portions of transcripts of the children's interviews.[39] He was allowed to question other witnesses, such as medical personnel, concerning the propriety of certain investigation techniques, and to examine Anna G., who maintained she had not been molested by Harrison, concerning the manner in which Weldon Griffith questioned her, and to impeach her testimony in this regard through a defense investigator who also interviewed her. Finally, he was permitted to argue to the jury, based on his view of the evidence admitted at trial, that the children's allegations were the product of suggestive questioning and other improper investigative techniques.
 
 
 291
 Harrison now claims error, under both the federal Constitution and state law, based on Judge O'Neill's refusal to allow him to present expert testimony concerning suggestive investigative techniques. We find no error of federal constitutional dimension and conclude that, if error did occur under state law, it was harmless.
 
 
 292
 We begin with the unassailable principle that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]" (Crane v. Kentucky (1986) 476 U.S. 683, 690.) An essential component of procedural fairness is the opportunity to be heard. (Ibid.) This does not mean, however, that a defendant is automatically entitled to present every iota of evidence he or she desires. "As a general proposition, the ordinary rules of evidence do not infringe on a defendant's right to present a defense. [Citation.] Trial courts possess the 'traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' [Citation.] The trial court's rulings in this regard will not be overturned on appeal unless it can be shown that the trial court abused its discretion. [Citation.] Nonetheless, the trial court's discretion is not without limits, particularly if it operates to hamper defense counsel's ability to present evidence. [Citation.]" (People v. Frye (1998) 18 Cal.4th 894, 945.)
 
 
 293
 Here, there was no blanket exclusion of evidence supporting Harrison's defense. (Contrast Crane v. Kentucky, supra, 476 U.S. at p. 690.) Judge O'Neill expressly permitted Richardson to question witnesses concerning investigative techniques and to argue the matter to the jury, and Richardson took advantage of the opportunity. While restrictions short of complete exclusion may constitute a violation of the federal Constitution (see People v. Fudge (1994) 7 Cal.4th 1075, 1103; People v. Page (1991) 2 Cal.App.4th 161, 186 & fn. 14), under the circumstances of this case, we are satisfied that the exclusion of expert testimony did not rise to such a level because Judge O'Neill's ruling "did not deprive [Harrison] of '"a meaningful opportunity to present a complete defense."' [Citation.]" (Id. at p. 186, fn. omitted.) This being the case, "[i]f the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in People v. Watson (1956) 46 Cal.2d 818, 836 [], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (Chapman v. California (1967) 386 U.S. 18, 24 [])." (People v. Fudge, supra, 7 Cal.4th at p. 1103.)
 
 
 294
 In a case such as this, evidence concerning the effect of particular investigative techniques on child witnesses/alleged victims is relevant and, hence, admissible except as otherwise provided by statute. (Evid. Code, 210, 351.) Thus, in the present case the proffered evidence was not automatically excludable as irrelevant, as Judge O'Neill and the parties seem implicitly to have recognized. Moreover, to the extent the proposed experts would have testified about the content of pertinent studies reported in the professional literature, their testimony would have consisted of facts, not opinion. (People v. McDonald, supra, 37 Cal.3d at pp. 366-367.) "Factual testimony by an expert is admissible if it complies with the general statutory requirements that the witness be 'qualified' by his special knowledge (Evid. Code, 720) and that his evidence be relevant to the issues (id., 351)." (People v. McDonald, supra, 37 Cal.3d at p. 366, fn. omitted.) Here, the prosecutor did not challenge the qualifications of the witnesses.
 
 
 295
 Because Richardson's purported offer of proof did not indicate, with any precision, the evidence to be presented, it is impossible to tell whether the psychological reasons for the effects on children had relevance beyond that of the effects themselves. "[A]ny claim that evidence was wrongly excluded cannot be raised on appeal absent an offer of proof in the trial court. (Evid. Code, 354.)" (People v. Pride, supra, 3 Cal.4th at p. 235.)[40] "One function of an offer at trial is to provide a reviewing court with the means of assessing prejudice from any error [citation], thus enabling a party challenging the judgment to meet its burden of affirmatively showing reversible error by an adequate record [citation]." (Gutierrez v. Cassiar Mining Corp. (1998) 64 Cal.App.4th 148, 161.) "To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]" (People v. Schmies (1996) 44 Cal.App.4th 38, 53, italics added.) "Nothing in this record properly shows, beyond surmise, what [the excluded witnesses] would have said." (Gutierrez v. Cassiar Mining Corp., supra, 64 Cal.App.4th at p. 162.)[41] Although we can speculate as to the gist of Dr. Underwager's testimony based on other cases in which he has been involved (see, e.g., U.S. v. Rouse (8th Cir. 1997) 111 F.3d 561, 570-572 ["'learned'" or "'implanted'" memories]; Kavanagh v. Berge (7th Cir. 1996) 73 F.3d 733, 736 [correct and incorrect questioning techniques]; Underwager v. Channel 9 Australia (9th Cir. 1995) 69 F.3d 361, 363-364 ["Underwager is a Minnesota psychologist who has testified as an expert witness in more than 250 trials on the subject of the unreliability of children's testimony alleging sexual abuse"]; Underwager v. Salter (7th Cir. 1994) 22 F.3d 730, 731-732 [children are incapable of correctly remembering or accurately describing sexual contacts; "Underwager's approach has failed to carry the medical profession, but it has endeared him to defense lawyers"]), this information was not presented to Judge O'Neill and, in any event, would not have adequately informed him of the content of the answers to be elicited from Dr. Underwager or any other proposed witness (see Semsch v. Henry Mayo Newhall Memorial Hospital (1985) 171 Cal.App.3d 162, 167).[42]
 
 
 296
 Because Judge O'Neill appears to have accepted Richardson's statements as an offer of proof and the Attorney General does not discuss this point on appeal, we will assume the psychological component of the proposed testimony would have been relevant and would have satisfied the requirements of Evidence Code sections 402[43] and 801.[44] (See People v. Alcala, supra, 4 Cal.4th at p. 788.) We now review its exclusion for abuse of discretion. (People v. Alcala, supra, 4 Cal.4th at p. 788; People v. McAlpin (1991) 53 Cal.3d 1289, 1299.)
 
 
 297
 The seminal case on this type of psychological testimony is People v. McDonald, supra, 37 Cal.3d 351. There, the prosecution presented seven eyewitnesses who identified the defendant with varying degrees of certainty, plus one who said he definitely was not the perpetrator, and the defendant presented six witnesses who placed him in another state on the date the crimes were committed. (Id. at p. 355.) A defense psychologist proposed to tell the jury about various psychological factors that may affect the reliability of eyewitness identification, and to help counter some common misconceptions about the process. The psychologist was not going to offer an opinion that any particular witness was or was not mistaken in his or her identification of the defendant. (Id. at pp. 361-362.) The California Supreme Court held that, upon a proper showing, such testimony is admissible, and it found error to exclude it under the particular circumstances of the case. (Id. at p. 355.)
 
 
 298
 The Supreme Court examined some of the psychological factors as described in professional literature and concluded that, although jurors might not be totally unaware of them, the "body of information" then available on the subject was sufficiently beyond common experience so that expert opinion thereon could assist the trier of fact in an appropriate case. (People v. McDonald, supra, 37 Cal.3d at pp. 367-369.) The court went on to determine that the expert testimony in question did not seek to take over the jury's task of judging credibility because it did not tell jurors whether a particular witness was accurate, but instead informed them of certain factors that could affect eyewitness identification. Moreover, the court noted, California has abandoned the "ultimate issue" rule. (Id. at pp. 370-371; see Evid. Code, 805.) Finally, the court determined that such evidence was not excludable based on the Kelly-Frye rule.[45]
 
 
 299
 The court reiterated that whether to admit expert opinion evidence is a matter within the trial court's discretion, but found that discretion abused in the circumstances before it. (People v. McDonald, supra, 37 Cal.3d at pp. 376-377.) The court focused on the fact that because no other evidence connected the defendant with the crime, the crucial feature of the case was the accuracy of the eyewitness identifications - an issue on which the evidence was "far from clear." (Id. at p. 375.) The court also noted that elements which could have raised a reasonable doubt as to the accuracy of the identification were present in the testimony of each of the witnesses who identified the defendant. Under the circumstances, exclusion of the testimony "undercut the evidentiary basis of defendant's main line of defense ... and deprived the jurors of information that could have assisted them in resolving that crucial issue." (Id. at p. 376.) The court concluded:
 
 
 300
 "An error in excluding expert testimony may be found harmless. [Citation.] In the case at bar, however, the record compels us to conclude that the error was prejudicial. As we have seen, the issue affected by the ruling was crucial, given the absence of any other evidence connecting defendant with the crime; and the evidence on that issue was close, given the potential weaknesses in the prosecution's testimony and the presence of both eyewitness and alibi testimony favorable to the defense. An error that impairs the jury's determination of an issue that is both critical and closely balanced will rarely be harmless. Rather, after an examination of the whole record we find it reasonably probable that a result more favorable to defendant would have been reached in the absence of this error. (People v. Watson (1956) 46 Cal.2d 818, 836 [].) There has therefore been a miscarriage of justice, and the judgment must be reversed. (Cal. Const., art. VI, 13.)
 
 
 301
 "We reiterate that the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; ... 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' [Citation.] We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (People v. McDonald, supra, 37 Cal.3d at pp. 376-377, fns. omitted.)
 
 
 302
 In People v. Alcala, supra, 4 Cal.4th 742, the California Supreme Court signaled a marked repudiation of any expansive reading of McDonald. In Alcala, the trial court excluded the testimony of London, a psychologist who was prepared to testify that law enforcement personnel hypnotized witness Crappa without her knowledge, and that police investigators used other sophisticated psychological techniques, short of hypnosis, in order to manipulate and contaminate Crappa's memory. The defendant offered London's testimony in an attempt to persuade the court to strike Crappa's testimony or, alternatively, to impeach her account before the jury. After a foundational hearing, the trial court determined the defendant had failed to establish Crappa was hypnotized; hence, the court refused to strike her testimony. The court further excluded London's testimony, pursuant to Evidence Code section 352, as highly speculative and likely to confuse the jury. (People v. Alcala, supra, 4 Cal.4th at pp. 785-786.)
 
 
 303
 The California Supreme Court upheld the trial court's determination. It discussed the judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony (People v. Alcala, supra, 4 Cal.4th at pp. 781-782), then stated:
 
 
 304
 "Even if we assume that London's proffered testimony (regarding police investigation techniques short of hypnosis) satisfied the requirements of Evidence Code sections 402 and 801, the trial court properly exercised its discretion under Evidence Code section 352 in excluding this testimony. In addition to the judicial policy discussed earlier (ante, pp. 781-782), the trial court's concern with avoiding undue consumption of time justifies the exclusion of London's testimony - that concern mirroring, as it does, our observation in [People v. Shirley (1982) 31 Cal.3d 18] that testimony pertaining to the presence or absence of interrogation 'safeguards' is likely to inject 'undue delay and confusion into the judicial process' and lead to 'parades of expert witnesses.' (People v. Shirley, supra, 31 Cal.3d at pp. 39-40.) The jury was read the testimony given by Crappa at the initial trial, and it heard the audiotapes of her lengthy pretrial interviews with the police. Although London was prepared to testify that police investigators had employed improper interrogation techniques while interviewing Crappa, he had not attended those sessions, a circumstance that lessened the probative value of the opinion he would render. (See id., at pp. 63-64 [unduly suggestive interrogations may include 'hypnotist's demeanor and other nonverbal conduct'].) The reliability of his testimony was suspect. Thus, it was within the trial court's discretion to conclude that London's testimony would have been speculative and unduly time-consuming. (Compare People v. McDonald (1984) 37 Cal.3d 351, 375-377 [] [trial court erred in excluding expert testimony regarding psychological factors affecting eyewitness identification, where the identification was not substantially corroborated by evidence giving it independent reliability].)
 
 
 305
 "Moreover, the exclusion of London's testimony did not prevent the defense from suggesting to the jury that Crappa's testimony was suspect or unreliable. As noted earlier, the 'intense' cross-examination of Crappa at defendant's first trial - admitted before the jury at defendant's second trial under the prior-testimony exception to the hearsay rule - included 'much sparring about whether her evasive responses to police questioning, and at the preliminary hearing, were outright lies.' [Citation.] At defendant's second trial, the defense was not precluded from urging the jury to find that the nature of the police questioning of Crappa rendered her responses untrustworthy; defense counsel in fact went to great lengths in his closing argument to suggest that the police had contaminated Crappa's testimony.
 
 
 306
 "In view of the foregoing, we conclude that the trial court did not err in excluding London's testimony as not sufficiently probative to outweigh the probability its admission would necessitate undue consumption of time, confuse the issues, or mislead the jury. (Evid. Code, 352.)" (People v. Alcala, supra, 4 Cal.4th at pp. 788-789, fns. omitted.)
 
 
 307
 In the case at bench, Cindy E. was an eyewitness to many of the crimes charged.[46] In addition, Sylvia reported the abuse almost immediately after it occurred. These circumstances sufficiently corroborated the children's accounts so as to give them independent reliability; hence, this case was one in which Judge O'Neill retained discretion whether to admit or exclude the proffered expert testimony. (People v. Alcala, supra, 4 Cal.4th at p. 789; People v. Walker (1988) 47 Cal.3d 605, 628; People v. McDonald, supra, 37 Cal.3d at p. 377.)
 
 
 308
 Here, the offer of proof was weak. Insofar as we can tell, none of the experts attended any of the interview sessions in which the children were involved. Allowing the expert testimony would have led to a "battle of experts" - a situation which would have consumed much time with no guarantee it would do anything other than confuse the jury. The psychological "whys" were not as important as the central point: that children can be misled and their claims molded through the use of particular investigative techniques. Defense counsel was permitted to examine witnesses about investigative techniques, and to argue the subject to the jury. In fact, testimony concerning the propriety (or lack thereof) of certain investigative techniques was placed before the jury by other witnesses, a situation apparently lacking in McDonald. There was some independent corroboration of the children's testimony. Under the circumstances, we find no abuse of discretion and, certainly, no miscarriage of justice. The evidence was properly excluded; however, assuming it was not, it is not reasonably probable that a result more favorable to Harrison would have been reached had the evidence been admitted. (People v. Alcala, supra, 4 Cal.4th at p. 789; People v. Sanders (1995) 11 Cal.4th 475, 509-510; People v. Sanders, supra, 51 Cal.3d at pp. 505-506.)
 
 D.Other Evidentiary Rulings
 
 309
 Harrison next contends that various other evidentiary rulings combined to violate his rights under the federal Constitution and state law. Although not altogether clear, it appears he is challenging Judge O'Neill's exclusion of evidence concerning alleged physical or sexual abuse of, or sexual conduct by, any minor witnesses which occurred after the initial report of abuse, including evidence that (1) Cindy E. forced the children to do a "strip tease"; (2) Cindy was abused by her father and in turn physically abused her children; (3) a registered sex offender lived with Cindy and her children and there was subsequent physical and sexual abuse of the children; and (4) Janiva P. had sex with "Pete" and the three brothers alleged as victims in this case.
 
 
 310
 In his trial brief, Harrison stated that he would seek to introduce evidence of prior molestations and sexually-related activity to show the source of the children's knowledge of sexual matters, as well as evidence of prior false accusations of sexual misconduct and physical harm. The prosecutor moved to exclude evidence of sexual conduct of the children with others, absent compliance with Evidence Code section 782. Richardson disagreed that compliance was needed, arguing that he sought to introduce such evidence not to attack the children's credibility, but in order to show knowledge and, implicitly, motive for fabricating testimony. Ultimately, Richardson conceded these were issues of credibility, and he agreed to comply with Evidence Code section 782. Accordingly, Judge O'Neill granted the People's motion, pending compliance with the statute.
 
 
 311
 Richardson subsequently moved for admission of prior sexual conduct. Appended to his motion were a declaration and offer of proof in which he detailed proffered testimony concerning sexual conduct by Tony R., Victor R., Jeffrey R., Janiva P., Andrea G., and Sylvia G. The defense sought to introduce this evidence to demonstrate the children's knowledge of sexual matters, that this knowledge and conduct antedated their involvement with Harrison, and that the children were attributing the acts of others to Harrison. The prosecutor objected to the affidavit on grounds of hearsay and the sexual assault victim-counselor privilege (Evid. Code, 1035 et seq.). Judge O'Neill rejected the hearsay assertion, but ruled the subject could not be mentioned before the jury prior to presentation of a very specific offer of proof, followed by a hearing outside the jury's presence to make sure such evidence did, in fact, exist.
 
 
 312
 The subject arose many times during trial. Ultimately, Judge O'Neill excluded, as irrelevant, evidence that Cindy made her boys perform a striptease years after the time frame of the charges, the defense theory being that this constituted circumstantial evidence that Cindy either molested the children or caused them to fabricate the allegations against Harrison. Judge O'Neill also excluded, pursuant to Evidence Code section 352, evidence that Cindy was herself abused.[47] He permitted Cindy to be examined and impeached concerning why Child Protective Services visited her home prior to the time frame of the charges, as the defense theory was that the children concocted the allegations against Harrison in order to obtain the love and affection they had been denied because Cindy physically abused them, and that Harrison did not keep Cindy a virtual captive as she testified and she had the opportunity to report the sexual misconduct if, in fact, it occurred. Judge O'Neill sustained relevance, hearsay, and Evidence Code section 352 objections to questions concerning whether the 16-year-old nephew of Cindy's present husband was registered as an adolescent sex offender and was currently living in the home (the defense theory being that this was circumstantial evidence the children gained their sexual knowledge from this person), as well as relevance and Evidence Code section 352 objections to reports to Child Protective Services of physical and sexual abuse in Cindy's home in 1992 and 1993, long after Harrison left (the defense theory being that the fact the children were abused before and after Harrison was in the home was circumstantial evidence of his innocence). Judge O'Neill sustained relevance and Evidence Code section 352 objections to proffered evidence that Victor and Jeffrey committed arson (the defense theory being that it affected their credibility); Cindy threw one of the children against a wall in 1992 (the defense theory being transference by the children of Cindy's abuse to Harrison); and sexual conduct, again in 1992, between Victor and the nephew of Cindy's husband.
 
 
 313
 Judge O'Neill permitted Richardson to ask Cindy whether she molested the children, although he limited the question to the period of 1986 to 1989, when Harrison was in the home. Cindy responded that she was forced to orally copulate Tony, but she denied beating the children during that time. Richardson then sought to question Tony R. about what the child told CALM counselors the first time he met with them.[48] The prosecutor's assertion of privilege was sustained. However, Judge O'Neill permitted Richardson to ask Tony, outside the jury's presence, whether Cindy or anyone else sexually molested him during the time frame of the charges. Tony responded that no one other than Harrison, including Cindy or her husband's nephew, had molested him. Richardson asked to have the testimony placed before the jury so that he could present evidence it was untrue, and he sought to show that Tony acquired his sexual knowledge from sources other than Harrison. To that end, he requested permission to question Tony about the subject "from the beginning of when he remembers until present." Judge O'Neill sustained relevance and Evidence Code section 352 objections concerning the time period after June 6, 1990, the date the first statement outlining specifics of the molestations was taken from Tony. The defense was allowed to examine Victor concerning events during the same time frame. Judge O'Neill denied Richardson's subsequent request to go beyond that time frame because the children were now recounting events they did not mention in the specified interviews, as the children were still testifying to the same kinds of acts and so not demonstrating expanded knowledge. Hence, evidence beyond the specified time frame remained irrelevant.
 
 
 314
 Later during trial, Richardson sought to present evidence that Janiva P. had engaged in sex with Cindy's three boys as well as two others; that she had become pregnant and suffered a miscarriage about a year before trial; and that she had told Cindy that she had been molested by Marcelliano Conde. Judge O'Neill sustained objections pursuant to Evidence Code sections 352 and 782, observing that the defense sought to admit the evidence to show prior knowledge, but Janiva had testified only to "the very simplest of sexual conduct." Accordingly, he found the proffered evidence more collateral than probative and excluded it. With respect to Sylvia G., however, Judge O'Neill ruled the defense could examine her about her sexual knowledge and, if she denied possessing any prior to the incident with Harrison, the defense might be able to delve into whether her mother was a prostitute, assuming the child witnessed acts of prostitution. The defense also sought to show that Sylvia claimed to have been molested by Steve Lozano, on the basis that this information showed knowledge (if Sylvia was telling the truth) or that her credibility was suspect because she made prior false accusations (if the allegation was false). Judge O'Neill decided to hear Lozano's testimony outside the jury's presence first, but ruled that, if Lozano testified in the manner Richardson asserted, Richardson would then be permitted to ask Sylvia whether she accused Lozano of sexually touching her and, depending on her testimony, to put Lozano in front of the jury and ask him whether he sexually touched her. Pursuant to Evidence Code section 352, Judge O'Neill ruled the defense could not go into the specifics of the alleged sexual acts or to bring in Sylvia's statements on the matter to her aunt and uncle, as that would essentially result in trying a collateral case. Sylvia was later asked, in front of the jury, whether Steve Lozano molested her, and whether this occurred before or after the molestation by Harrison. The parties stipulated that Lozano would deny molesting her if he testified.
 
 
 315
 Richardson subsequently asked to question Cindy E. about a statement she made to CALM to the effect that Janiva P. told her that she (Janiva) had been molested by Porfirio Conde. The defense also sought to admit evidence that Janiva told Alice Perez that she was molested by Marcelliano Conde. Defense counsel argued the issue went to knowledge, impeachment of Janiva's statements, and to show her propensity to make false accusations. Following presentation of an amended and more detailed offer of proof, Judge O'Neill ruled that, since Andrea G. had been asked whether she was molested by anyone else, the defense could bring in Porfirio Conde to deny molesting her. Judge O'Neill further ruled the defense could ask Janiva whether she had been molested by anyone in the past and, if so, by whom, and then bring in the alleged perpetrator and question him. However, the details of any alleged molestation were excluded. The court viewed this as protecting the alleged victims under Evidence Code section 782, while still allowing the defense to explore the making of allegedly false accusations. Richardson was subsequently allowed to question Janiva and Andrea, as well as Cindy E. and other witnesses to whom Janiva and Andrea allegedly made statements, concerning whether the girls said they were molested by either of the Condes. He was also allowed to examine Porfirio Conde.
 
 
 316
 We find no error in Judge O'Neill's rulings. The defense sought admission of the evidence to attack the credibility of various witnesses (including that of the children by showing their sexual knowledge came from sources other than Harrison); and to show the children had a motive to fabricate allegations against Harrison, either because they were transferring to him their abuse by other people or because in return for the allegations, they received the love and affection that was otherwise missing from their lives.
 
 
 317
 The California Supreme Court has summarized the applicable law thus:
 
 
 318
 "In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal in the absence of an abuse of that discretion. (People v. Green [(1980)] 27 Cal.3d [1,] 19;[49] People v. Pierce (1979) 24 Cal.3d 199, 211.) This discretion is not, however, unlimited, especially when its exercise hampers the ability of the defense to present evidence. While the trial judge has broad discretion to control the ultimate scope of cross-examination, wide latitude should be given to cross-examination designed to test the credibility of a prosecution witness in a criminal case. (People v. Belmontes (1988) 45 Cal.3d 744, 780.)
 
 
 319
 "The United States Supreme Court has '"recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis [v. Alaska (1974) 415 U.S. 308, 316-317] (citing Greene v. McElroy, 360 U.S. 474, 496 (1959)). It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) (italics in original).' (Delaware v. Van Arsdall (1986) 475 U.S. 673, 678-679; see also People v. Harris [(1989)] 47 Cal.3d [1047,] 1091.)
 
 
 320
 "The Van Arsdall court concluded that 'a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." (Davis v. Alaska, supra, at 318.' (Delaware v. Van Arsdall, supra, 475 U.S. at p. 680.) 'There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced "a significantly different impression of [the witness's] credibility ...."' (People v. Belmontes, supra, 45 Cal.3d at p. 780, quoting Van Arsdall, supra, 475 U.S. at p. 680.)" (People v. Cooper (1991) 53 Cal.3d 771, 816-817, parallel citations omitted.)
 
 
 321
 "Application of the ordinary rules of evidence ... does not impermissibly infringe on a defendant's right to present a defense. [Citation.]" (People v. Mincey (1992) 2 Cal.4th 408, 440.) Simply stated, just because evidence may tend to support a defense does not mean it must be admitted. (See People v. Blackburn (1976) 56 Cal.App.3d 685, 691 [due process right to fair trial does not require admission of all relevant evidence tending to exonerate defendant].) We turn now to Judge O'Neill's application of the rules of evidence in the case at bench.
 
 
 322
 Several statutes come into play with respect to the proffered evidence. The first is Evidence Code section 780, which states in part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [] ... [] (f) The existence or nonexistence of a bias, interest, or other motive. [] ... [] (i) The existence or nonexistence of any fact testified to by him." Under subdivision (f) of the statute, "evidence concerning the alleged existence of a witness' motive to fabricate testimony is admissible to attack his credibility. Evidence of such a motive may properly include specific acts and conduct of the witness. [Citation.] However, section 780 does not require that all questions relating to a witness' credibility be allowed on cross-examination; nor does it mandate the admission of all evidence offered to show a motive to fabricate. [Citation.] Evidence of a witness' conduct must unequivocally point to a possible motive to fabricate testimony before it is admissible. [Citation.] Moreover, evidence of such a motive need not be admitted where the theory behind the alleged motive to fabricate is highly tenuous, speculative, conjectural or based on 'possibilities.' [Citations.]" (People v. Johnson (1984) 159 Cal.App.3d 163, 168, fn. omitted.)
 
 
 323
 Evidence Code section 782 sets out the procedure involved, in specified prosecutions, for attacking credibility under Evidence Code section 780. (People v. King (1979) 94 Cal.App.3d 696, 703.) It does not prohibit impeachment by contradiction or otherwise (see People v. Keith (1981) 118 Cal.App.3d 973, 983); instead, it requires that a certain preliminary showing be made, consonant with the legislative intent to limit public exposure of a victim's prior sexual history (see People v. Chandler (1997) 56 Cal.App.4th 703, 708). To that end, Evidence Code section 782 provides in part:
 
 
 324
 "(a) In any prosecution under Section 261, ... 286, 288, [or] 288a, ... of the Penal Code, ... if evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness under Section 780, the following procedure shall be followed:
 
 
 325
 "(1) A written motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness.
 
 
 326
 "(2) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated.
 
 
 327
 "(3) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant.
 
 
 328
 "(4) At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780, and is not inadmissible pursuant to Section 352 of this code, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.
 
 
 329
 "(b) As used in this section, 'complaining witness' means the alleged victim of the crime charged, the prosecution of which is subject to this section."
 
 
 330
 "Evidence Code section 782 vests broad discretion in the trial court to weigh the defendant's proffered evidence prior to its submission to the jury and to resolve the conflicting interests of the victim and the defendant. [Citation.] In addition, the statute reaffirms the role of Evidence Code section 352 in authorizing the trial court to exclude relevant evidence which is more prejudicial than probative. [Citation.]" (People v. Casas (1986) 181 Cal.App.3d 889, 895-896.)
 
 
 331
 Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Under this statute, "the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (People v. Rodrigues (1994) 8 Cal.4th 1060, 1124, citations & italics omitted.)
 
 
 332
 Evidence concerning the state of a victim's knowledge of sexual matters "relates directly to the victim's credibility, and falls squarely within [Evidence Code] section 782," whether or not the sexual conduct might be considered "'blameworthy.'" (People v. Harlan (1990) 222 Cal.App.3d 439, 446-447.) Accordingly, Judge O'Neill properly required compliance with that statute where the defense theory of relevance concerned the children's knowledge.
 
 
 333
 In terms of the discretionary call under Evidence Code section 352, "[a] child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts. This is because knowledge of such acts may be unexpected in a child who had not been subjected to them. In such a case it is relevant for the defendant to show that the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant. Thus, if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused, evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted." (People v. Daggett (1990) 225 Cal.App.3d 751, 757.)
 
 
 334
 Daggett does not stand for the proposition that all "knowledge" evidence should have been admitted in the present case. There, the defendant's offer of proof involved the victim's having been molested several years before the acts that gave rise to the charges against the defendant. (People v. Daggett, supra, 225 Cal.App.3d at p. 754.) The Court of Appeal simply held that the offer of proof was sufficient, so that the trial court erred by not holding a hearing to determine whether the prior acts of molestation were similar to those presently alleged. (Id. at p. 757.) In the case at bench, by contrast, Harrison sought to question the children concerning acts which allegedly occurred as long as years after the acts that gave rise to the charges against him. Judge O'Neill did not err in implicitly determining such evidence was, at best, of minimal probative value after the point in time at which the children gave their first detailed reports of sexual misconduct, whether the defense theory was knowledge or "transference." "[T]his court will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless it is shown the trial court exercised its discretion '"in an arbitrary, capricious or patently absurd manner."' [Citations.]" (People v. Frye, supra, 18 Cal.4th at p. 948.) Evidence of alleged physical or sexual abuse of, or sexual conduct by, the children which occurred after the initial detailed reports, was properly excluded.[50]
 
 
 335
 False accusations of sexual misconduct are probative of credibility and, at least one court has held, are not subject to the procedural requirements of Evidence Code section 782 because the conduct placed before the jury as bearing on credibility is the making of the false statement, not the sexual conduct which is the content of the statement. (People v. Franklin (1994) 25 Cal.App.4th 328, 335-336.) Here, Judge O'Neill permitted the defense to explore whether false accusations were made; he simply did not permit Richardson to delve into details. This ruling did not constitute an abuse of discretion, nor did it deny Harrison his right of confrontation since "a reasonable jury [would not] have received a significantly different impression of the witness[es'] credibility had the defendant been permitted to pursue his proposed line of cross-examination." (Delaware v. Van Arsdall, supra, 475 U.S. at p. 680; People v. Greenberger (1997) 58 Cal.App.4th 298, 350.)
 
 
 336
 In his opening brief, Harrison also notes that Judge O'Neill excluded evidence in the CALM records that the boys played "hate" games involving Harrison; that Sylvia G.'s mother had objected to the child being placed in Richard N.'s care because she feared he would abuse the child; that Cindy E. told persons at CALM that Janiva claimed to have been molested by Porfirio Conde; that CALM counselors interviewed Cindy in front of her children; that the boys were interviewed together at CALM; and that the boys often lied at CALM. Although he provides record cites to what apparently are challenged rulings, he simply asserts that each was erroneous under California law and that the set of rulings, considered with exclusion of his experts' testimony, deprived him of his right to present a defense. Except for a general discussion of the statutes upon which Judge O'Neill relied at various times, however, Harrison does not tell us the basis for any particular ruling or why that ruling was error. "'Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion.'" (People v. Dougherty (1982) 138 Cal.App.3d 278, 282; see also People v. Hardy (1992) 2 Cal.4th 86, 150; People v. Wharton (1991) 53 Cal.3d 522, 563.)
 
 
 337
 As a result, we decline to discuss the foregoing evidentiary rulings. We note, however, that at least some evidence was admitted concerning what took place during CALM sessions. The defense was permitted to introduce a fair amount of evidence about the types of therapy offered at CALM in these kinds of cases, including group therapy, whether a mother would be interviewed in front of her children, whether group interviews might take place, and the use of "Carl-bashing." Harrison has not established that Judge O'Neill erred in determining the sexual assault victim-counselor privilege was available in this case (see Evid. Code, 1035.2, 1035.8;[51] Menendez v. Superior Court (1992) 3 Cal.4th 43, 447-450 [dealing with analogous psychotherapist-patient privilege]; Farrell L. v. Superior Court (1988) 203 Cal.App.3d 521, 526-527) or that the privilege was not required to yield (see Evid. Code, 1035.4;[52] People v. Gilbert (1992) 5 Cal.App.4th 1372, 1389-1392; Farrell L. v. Superior Court, supra, 203 Cal.App.3d at pp. 527-528). He likewise has not established that the CALM records themselves should have been admitted despite his failure to lay requisite foundation. (Evid. Code, 1271.) Last, he has not established that Judge O'Neill's exclusion of evidence pursuant to Evidence Code section 352 constituted error or violated his constitutional rights. (See People v. Rodriguez (1999) 20 Cal.4th 1, 9-10.) Accordingly, we find no cause for reversal, whether considering the various rulings singly or in combination.
 
 E.Jury Misconduct
 
 338
 Harrison says Judge O'Neill erred by failing to inquire into instances which might have demonstrated jury misconduct or that a juror was subject to discharge. We disagree.
 
 
 339
 At the start of the afternoon session on October 13, 1994, which was in the midst of Tony R.'s testimony, Richardson informed Judge O'Neill that, as the jury was leaving for lunch, Harrison overheard several of the jurors talking to each other and saying, "'poor little guy.'" Richardson asked that the jury be readmonished not to discuss the merits of the case until all of the evidence had been presented. Judge O'Neill agreed to do so, although he denied Harrison's motion for a mistrial. At the next recess, Judge O'Neill reminded jurors that it was very important that they not discuss any aspect of the case or form any opinion. When court recessed for the evening, he admonished them not to discuss the case with anyone, and that they could not make comments or discuss the case in any way even among themselves. The next day, Judge O'Neill reiterated that jurors were not to discuss the case or make comments to each other, and he reminded them that they had not yet heard all of the evidence.
 
 
 340
 On October 17, Richardson informed the court that he had just been told by his investigator that the investigator and Harrison recognized Juror Number Five as having been a nurse at APU at one point when Harrison was there. As a result, defense counsel requested that the juror be removed and an alternate seated. Judge O'Neill noted that all jurors had been asked whether they recognized Harrison or any of the attorneys, and the juror in question did not respond. Judge O'Neill inferred from the lack of response that the juror did not recall Harrison, a situation the judge did not find surprising given the high volume of patients at APU. Accordingly, he found no reason to believe the juror knew or remembered Harrison unless she brought it to the court's attention.
 
 
 341
 Richardson then represented that Harrison had just informed him that Harrison had filed lawsuits against APU and this juror for taking away his legal materials. Judge O'Neill responded that he needed to see a copy of the pleading, which Richardson agreed to obtain from the attorney handling that case. When Judge O'Neill asked whether the juror was named as a defendant in the lawsuit, Harrison personally responded that she was going to be named, as she was one of the Doe defendants. Judge O'Neill stated that was "not good enough," then warned against naming the juror in order to get rid of her. Judge O'Neill then examined a civil lawsuit which was contained in the record before him and satisfied himself that it did not pertain to Juror Number Five. Insofar as the record shows, the other civil suit was not presented to the judge.
 
 
 342
 On October 24, Harrison submitted a Marsden motion which in part concerned Juror Number Five. Notably, Harrison's allegations concerning the juror were somewhat different than those presented in court. Harrison claimed he had informed Richardson that he had been watching the juror, who was prejudiced against Harrison due to a civil suit he had filed against the juror's employer. Harrison represented that the juror kept staring at him and, after one of the children testified, said "poor little boy" as she was leaving the courtroom. Harrison represented that the juror stated she worked at Valley Medical Center, but she was not revealing all of the facts because in reality she worked at APU. Harrison claimed that he had filed a complaint against almost every friend of the juror and a civil suit against the mental facility at which she worked. Harrison stated that she had a strong motive to dislike him, had failed to tell the court that she knew him, and kept giving him vengeful looks. Judge O'Neill noted that the issue had already been raised and ruled upon.
 
 
 343
 Harrison now contends he is entitled to reversal of the judgment and a limited remand in order to determine whether there was prejudicial jury misconduct or whether, even absent misconduct, good cause existed to discharge any juror.
 
 
 344
 "If at any time, whether before or after the final submission of the case to the jury, a juror ... upon ... good cause shown to the court is found to be unable to perform his duty, ... the court may order him to be discharged and draw the name of an alternate, who shall then take his place ...." ( 1089.)[53] When a juror cannot be fair and impartial, he or she cannot perform his or her duty within the meaning of section 1089. (People v. Warren (1986) 176 Cal.App.3d 324, 327; People v. Van Houten (1980) 113 Cal.App.3d 280, 288.) However, bias on the part of a juror may not be presumed (People v. Williams (1997) 16 Cal.4th 153, 232), and the juror's inability to perform his or her duties "must appear as a 'demonstrable reality.'" (People v. Lucas (1995) 12 Cal.4th 415, 489.)
 
 
 345
 "'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged. [Citation.] ...'
 
 
 346
 "'"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct - like the ultimate decision to retain or discharge a juror - rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial."' [Citation.] A hearing is required only where the court possesses information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case. [Citation.]" (People v. Bradford (1997) 15 Cal.4th 1229, 1348.)
 
 
 347
 With respect to the "poor little guy" comment, we note that "our jury system is 'fundamentally human.' [Citation.]" (People v. Cox (1991) 53 Cal.3d 618, 696.) Jurors are not required to leave their humanity at the courtroom door. Given the circumstances under which the comment was made, the record suggests no more than a passing, verbalized expression of compassion toward a child. (See People v. Kaurish (1990) 52 Cal.3d 648, 694 [no duty to inquire into juror's state of mind where juror's derogatory remark toward defense counsel was result of momentary exasperation with proceedings].) Nothing in the record suggests Judge O'Neill possessed information which, if true, would have constituted good cause to doubt a juror's ability to perform his or her duties; hence, Judge O'Neill was under no duty to inquire. (See People v. Bradford, supra, 15 Cal.4th at p. 1348.) This conclusion is bolstered by the fact defense counsel did not request a hearing, but simply make a perfunctory motion for mistrial and asked that the jury be readmonished. (See People v. DeSantis (1992) 2 Cal.4th 1198, 1235.) Judge O'Neill did so - several times, in fact - and we presume the jurors followed these instructions. (People v. Osband (1996) 13 Cal.4th 622, 676; People v. Diaz (1987) 195 Cal.App.3d 1375, 1382.)
 
 
 348
 With respect to Juror Number Five, Judge O'Neill was informed the juror was a nurse at APU at the same time Harrison was placed there. If true, this information would not, without more, constitute good cause to doubt the juror's ability to perform her duties: as Judge O'Neill pointed out, all jurors were asked whether they recognized Harrison and this juror did not respond, implying she did not recall Harrison, and this situation was not surprising, given the high volume of patients at APU. Thus, no inquiry was required.[54] Judge O'Neill left open the possibility that a lawsuit against the juror might require her discharge, and he asked to see a copy of the pleadings and inquired whether she was named in the suit. When Harrison conceded that she had not yet been named, Judge O'Neill appropriately found the facts insufficient to justify the juror's discharge. However, nothing Judge O'Neill said precluded Harrison from presenting a copy of the lawsuit and explaining which allegation(s) applied to Juror Number Five. Judge O'Neill simply warned Harrison not to name the juror for the purpose of securing her discharge from the jury. The warning was not unwarranted, given Harrison's track record in this regard and changing allegations concerning the juror, and it was reasonable for Judge O'Neill to seek further information about the lawsuit before questioning the juror and possibly thereby creating bias where none existed.[55] As to the possibility the juror might be biased because Harrison had filed a lawsuit against her employer, the record shows that, assuming Juror Number Five had indeed worked at APU, she had not done so in some time. It makes sense that Judge O'Neill wanted to examine the lawsuit, to see whether there was any basis to believe she might have knowledge of it, before asking her about it. Logically, if the juror had no knowledge of the lawsuit, it cannot possibly have biased her either because she was named therein, or because Harrison filed it against her employer.
 
 
 349
 As previously noted, the decision whether to investigate the possibility of juror bias is a discretionary matter with the trial court. (People v. Bradford, supra, 15 Cal.4th at p. 1348.) When we review such a ruling, "we will uphold the decision unless it '"falls outside the bounds of reason."' [Citations.]" (People v. Earp (1999) 20 Cal.4th 826, 892.) Moreover, "'[t]he exercise of that discretion is not rendered abusive merely because other alternative courses of action may have been available to the trial judge.' [Citation.]" (People v. Bell (1998) 61 Cal.App.4th 282, 288-289.) We find that, under all the circumstances, Judge O'Neill's course of conduct fell well within the bounds of reason. Accordingly, there was no abuse of discretion and, hence, no error.
 
 F.Shackles
 
 350
 At the outset of jury selection, Harrison submitted a letter to Judge O'Neill in which he complained that he was "leg cuffed" and that most of the jury could see his feet were shackled to the table. Harrison claimed this was prejudicial, and asserted that he had heard several "jury persons" whispering that he was in shackles. Richardson related that he disagreed with Harrison's assertion of prejudice, as he had explained to Harrison that he felt it was in the defense's best interest, for strategic reasons, to be open with the jury and not have jurors think anything was being hidden from them. He also believed jurors might feel sorry for Harrison because he had been in custody for so long. Richardson expressed an intent to inform the jury at some point that Harrison was in custody, and to ask Judge O'Neill to admonish jurors that they could not believe Harrison was guilty based on that fact. Judge O'Neill agreed that if Richardson proceeded as planned, he would admonish the jury that the fact Harrison had been arrested and taken into custody, and was currently in custody, could not be used to indicate he was guilty.
 
 
 351
 Based on Richardson's strategic decision, Judge O'Neill found the issue of shackles to be moot. However, he noted that a skirt had been placed on the table at which Harrison was seated and no one allowed into the first row, and that everything possible had been done to make sure this was not an issue. Judge O'Neill related that although he had watched, he had not seen anyone looking at Harrison's feet, nor had he seen anyone look in Harrison's direction as they made their way to their seats. Judge O'Neill acknowledged Harrison's statement that he had heard a comment; however, Judge O'Neill found this "surprising in that this courtroom is acoustically set up so that the bench is the best place to hear anybody say anything, and I can tell you that I hear people talking from the back rows of this courtroom, and I hear them very clearly. They sometimes don't realize how far clearly it is that I hear them. But none the less, I haven't heard anybody say anything."
 
 
 352
 During voir dire, Richardson questioned at least one prospective juror on the effect of Harrison's being kept in custody. At the conclusion of jury selection, Harrison asked for an assurance that the jury would not see him "walking back and forth in chains" between the holding cell and the courtroom. Richardson expressed the opinion, based on his trial experience, that it was almost an insult to jurors' intelligence to try to make them believe a defendant was not in custody when he or she was. For that reason, and because he believed the jury, after hearing Harrison's testimony and considering the state of the evidence, might be made to feel sorry for Harrison, he still intended to bring the issue before the jury at some point. Judge O'Neill noted that the bailiffs were experienced with this type of situation, and that the jury room door was always closed when Harrison was taken back to the cell.
 
 
 353
 On October 28, Judge O'Neill took testimony, outside the jury's presence, concerning an incident that occurred the previous afternoon between Harrison and the bailiff and which involved an argument and physical struggle. The sheriff's department requested to be allowed to use an electronic immobilization belt on Harrison, but Richardson objected, noting that this was the first time there had been a problem and that Harrison would be testifying that day. Judge O'Neill found there had been a breach of courtroom security, and decided the sheriff's department could do what it needed to, short of the belt. Judge O'Neill warned, however, that if he saw any sign of physical aggression by Harrison, the belt would be used and it would no longer be of concern to the court whether the belt could be seen by the jurors.
 
 
 354
 Richardson did not elicit from Harrison that he was in custody or argue the point to the jury, nor did he request that the court give CALJIC No. 1.04.[56] While Judge O'Neill did not give that instruction, he did tell jurors that they could not be biased against Harrison because he had been arrested, charged, or brought to trial; that none of those circumstances was evidence of guilt; and that jurors were not to infer or assume from any or all of them that Harrison was more likely to be guilty than innocent.
 
 
 355
 Harrison now complains that Judge O'Neill erred by allowing the jury to see him in shackles, and that this error was compounded by the court's failure to give CALJIC No. 1.04. We find no error and, manifestly, no prejudice.
 
 
 356
 "A criminal defendant cannot be physically restrained in the jury's presence unless there is a showing of manifest need for such restraints. [Citation.] Such a showing, which must appear as a matter of record [citation], may be satisfied by evidence, for example, that the defendant plans to engage in violent or disruptive behavior in court, or that he plans to escape from the courtroom [citation]. A shackling decision must be based on facts, not mere rumor or innuendo. [Citation.]" (People v. Anderson (2001) 25 Cal.4th 543, 595; People v. Cox, supra, 53 Cal.3d at pp. 651-652; People v. Duran (1976) 16 Cal.3d 282, 290-293 (Duran).)
 
 
 357
 Here, no showing of "manifest need" was made at the time Harrison originally objected. However, defense counsel short-circuited the making of such a showing by expressing a strategic purpose for having the jury know Harrison was in custody. Accordingly, we tend to agree with the People that any issue of an inadequate showing has been waived. Since an attorney can waive the right of his or her client to appear before the jury in civilian clothes instead of jail garb, a right which is of federal constitutional dimension (In re Avena (1996) 12 Cal.4th 694, 731) and which has been equated by the United States Supreme Court with shackling (Holbrook v. Flynn (1986) 475 U.S. 560, 568; see People v. Jenkins (2000) 22 Cal.4th 900, 996), we fail to see why an attorney cannot waive the right to have his or her client unrestrained in front of the jury absent the requisite showing under Duran. Moreover, we cannot say defense counsel's tactics were unreasonable. Richardson sought to engender sympathy, in any way he could, for a person charged with decidedly unsympathetic crimes. That his tactics may have been unconventional, or that his strategy may have changed mid-trial and so he ultimately did not raise the matter with the jury, does not mean the record before us affirmatively discloses the lack of a rational tactical purpose for the strategy. (See People v. Majors (1998) 18 Cal.4th 385, 406.)[57]
 
 
 358
 Regardless, we need not determine whether the issue was waived. As the California Supreme Court recently explained,
 
 
 359
 "No basis for reversal appears in any event, because the record contains no hint that physical restraints impaired the fairness of defendant's trial and thus caused prejudice.
 
 
 360
 "As we explained in Cox, '[t]he rule in ... Duran ... seeks to avoid the pernicious effect of the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system ..., as well as the effect such restraints have upon a defendant's decision to take the stand ...." [Citations.] In assessing the impact on the right to a fair trial, the first and last of these considerations predominate.' [Citation.]
 
 
 361
 "Hence, in Duran itself, we found that improper shackling was among several errors causing cumulative prejudice when '[the] [d]efendant ... elected to testify in his own behalf [and] was required to appear as a witness with both wrist and ankle restraints, thereby damaging his credibility ....' [Citation.] On the other hand, we have consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense. [Citations.]" (People v. Anderson, supra, 25 Cal.4th at p. 596.)
 
 
 362
 In the present case, there is no evidence the jury saw the restraints. Given Judge O'Neill's statements about the skirt on the table and his observations of the prospective jurors, we will not assume "that the precautions taken to avoid prejudice to [Harrison] were ineffective and that the jury was aware of, or influenced by, the restraint." (People v. Coddington (2000) 23 Cal.4th 529, 651, overruled on other grounds in Price v. Superior Court (2000) 25 Cal.4th 1046,1069, fn. 13.) "Moreover, prejudicial error is not established simply on the basis of one or more jurors having seen the defendant in shackles. [Citation.]" (People v. Coddington, supra, 23 Cal.4th at p. 651; People v. Ochoa (1998) 19 Cal.4th 353, 417; see Duran, supra, 16 Cal.3d at p. 287, fn. 2.) At most, crediting Harrison's written statement to the fullest possible extent, his shackles were briefly seen during jury selection.
 
 
 363
 Significantly, the record contains no hint that the shackles affected Harrison's decision to take the stand or the quality of his testimony, or that jurors were aware he was shackled while testifying.[58] Harrison did complain about the effect the threat of the electronic immobilization belt had on his testimony, but by that time there had been a breach of courtroom security and a hearing thereon. Under those circumstances, Judge O'Neill did not abuse his discretion by holding open the possibility of additional restraints. (See People v. Allen (1986) 42 Cal.3d 1222, 1263 [when trial court's decision to shackle is made in accord with Duran guidelines, determination will be upheld unless defendant establishes manifest abuse of discretion].) Moreover, even assuming error in allowing the restraints prior to this point, whether on the part of the court or counsel or both, the matter became moot once the requisite need arose. (See People v. Cox, supra, 53 Cal.3d at pp. 659-660.)
 
 
 364
 Harrison complains that Judge O'Neill did not instruct the jury in the language of CALJIC No. 1.04 as he said he would. However, Judge O'Neill offered to give the instruction if defense counsel raised the matter with the jury. Defense counsel did not, nor did he request the instruction be given. Where, as here, "the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (Duran, supra, 16 Cal.3d at p. 292, fn. omitted; see People v. Bolin (1998) 18 Cal.4th 297, 318 [where no juror saw defendant in restraints, trial court was under no obligation to instruct on point].) Assuming the instruction was required, however, its absence did not prejudice Harrison. At most, jurors merely got a glimpse of the shackles. Insofar as the record shows, the restraints were not visible while Harrison testified. Moreover, Judge O'Neill gave a cautionary instruction concerning the fact Harrison had been arrested and charged. Under these circumstances, the failure to give CALJIC No. 1.04 was harmless under any standard. (Compare People v. Jacobs (1989) 210 Cal.App.3d 1135, 1142 [failure to instruct in similar language judged under Watson standard] with People v. Jackson (1993) 14 Cal.App.4th 1818, 1827-1830 [acknowledging Jacobs but determining that constitutional error occurs if restraints are visible to jury for substantial length of time without meeting Duran requirements].)
 
 
 365
 Harrison says the error was exacerbated when the prosecutor referred to him as an "animal." We deal with his claim of prosecutorial misconduct in part III G., post. Suffice it to say the combination of a brief glimpse of shackles (at most), coupled with a questionable epithet, did not deprive Harrison of his right to a fair trial.
 
 G.Prosecutorial Misconduct
 
 366
 Last, Harrison contends the prosecutor committed prejudicial misconduct, which Judge O'Neill failed to control, by referring to him as an "animal" and "piece of garbage." In this respect, the following occurred during the prosecutor's summation to the jury:
 
 
 367
 "[MR. RICE:] Also, bear in mind the demeanor of these kids when they're on the stand. Tony, Victor, Andrea, Janiva and Sylvia. When you look at the way - the courage that they had to come in here and tell you how they were brutally sexually assaulted by this animal. Compare that to this animal's demeanor on the stand when he testified. He couldn't even look his own attorney in the face. He couldn't look me in the face. He couldn't look you in the face.
 
 
 368
 "MR. RICHARDSON: Objection to the characterization of 'animal.'
 
 
 369
 "MR. RICE: I think it's fair comment.
 
 
 370
 "THE COURT: The objection is overruled."
 
 
 371
 The prosecutor proceeded to summarize some of the evidence against Harrison as well as various instructions. This ensued:
 
 
 372
 "MR. RICE: The charges here relating to Andrea [G.] are all corroborated by Cindy [E.] That's what's charged here. The acts that this piece of garbage -
 
 
 373
 "MR. RICHARDSON: Objection, Your Honor.
 
 
 374
 "MR. RICE: Submitted.
 
 
 375
 "THE COURT: I think we're going a little bit too far.
 
 
 376
 "MR. RICE: Okay. I'll stick with 'animal.'
 
 
 377
 "MR. RICHARDSON: Objection.
 
 
 378
 "MR. RICE: The acts that this person did to Andrea [G.] that Cindy [E.] witnessed. Cindy [E.] witnessed Andrea [G.] orallly copulating Carl around Christmas time, December of '88.
 
 
 379
 "(Thereupon the Defendant was making noise.)
 
 
 380
 "MR. RICE: Knock it off.
 
 
 381
 "THE COURT: Now, hang on just a minute. Just a minute.
 
 
 382
 "Ladies and gentlemen, would you please return to the jury room for just a minute? We'll be with you in just a minute.
 
 
 383
 "(Thereupon the Jury retired from the courtroom, and the following proceedings were had:)
 
 
 384
 "THE COURT: The jury has left the courtroom.
 
 
 385
 "Mr. Rice, please don't talk to -
 
 
 386
 "MR. RICE: I'm sorry.
 
 
 387
 "THE COURT: - to the Defendant directly.
 
 
 388
 "Mr. Harrison, if your intent is to distract the District Attorney during his closing argument by pounding your cup on the table, you had better stop it. If there is any more attempt or actual distraction either of the Prosecutor, or of me, or of the jury, you are going to be removed. That's all I'm going to say.
 
 
 389
 "MR. RICE: I'm sorry, Your Honor. [] ... []
 
 
 390
 "MR. RICHARDSON: I think what my client is trying to say, and I've been putting objections on the record ... it's difficult for anyone to be called 'garbage' and 'animal' and that sort of thing. [] ... []
 
 
 391
 "Anyway, I'll explain to my client the necessity of proper courtroom decorum. And I would just simply request that any further reference to my client in that fashion is inappropriate. Let's just talk about the facts.
 
 
 392
 "THE COURT: Mr. Rice, my request would be that you not do
 
 
 393
 that -
 
 
 394
 "MR. RICE: I'll stop.
 
 
 395
 "THE COURT: - because it is not necessary. I don't think there's anybody in the courtroom -
 
 
 396
 "MR. RICE: It is hard for me to control my anger.
 
 
 397
 "THE COURT: I don't think there's anybody in the courtroom that doesn't understand what you think about him personally, but it's not relevant.
 
 
 398
 "MR. RICE: Okay. [] ... []
 
 
 399
 "(Thereupon the jury returned to the courtroom, and the following proceedings were had:)
 
 
 400
 "THE COURT: Okay. Thank you, ladies and gentlemen.
 
 
 401
 "We're ready to proceed. Jury is all back.
 
 
 402
 "MR. RICE: I would like to apologize to all of you, it is very hard for me to control my anger."
 
 
 403
 Harrison now says the "animal" and "piece of garbage" references violated his rights, under the Fourteenth Amendment to the United States Constitution, to a fair trial and due process. "'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"
 
 
 404
 [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]' [Citation.]" (People v. Hill, supra, 17 Cal.4th at p. 819, fn. omitted.) A showing of bad faith (i.e., intentional misconduct) is not required. (Id. at p. 822; People v. Bolton (1979) 23 Cal.3d 208, 213-214; People v. Pitts, supra, 223 Cal.App.3d at p. 691.)
 
 
 405
 We find no federal constitutional error. The epithets were two brief references in an otherwise straightforward argument. Even assuming they constituted misconduct, they did not render Harrison's trial fundamentally unfair. Accordingly, we examine them under state law.
 
 
 406
 "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion - and on the same ground - the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.] [] The foregoing, however, is only the general rule. A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if '"an admonition would not have cured the harm caused by the misconduct."' [Citations.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (People v. Hill, supra, 17 Cal.4th at pp. 820-821; People v. Pitts, supra, 223 Cal.App.3d at pp. 691-692.)
 
 
 407
 Here, Judge O'Neill overruled defense counsel's objection to the "animal" reference. The objection to "piece of garbage" was implicitly sustained, but no
 
 
 408
 admonition was requested. In order to forestall a claim of ineffective assistance of counsel, and because it was so bound up with the "animal" reference, we will examine it on the merits. (See People v. Duncan (1991) 53 Cal.3d 955, 977.)
 
 
 409
 "When a defendant makes a timely objection to prosecutorial argument, the reviewing court must determine first whether misconduct has occurred, keeping in mind that '"[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom"' [citation], and that the prosecutor 'may "vigorously argue his case" ..., "[using] appropriate epithets warranted by the evidence."' [Citation.] Second, if misconduct ha[s] occurred, we determine whether it is 'reasonably probable that a result more favorable to the defendant would have occurred' absent the misconduct. [Citation.]" (People v. Welch (1999) 20 Cal.4th 701, 752-753.) "As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion. [Citation.]" (People v. Alvarez (1996) 14 Cal.4th 155, 213.)
 
 
 410
 "'"In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." [Citation.]'" (People v. Alvarez, supra, 14 Cal.4th at p. 213.) In this regard, "[t]he use of opprobrious epithets in jury argument is not in itself misconduct. [Citations.]" (People v. Lang (1989) 49 Cal.3d 991, 1022.) "A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury. [Citations.]" (People v. Pensinger (1991) 52 Cal.3d 1210, 1251.)
 
 
 411
 We compare the epithets used here to some which have not received appellate condemnation. (See, e.g., People v. Thomas (1992) 2 Cal.4th 489, 537 ["'perverted murderous cancer'" and "'walking depraved cancer'" within range of permissible comment regarding defendant's "egregious conduct"]; People v. Sully (1991) 53 Cal.3d
 
 
 412
 1195, 1249 ["'human monster'" and "'mutation'" not misconduct]; People v. Duncan, supra, 53 Cal.3d at pp. 976-977 [likening defendant to wild animal in its natural habitat not misconduct considering circumstances of crime]; People v. Pensinger, supra, 52 Cal.3d at p. 1251 ["'perverted maniac'" within bounds of proper argument]; People v. Bloom (1989) 48 Cal.3d 1194, 1213 [likening defendant to Fu Manchu and describing both as "'evil incarnate'" "may have constituted a reasonably fair comment on the evidence"]; People v. Hovey (1988) 44 Cal.3d 543, 579-580 [references to Adolph Hitler and Marquis de Sade; prosecutor has right to point out that modest behavior in courtroom is not inconsistent with depraved conduct under other circumstances]; but see People v. Fosselman (1983) 33 Cal.3d 572, 580 [characterizing defendant as "an 'animal ... out to get somebody that morning'" inflammatory]; People v. Villa (1980) 109 Cal.App.3d 360, 363-366 [references to evidence not before jury were error, and it was "at least arguable" that prosecutor's "subjective indictments" of defendant, including reference to defendant as an "'animal,'" were misconduct].)
 
 
 413
 The evidence in this case may understandably provoke feelings of revulsion and disgust. However, a prosecutor must control his or her reaction and attempt to preserve the objectivity necessary to dispassionate judgment. The comments made here did not facilitate a tenor of objectivity and were, in our view, inappropriate. Nevertheless, even if the epithets went too far or if the prosecutor crossed the line into impropriety by responding, "I'll stick with 'animal'" or by directly addressing Harrison, the misconduct was harmless. Considering the remarks in the context of the argument as a whole (see People v. Dennis, supra, 17 Cal.4th at p. 522), the incident was brief and isolated. Judge O'Neill's observation that the prosecutor was going too far, coupled with the prosecutor's subsequent apology for his conduct, sufficiently indicated to jurors that they were not to consider what had occurred. (Cf. People v. Pensinger, supra, 52 Cal.3d at pp. 1250-1251.) Moreover, contrary to Harrison's numerous assertions, the evidence of guilt was strong. Under these circumstances, it is not reasonably probable a result more favorable to Harrison would have occurred absent the epithets and exchange with Harrison.
 
 
 414
 Harrison complains the shackling and "animal" reference prejudiced him, apparently because the combination conveyed to the jury that he was dangerous. "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]" (People v. Osband, supra, 13 Cal.4th at p. 689; see also People v. Frye, supra, 18 Cal.4th at p. 970; People v. Samayoa (1997) 15 Cal.4th 795, 841.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (People v. Frye, supra, 18 Cal.4th at p. 970.)
 
 
 415
 We find no reasonable likelihood the jury linked the "animal" reference with the fact Harrison was shackled, assuming jurors were even aware of that circumstance. The prosecutor's comments were clearly made in reaction to the children's testimony that Harrison committed brutal sexual assaults against them, and nothing in the remarks remotely hinted at the fact Harrison was shackled. In short, the prosecutor's comments did not make a connection between the evidence and Harrison's physical restraints, and there is no reason to believe the jury did.
 
 
 416
 Last, we reject Harrison's contention that Judge O'Neill failed to control the prosecutor's misconduct. To the contrary, he adequately controlled the courtroom and discharged his duty to assure a fair trial. (See People v. Bell, supra, 49 Cal.3d at p. 542.)
 
 DISPOSITION
 
 417
 The order declaring Harrison a vexatious litigant is vacated. In all other respects, the judgment is affirmed. The superior court is directed to determine whether the
 
 
 418
 vexatious litigant order was transmitted to the Judicial Council and, if so, the order is directed to be withdrawn.
 
 
 419
 Ardaiz, P.J.
 
 
 420
 WE CONCUR: Buckley, J., Cornell, J.
 
 
 
 Notes:
 
 
 *
 Pursuant to California Rules of Court, rules 976(b) and 976.1, only the Statement of the Case, Roman numeral I, B of the Discussion, and the Disposition of this opinion is certified for publication.
 
 
 [1]
 All statutory references are to the Penal Code unless otherwise stated.
 
 
 *
 See footnote, ante, page 1.
 
 
 *
 See footnote, ante, page 1.
 
 
 [2]
 Harrison's opening brief contains a lengthy chronology of his Marsden motions, including some which, he asserts, were never heard or ruled upon. Under the subheading "The Claims of Error," however, he discusses only hearings on motions dated May 7, 1991, and October 4, 1994. Accordingly, we address only those two motions.
 
 
 [3]
 Berryman was overruled on other grounds in People v. Hill (1998) 17 Cal.4th 800, 823, footnote 1.
 
 
 [4]
 Judge Nunez subsequently granted the motion.
 
 
 [5]
 We have reviewed all of Harrison's allegations, but find no reason to recite each one.
 
 
 [6]
 An order declaring a party to be a vexatious litigant is not itself appealable, but may be reviewed, as here, on appeal from a subsequent judgment. (In re Bittaker (1997) 55 Cal.App.4th 1004, 1008.)
 
 
 [7]
 Code of Civil Procedure section 391.7, subdivision (a) provides in part: "In addition to any other relief provided in this title, the court may, on its own motion or the motion of any party, enter a prefiling order which prohibits a vexatious litigant from filing any new litigation ...." (Italics added.)
 
 
 [8]
 Code of Civil Procedure section 391, subdivision (d) defines "plaintiff" as "the person who commences, institutes or maintains a litigation or causes it to be commenced, instituted or maintained ...."
 
 
 [9]
 "'Defendant' means a person (including corporation, association, partnership and firm or governmental entity) against whom a litigation is brought or maintained or sought to be brought or maintained." (Code Civ. Proc., 391, subd. (e).)
 
 
 [10]
 In fact, Harrison submitted a letter to Judge O'Neill on or about August 4, 1994, although the letter's contents were bizarre.
 
 
 *
 See footnote, ante, page 1.
 
 
 [11]
 There is some confusion in the record about the date of the hearing in which Harrison first mentioned Jackson. On page 111 of the volume of reporter's transcripts of the various hearings before Judge Gomes, the hearing is dated August 13, 1992. On page 1, in the list of all hearing dates reported in the volume, the date has been changed by interlineation to 1993. The clerk's transcript contains no minutes of a hearing on August 13, 1992. However, it does contain the minutes of a hearing held on August 13, 1993, which took place before Judge Gomes and was reported by the same court reporter who prepared the transcript in question. The minutes of the hearing correspond to the reporter's transcript dated August 13, 1992, and the transcript of that hearing is internally consistent with the hearing that follows and which took place on August 20, 1993. Accordingly, we conclude that Harrison first raised the Jackson issue in August 1993, not in August 1992. (This conclusion is also consistent with the procedural history set out in Harrison's December 8, 1993, motion to dismiss, as well as that contained in the district attorney's response to that motion.) Regardless, it appears the true issue is whether defense counsel was ineffective for failing to move for dismissal of the criminal charges in 1992, shortly after Judge Quaschnick issued his findings. We will analyze Harrison's claim accordingly.
 
 
 [12]
 Section 1370, which governs what occurs after a defendant in a criminal action has been found not competent to stand trial, provides, as Harrison recognizes, that "[t]he criminal action remains subject to dismissal pursuant to Section 1385." ( 1370, subd. (d).) Section 1385, subdivision (a) permits dismissal of an action or part of an action only upon the judge's own motion or upon application of the prosecuting attorney. In short, "a defendant does not have the statutory privilege of moving to dismiss an action ... under Penal Code section 1385, subdivision (a). [Citations.]" (People v. Hernandez (2000) 22 Cal.4th 512, 522, italics added; see also People v. Barraza (1994) 30 Cal.App.4th 114, 121, fn. 8; People v. Superior Court (Flores) (1989) 214 Cal.App.3d 127, 136-137; People v. Andrade (1978) 86 Cal.App.3d 963, 973.) A defense attorney cannot be found to have performed deficiently for failing to make a motion he or she was not authorized to make.
 In the face of the clear language of section 1385, subdivision (a), some courts have held that a defendant may "ask the trial court to exercise its discretion under section 1385." (People v. Superior Court (Flores), supra, 214 Cal.App.3d at p. 137; People v. Lopez (1988) 198 Cal.App.3d 135, 140.) Accordingly, we treat Harrison's argument as being that he was denied the effective assistance of counsel when Richardson did not make a timely request of the trial court to exercise its discretion to dismiss the charges.
 
 
 [13]
 The general procedures were substantially the same in 1992, when Judge Quaschnick made his findings, and in 1993, when Harrison moved to dismiss the criminal charges.
 
 
 [14]
 We note that, although Judge Quaschnick did preside over the August 14, 1992, hearing on the conservatorship, he subsequently disqualified himself from hearing a motion to dismiss, based on his original findings, which was brought in December 1993.
 
 
 [15]
 In Jackson, the Supreme Court noted: "Were the State's factual premise that Jackson's commitment is only temporary a valid one, this might well be a different case. But the record does not support that premise.... There is nothing in the record that even points to any possibility that Jackson's present condition can be remedied at any future time." (Jackson v. Indiana, supra, 406 U.S. at pp. 725-726.) Here, by contrast, there were conflicting expert opinions, and the record amply suggests Harrison was not consistently incompetent.
 
 
 [16]
 We would reach the same conclusion, for the same reasons, if we believed Judge Quaschnick's findings were to be considered, under Jackson and Davis, without regard to the three-year limitation.
 
 
 [17]
 At all relevant times, Welfare and Institutions Code section 5008 has provided in part: "(h)(1) For purposes of ... Chapter 3 (commencing with Section 5350) [dealing with conservatorship for gravely disabled persons], 'gravely disabled' means either of the following: [] ... [] (B) A condition in which a person, has been found mentally incompetent under Section 1370 of the Penal Code and all of the following facts exist: [] (i) The indictment or information pending against the defendant at the time of commitment charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person. [] (ii) The indictment or information has not been dismissed. [] (iii) As a result of mental disorder, the person is unable to understand the nature and purpose of the proceedings taken against him or her and to assist counsel in the conduct of his or her defense in a rational manner." (Italics added.)
 
 
 [18]
 Even an error of such magnitude does not divest the trial court of jurisdiction in the fundamental sense. (People v. Superior Court (Marks) (1991) 1 Cal.4th 56, 63-71; In re Griffin, supra, 67 Cal.2d at pp. 346-347.)
 
 
 [19]
 Likewise, where a section 995 motion erroneously has been denied - meaning, of course, that the defendant's motion to dismiss should have been granted - the defendant is not entitled to reversal of an ensuing conviction absent a showing of prejudice at trial. (People v. Crittenden (1994) 9 Cal.4th 83, 136-137; see People v. Pompa-Ortiz (1980) 27 Cal.3d 519, 529.) We recognize that at least one appellate court has found the Pompa-Ortiz rationale inapplicable to competency proceedings (People v. Mayes (1988) 202 Cal.App.3d 908, 919-920, fn. 7), but that case involved a situation in which the trial court erroneously denied the defendant "the opportunity to present evidence material to the question of his competency." (Id. at p. 919.) That is not the same species of error alleged here.
 
 
 [20]
 Most of the record of this hearing, including the reporter's transcript, is contained in the record on appeal of case No. F021375, which was dismissed as being from an interlocutory, nonappealable order. We have previously taken judicial notice of our records in that case.
 
 
 [21]
 "In People v. Medina[, supra,] 51 Cal.3d [at page] 885, [the California Supreme Court] held 'that section 1369 passes constitutional muster under both the federal and state Constitutions.' In Medina v. California[, supra,] 505 U.S. [at pages] 452-453, the United States Supreme Court upheld [the California] court's ruling that section 1369 does not violate the due process clause of the federal Constitution. (Cf. Cooper v. Oklahoma, supra, 517 U.S. [at pp. 366-369] [a requirement that a criminal defendant prove his incompetence by clear and convincing evidence violates the due process clause of the federal Constitution].)" (People v. Jones (1997) 15 Cal.4th 119, 158, parallel citations omitted, overruled on other grounds in People v. Hill, supra, 17 Cal.4th at p. 823, fn. 1.)
 
 
 [22]
 At all relevant times, subdivisions (c) and (d) of section 1372 have provided: "(c) When a defendant is returned to court with a certification that competence has been regained, the court shall notify either the community program director, the county mental health director, or the regional center director and the Director of Developmental Services, as appropriate, of the date of any hearing on the defendant's competence and whether or not the defendant was found by the court to have recovered competence. [] (d) Where the committing court approves the certificate of restoration to competence as to a person in custody, the court shall hold a hearing to determine whether the person is entitled to be admitted to bail or released on own recognizance status pending conclusion of the proceedings. Where the superior court approves the certificate of restoration to competence regarding a person on outpatient status, unless it appears that the person has refused to come to court, that person shall remain released either on own recognizance status, or, in the case of a developmentally disabled person, either on the defendant's promise or on the promise of a responsible adult to secure the person's appearance in court for further proceedings. Where the person has refused to come to court, the court shall set bail and may place the person in custody until bail is posted."
 
 
 [23]
 "Not including a jury trial (People v. Murrell, supra, 196 Cal.App.3d 822, 826)."
 (Fn24). People v. Rells, supra, 22 Cal.4th 860, the California Supreme Court's latest pronouncement on the subject, consistently and carefully refers to "trial" in conjunction with proceedings pursuant to section 1369 (see, e.g., People v. Rells, supra, 22 Cal.4th at pp. 863, 867) and "hearing" in conjunction with proceedings pursuant to section 1372 (see, e.g., People v. Rells, supra, 22 Cal.4th at pp. 863, 865, 867-868). In Rells, the court rejected the defendant's claim that the trial court erred in presumably conducting the hearing on his recovery of competence in conformity with the holding of Mixon (People v. Rells, supra, 22 Cal.4th at p. 870); the question on review was limited, "in substance, to the proper conduct of a hearing on a defendant's recovery of mental competence ..., including, impliedly, any presumption bearing on mental competence and, expressly, any burden of proof related thereto." (Id. at p. 865.) While this suggests the state Supreme Court agrees there is no right to a jury trial in a section 1372 proceeding, Rells does not directly address the issue.
 
 
 [25]
 In McPeters, criminal proceedings were suspended in March 1985, pursuant to section 1368. The doctors appointed to examine the defendant disagreed on whether he was competent to stand trial. The trial court then denied the prosecutor's request for a jury trial on the issue of competence, but we issued a writ of mandate determining that the People had a statutory right to such a trial. In October 1985, the doctors reexamined the defendant and concluded he was now competent to stand trial. The parties submitted the matter on the most recent doctors' reports and the court found the defendant competent to stand trial. On appeal, the defendant unsuccessfully claimed this procedure violated due process "by depriving him of a full, trial-type, adversary hearing" on the issue of his competence. (People v. McPeters, supra, 2 Cal.4th at p. 1168.)
 
 
 [26]
 In Harris, criminal proceedings were suspended and a doctor was appointed to exam).ine the defendant. The defendant refused to cooperate with the doctor, who concluded the defendant was incompetent. Defense counsel waived his client's presence at the hearing on the doctor's report, and the court found the defendant incompetent to stand trial. The defendant appealed from the commitment order but, while the appeal was pending, he was certified competent to stand trial. As described by the appellate court, "[t]he trial court reinstituted Penal Code section 1368 proceedings and ... a jury found appellant mentally competent to stand trial." (People v. Harris, supra, 14 Cal.App.4th at pp. 989-990.)
 
 
 [27]
 Indeed, the record offers no assurance such a request would have been granted. Judge Kane's order cites People v. Murrel, supra, 196 Cal.App.3d 822, and People v. Mixon, supra, 225 Cal.App.3d 1471, suggesting the court agreed with the parties' conclusion that no jury trial was required.
 
 
 [28]
 The People say defense counsel in fact asked the court to take judicial notice of its file. The portion of the record cited to us refers to the hearing before Judge Papadakis, not to the hearing before Judge Kane.
 
 
 [29]
 The record supports the pattern suggested by the prosecutor - i.e., increasingly bizarre behavior the closer Harrison got to trial, resulting in section 1368 proceedings and a postponement of the criminal trial.
 
 
 [30]
 We note that, during a later hearing, Judge O'Neill told Harrison, "Mr. Harrison, Judge Kane felt you were a game player, and I agree with him." Judge O'Neill also stated, "The Court finds that this Defendant is acting in a bizarre manner, and I believe he's feigning. I do. I think that he's doing it when he wants to do it, and he's not doing it when he doesn't want to do it. And he may not be the most stable individual, but he knows how to play the system. And that's - I think Judge Kane was right in his order. And he's acting in a bizarre manner, despite the finding of Judge Kane that apparently did not convince him that the Court was onto him is not convincing either."
 
 
 *
 See footnote, ante, page 1.
 
 
 [31]
 The record on appeal does not contain the motion; however, we have reconstructed its contents based on the declaration in opposition filed by Judge O'Neill and Judge Schultz's ruling.
 
 
 [32]
 As the People note, a petition for writ of mandate/prohibition was denied by this court on October 13, 1994, in case No. F022464. However, the issue raised therein concerned denial of an in limine motion, not the motion for disqualification.
 
 
 [33]
 We see no practical difference between a finding of untimeliness vis--vis a peremptory challenge pursuant to Code of Civil Procedure section 170.6, which was at issue in Hull, and a challenge for cause, which is at issue here. Under either circumstance, the finding of untimeliness has the same ultimate effect as denial of the motion on the merits.
 
 
 [34]
 In People v. Brown, supra, 6 Cal.4th 322, the California Supreme Court determined that Code of Civil Procedure section 170.3, subdivision (d) applies to all statutory judicial disqualification claims, even those based on provisions, such as Code of Civil Procedure section 170.1, subdivision (a)(6)(C), which appear to codify due process grounds for relief. However, Code of Civil Procedure section 170.3, subdivision (d) "does not apply to, and hence does not bar, review (on appeal from a final judgment) of nonstatutory claims that a final judgment is constitutionally invalid because of judicial bias." (People v. Brown, supra, 6 Cal.4th at p. 335.) Although Harrison makes various claims of judicial error and asserts that Richardson's declaration alleged facts constituting an objective showing of bias, he does not make a nonstatutory claim that his conviction is constitutionally invalid because of judicial bias, nor would the record support such an assertion.
 
 
 [35]
 The record shows that Judge O'Neill's declaration in response to the initial statement of disqualification was served on Richardson, and Richardson's comments to Judge O'Neill strongly suggest he was cognizant of the initial filing.
 
 
 [36]
 Harrison initially asked for a total of 26, but amended his request to conform to the provisions of Code of Civil Procedure section 231.
 
 
 [37]
 Harrison cites People v. Yates (1983) 34 Cal.3d 644 and People v. Smith (1984) 35 Cal.3d 798. In Yates, former section 1070 afforded 26 peremptory challenges if the offense was punishable with death or imprisonment in the state prison for life, and 10 challenges otherwise. At issue was the number of challenges to be given a defendant charged with first degree murder without special circumstances, where the punishment was imprisonment for 25 years to life. (People v. Yates, supra, 34 Cal.3d at p. 646.) In Smith, the issue before the court concerned the number of peremptory challenges available, under Yates, to a defendant charged with second degree murder and facing a term of 15 years to life. (People v. Smith, supra, 35 Cal.3d at pp. 808-809.) As Harrison recognizes, the court in Yates avoided the potential constitutional question (People v. Yates, supra, 34 Cal.3d at pp. 652-653), while Smith simply extended Yates's rationale (People v. Smith, supra, 35 Cal.3d at pp. 808-809). Neither case is of particular assistance here, since both dealt with changes to the law wrought by enactment of the 1978 death penalty initiative and Determinate Sentencing Act and the concomitant end of California's indeterminate sentencing scheme. (People v. Yates, supra, 34 Cal.3d at pp. 646-647, 649-650; see People v. Felix (2000) 22 Cal.4th 651, 657-658; People v. Brown, supra, 42 Cal.App.4th at pp. 477-478.)
 
 
 [38]
 In Vansickel v. White (9th Cir. 1999) 166 F.3d 953, 957, the Ninth Circuit Court of Appeals declared that the "state right to peremptory challenges [afforded by Code of Civil Procedure section 231] is a state-created liberty interest protected by the Fourteenth Amendment to the Constitution." However, Vansickel dealt with a due process claim in a case in which the defendant was statutorily entitled to 20 peremptory challenges, but received only 10. In the case at bench, the statute entitled Harrison to 10 peremptory challenges; he was deprived of none. Vansickel thus is factually and legally distinguishable, and does not stand for the proposition that the statutory scheme is subject to strict scrutiny analysis.
 
 
 [39]
 At the prosecutor's behest, a tape-recording of an interview was played for the jury.
 
 
 [40]
 In pertinent part, Evidence Code section 354 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means ...."
 
 
 [41]
 For that matter, it is not clear that Judge O'Neill was even informed who the proposed witnesses were, although Harrison now says they were Drs. Coleman, Underwager, and King.
 
 
 [42]
 "'Where an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal, and an offer, if made, may be broad and general.' [Citations.]" (People v. Schmies, supra, 44 Cal.App.4th at p. 54, fn. 9.) This is not such a case.
 
 
 [43]
 Evidence Code section 402 provides: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests. [] (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."
 Here, there was no foundational hearing.
 
 
 [44]
 Evidence Code section 801 states: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."
 "[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission .... Instead, ... even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness' (People v. Cole (1956) 47 Cal.2d 99, 103 [])." (People v. McDonald, supra, 37 Cal.3d at p. 367.)
 For years, this court has seen child molestation cases in which the investigative techniques have been called into question due to their effect on the child victims/witnesses. (See, e.g., People v. Pitts (1990) 223 Cal.App.3d 606, 819.) Given the number of such cases that have been reported in the media, it is conceivable that expert opinion on the subject ultimately will be excludable because it will add nothing to the jury's common fund of information.
 
 
 [45]
 People v. Kelly (1976) 17 Cal.3d 24; Frye v. United States (D.C. Cir. 1923) 293 Fed. 1013.
 
 
 [46]
 That the jury may not have believed her entire testimony does not mean it can be wholly disregarded. It provided at least some corroboration. (Cf. People v. Sanders (1990) 51 Cal.3d 471, 506.)
 
 
 [47]
 Richardson wanted to question Cindy about her claims of abuse at the hands of her father, then bring in the father to testify the allegations were false. Richardson then intended to argue to the jury that Cindy had made prior false accusations of sexual misconduct.
 
 
 [48]
 CALM is a program in Santa Barbara, where Cindy and the boys lived after she separated from Harrison, in which victims of child molestation receive counseling. Cindy's boys attended the program, and she apparently also received some counseling.
 
 
 [49]
 Green was overruled on other grounds in People v. Martinez (1999) 20 Cal.4th 225, and People v. Hall (1986) 41 Cal.3d 826, 834, fn. 3.
 
 
 [50]
 Evidence Cindy E. was abused by her father did not fall within the ambit of Evidence Code section 782, since she was not the "complaining witness" with respect to any sex crimes charged against Harrison. (See id., subd. (b).) Nevertheless, the exclusion of such evidence was not error. (See People v. Adames (1997) 54 Cal.App.4th 198, 208-209.)
 
 
 [51]
 Evidence Code section 1035.2 defines who qualifies as a sexual assault victim counselor for purposes of the privilege. Evidence Code section 1035.8 defines the privilege: "A victim of a sexual assault, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between the victim and a sexual assault victim counselor if the privilege is claimed by: [] (a) The holder of the privilege; [] (b) A person who is authorized to claim the privilege by the holder of the privilege; or [] (c) The person who was the sexual assault victim counselor at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure."
 
 
 [52]
 Evidence Code section 1035.4 states, in pertinent part: "The court may compel disclosure of information received by the sexual assault counselor which constitutes relevant evidence of the facts and circumstances involving an alleged sexual assault about which the victim is complaining and which is the subject of a criminal proceeding if the court determines that the probative value outweighs the effect on the victim, the treatment relationship, and the treatment services if disclosure is compelled."
 
 
 [53]
 Harrison includes section 1123 as part of the general legal framework. However, section 1123 was repealed in 1988. (See Stats. 1988, ch. 1245, 42, p. 4155.) Its provisions are now contained in section 233 of the Code of Civil Procedure and are substantially the same, insofar as we are concerned, as the provisions of section 1089.
 
 
 [54]
 During voir dire, Juror Number Five related that she was a registered nurse who held two jobs. She worked full-time at Kaiser in the Urgent Care department, and also worked per diem in the burn unit at Valley Medical Center. She explained that she was there previously 12 years before she moved to Kaiser 4 years ago. Absolutely nothing in the record suggests Juror Number Five intentionally concealed relevant facts or gave false answers during voir dire. (See People v. Blackwell (1987) 191 Cal.App.3d 925, 929-930.)
 
 
 [55]
 As a defendant may not bring a patently frivolous lawsuit against his or her attorney in order to mandate the appointment of new counsel (see People v. Horton, supra, 11 Cal.4th at p. 1106; Smith v. Lockhart, supra, 923 F.2d at p. 1321, fn. 11), it stands to reason a defendant similarly may not concoct cause to discharge a juror.
 
 
 [56]
 CALJIC No. 1.04 provides: "The fact that physical restraints have been placed on defendant [___] must not be considered by you for any purpose. They are not evidence of guilt, and must not be considered by you as any evidence that [he] [she] is more likely to be guilty than not guilty. You must not speculate as to why restraints have been used. In determining the issues in this case, disregard this matter entirely."
 
 
 [57]
 Harrison says there is a difference between being "in custody" and being shackled. Technically, this may be so; however, we do not believe so fine a point is properly drawn under the circumstances of this case. (See People v. Sheldon (1989) 48 Cal.3d 935, 946 [trial court's admonition regarding defendant being "in custody" sufficient where one prospective juror mentioned seeing defendant's shackles].)
 
 
 [58]
 Harrison was already seated on the witness stand when the jury entered the courtroom. There is no evidence the shackles were visible during his testimony. (Contrast People v. Givan (1992) 4 Cal.App.4th 1107, 1117.)